UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO.: 25-81544-CIV-JUDGE CANNON

JUNEL POCHETTE, as Personal
Representative of the Estate of MARCIA MAY
POCHETTE, and DEVIN WOODS,
as Personal Representative of the Estate of
JENICE MONIQUE WOODS,

    Plaintiffs,

       v.

CITY OF WEST PALM BEACH, a Florida
municipal corporation, AUSTIN DANIELOVICH,
individually, PIERRE ETIENNE, individually,
CHRISTOPHER REKDAHL, individually,
MICHAEL BORGEN, individually, WILLIAM
LOAYZA, individually, BRANDAN STEDFELT,
individually, and DARIAN THOMAS, individually,

    Defendants.

_____/

**PLAINTIFFS' THIRD[1] AMENDED COMPLAINT FOR DAMAGES
AND DEMAND FOR JURY TRIAL**

COME NOW the Plaintiffs, JUNEL POCHETTE, as Personal Representative of the Estate of

MARCIA MAY POCHETTE, and DEVIN WOODS, as Personal Representative of the Estate of

JENICE MONIQUE WOODS, and on behalf of each respective Estate and each respective

---

[1] Plaintiffs' Amended Complaint (ECF No. 3) only added the handwritten date to the final page. No substantive changes were made in the Amended Complaint. Such Amended Complaint was filed just hours after the initial Complaint (ECF No. 1) was filed on 12/10/2025.

1

Survivor, by and through their undersigned counsel, and hereby sue the CITY OF WEST PALM BEACH, a Florida municipal corporation, AUSTIN DANIELOVICH, individually, PIERRE ETIENNE, individually, CHRISTOPHER REKDAHL, individually, MICHAEL BORGEN, individually, WILLIAM LOAYZA, individually, BRANDAN STEDFELT, individually, DARIAN THOMAS, individually, and allege the following:

## JURISDICTIONAL ALLEGATIONS

1. This is an action exceeding the jurisdictional threshold of $75,000.00 (seventy-five thousand dollars) and which seeks damages in excess of $10,000,000.00 (ten million dollars), for each respective Estate and each respective survivor, for claims under both Florida law and federal law. Plaintiffs' state claims are presented pursuant to Florida Statutes §768.16 – §768.26 ("Florida Wrongful Death Act") and §768.28, as well as other applicable Florida law.

2. Plaintiffs also assert federal claims and damages pursuant to 42 U.S.C. §§ 1983, 1988 and the United States Constitution and its Amendments.

3. Plaintiffs hereby invoke supplemental jurisdiction of the United States District Court to adjudicate supplemental state tort claims arising under Florida law pursuant to 28 U.S.C. §1367 and further invoke the jurisdiction of the United States District Court pursuant to 28 U.S.C. §§1331 and 1343.

## CONDITIONS PRECEDENT

4. All conditions precedent to the prosecution of this action have occurred and/or have been performed, excused or waived.

5. As a condition precedent to filing the present action, the Plaintiffs and/or the Personal Representatives of the respective Estates for the decedents, MARCIA MAY POCHETTE

and JENICE MONIQUE WOODS, forwarded written notice pursuant to §768.28, Florida Statutes, to the CITY OF WEST PALM BEACH and the Florida Department of Financial Services.

## PARTIES

6.     The Plaintiffs in this matter, JUNEL POCHETTE and DEVIN WOODS, are the surviving spouses/husbands of the decedents, Marcia May Pochette and Jenice Monique Woods, and are the personal representatives for the Estate of Marcia May Pochette [as named or Marcia] and the Estate of Jenice Monique Woods [as named or Jenice], deceased individuals, whose wrongful deaths on July 30, 2024, form the basis of this lawsuit. JUNEL POCHETTE is the appointed personal representative for the Estate of Marcia May Pochette, deceased, and is the surviving spouse/husband of Marcia May Pochette. DEVIN WOODS is the appointed personal representative for the Estate of Jenice Monique Woods, deceased, and is the surviving spouse/husband of Jenice Monique Woods. All claims in this action, including all claims under the Florida Wrongful Death Act and all federal claims under 42 U.S.C. § 1983, are brought by JUNEL POCHETTE and DEVIN WOODS in their capacities as personal representatives of the respective Estates, for the benefit of each Estate and each statutory survivor, pursuant to §768.20, Florida Statutes.

7.     The Defendant, CITY OF WEST PALM BEACH [City or City Defendant], is a municipal corporation located in Palm Beach County, Florida, and is responsible for the actions and inactions of its agents, employees, representatives, supervisors, managers, officers, public officials, including duly sworn law enforcement officers, law enforcement managers and law enforcement supervisors for and/or with the West Palm Beach Police Department.

8.     The Defendants, AUSTIN DANIELOVICH, PIERRE ETIENNE, CHRISTOPHER REKDAHL, MICHAEL BORGEN, WILLIAM LOAYZA, BRANDAN

STEDFELT, and DARIAN THOMAS ("OFFICER DEFENDANTS"), were at all material times hereto and on July 30, 2024 sworn law enforcement officers employed by and working for the Defendant, CITY OF WEST PALM BEACH, specifically with and for the West Palm Beach Police Department, and acting under color of state law and within the course and scope of their employment with the CITY OF WEST PALM BEACH.   These individual OFFICER DEFENDANTS are sued in their individual capacities.

9.      All actions, inactions and omissions material to this cause of action occurred within Palm Beach County, Florida. Further, the decedents, Marcia May Pochette and Jenice Monique Woods, and their respective surviving spouses, JUNEL POCHETTE and DEVIN WOODS, were residents of Palm Beach County when this fatal crash occurred on July 30, 2024 and the DEFENDANT OFFICERS were employed with and working for the CITY OF WEST PALM BEACH, specifically the West Palm Beach Police Department, when this fatal crash occurred.

### GENERAL ALLEGATIONS AND FACTS COMMON TO ALL COUNTS

10.      On July 30, 2024, at approximately 8:10 P.M., Marcia May Pochette, deceased, and Jenice Monique Woods, deceased, were traveling home together in a motor vehicle on North Congress Avenue at or near its intersection with Meadows Boulevard in Boynton Beach, Florida after picking up food.

11.      The decedent, Jenice Monique Woods, was the driver of the involved 2017 Toyota Corolla and the decedent, Marcia May Pochette, was a passenger in such motor vehicle.

12.      Marcia May Pochette was the natural mother of Jenice Monique Woods. In addition, Jenice Monique Woods was in her first trimester of pregnancy with no known medical complications.

13.      On July 30, 2024, seven (7) law enforcement officers employed by and working for

4

the CITY OF WEST PALM BEACH and the West Palm Beach Police Department: AUSTIN DANIELOVICH, PIERRE ETIENNE, CHRISTOPHER REKDAHL, MICHAEL BORGEN, WILLIAM LOAYZA, BRANDAN STEDFELT, and DARIAN THOMAS, were working and operating as law enforcement members of the West Palm Beach Police Department's specialized unit, including and/or called the Bike Team and the Gang and Habitual Offender Suppression Team (GHOST).[2]

14. At all times material hereto, the Defendant, Officer AUSTIN DANIELOVICH, was the driver of a black and white West Palm Beach Police Department patrol vehicle.

15. At all times material hereto, the Defendant, Officer PIERRE ETIENNE, was the driver of an unmarked West Palm Beach Police Department Dodge Durango SUV.

16. At all times material hereto, the Defendant, Officer CHRISTOPHER REKDAHL, was the driver of an unmarked West Palm Beach Police Department Dodge Ram pickup truck.

17. At all times material hereto, the Defendant, Officer MICHAEL BORGEN, was a passenger in the unmarked West Palm Beach Police Department Dodge Ram pickup truck being driven by CHRISTOPHER REKDAHL.

18. At all times material hereto, the Defendant, Officer WILLIAM LOAYZA, was a passenger in the unmarked West Palm Beach Police Department Dodge Durango SUV being driven by PIERRE ETIENNE.

19. At all times material hereto, the Defendant, Officer BRANDAN STEDFELT, was a passenger in the marked West Palm Beach Police Department patrol vehicle being driven by

---

[2] The Gang and Habitual Offender Suppression Team (GHOST) was a specialized plainclothes unit within the West Palm Beach Police Department's Special Investigations Division, tasked with proactive street level investigative functions including narcotics enforcement and the apprehension of wanted persons. Its officers operated in unmarked vehicles and communicated on separate radio channels that were not recorded or monitored by Dispatch.

5

AUSTIN DANIELOVICH.

20.     At all times material hereto, the Defendant, Officer DARIAN THOMAS, was a passenger in the unmarked West Palm Beach Police Department Dodge Ram pickup truck being driven by CHRISTOPHER REKDAHL.

21.     Unbeknownst to Marcia May Pochette and Jenice Monique Woods, these seven (7) West Palm Beach Police Department officers had initiated an unlawful and dangerous high-speed vehicular pursuit, colloquially known within the Department as a "ghost chase", of another citizen, Neoni Copeland, based solely on a non-criminal vehicular traffic infraction.

22.     A "ghost chase" is a police tactic involving high-speed pursuit conducted with or without activation of low-visibility emergency lights, sirens, or notification to dispatch, in an intentional effort to evade departmental scrutiny and circumvent prohibitions against non-emergency or covert pursuits.

23.     Despite prohibitions under West Palm Beach Police Department policy and nationally accepted police practices[3], the seven (7) officers engaged in the lengthy high-speed pursuit of Neoni Copeland for a minor traffic infraction through congested and highly populated public roadways and on Interstate 95 in Palm Beach County, reportedly reaching speeds exceeding

---

[3] The Office of the State Attorney 15th Judicial Circuit Probable Cause Affidavit states "At the West Palm Beach Police Department, like most law enforcement agencies across this country, specific guidelines are established for motor vehicle pursuits with mandates governing when an officer should initiate or terminate a pursuit. In West Palm Beach, the guidelines are detailed in policy III-25, entitled Vehicle Pursuits." The PC Affidavit further identified some pertinent excerpts from the policy as follows "The officer(s) must give continuous radio updates as the pursuit evolves. The pursuit must be monitored by a supervisor. All officers involved in the pursuit must ensure their BWC (body worn camera) are recording throughout the duration of the pursuit. The officer initiating the pursuit must submit a report prior to the end of his or her shift, to document the facts of the pursuit. All other officers involved in the pursuit are required to complete a supplemental report detailing their involvement."

6

80 mph, and at times approaching and over 118 mph, with diminished visibility and heavy vehicular traffic, as well as in the opposite lanes of travel.

24. In a statement to Boynton Beach Police captured on body worn camera, Neoni Copeland stated that the pursuing police vehicles repeatedly attempted to cut him off in front, and that the pickup truck was trying to hit him and cut him off as he traveled on Interstate 95.

25. As a direct and foreseeable consequence of the officers' pursuit and driving actions and inactions, Neoni Copeland lost control of his vehicle and collided with the vehicle occupied by the decedents, Marcia May Pochette and Jenice Monique Woods, at the intersection of North Congress Avenue and Meadows Boulevard in Boynton Beach, Palm Beach County, Florida, killing them both.

26. The Office of the State Attorney 15th Judicial Circuit Probable Cause Affidavit[4] relating to this fatal high-speed police pursuit crash states "At approximately 8:10 P.M. on July 30, 2024, a traffic crash occurred in the 4300 block of North Congress Avenue in the City of Boynton Beach, Palm Beach County, Florida. Neoni Copeland, age 23, was the driver and sole occupant of a 2022 Kia Stinger sedan. The Kia struck the passenger side of a 2017 Toyota Corolla being driven by Jenice Woods, age 27. The Toyota's passenger was Mrs. Woods' mother, Marcia Pochette, age 57. Both women were pronounced dead shortly after arriving at a hospital. The deaths were caused by massive blunt force injuries. Mrs. Woods was newly pregnant when she died."

27. The Probable Cause Affidavit from the Office of the State Attorney further states "A team of Boynton Beach (BB) police officers were at the crash scene within a few minutes. The

---

[4] The involved West Palm Beach Police Department Officers were charged with Leaving the Scene of a Crash Involving Death (two counts), a felony of the first degree, and/or Official Misconduct, a felony of the third degree.

two women were still trapped in the Toyota. The Kia was unoccupied. Witnesses said a young man ran from the crash scene, headed westbound. BB officers found Neoni Copeland about ten minutes later and arrested him. Copeland said he was driving the way he was, and fled from the crash scene out of fear, because he was being chased by the WPB police. Neoni Copeland said he was "100 percent" certain the pursuit was initiated by WPB police officers whom he initially saw on 45th Street in WPB. No WPB officers contacted the BB police. No WPB officers remained at the crash scene where two people died."

28. The Probable Cause Affidavit further indicates "BB police investigators began checking nearby video sources, including one from a nearby Presidente Supermarket. That video, and others from nearby businesses, confirmed Copeland had been, at the time of the crash, fleeing a close pursuit by unknown members of the WPB Police Department. Three WPB police vehicles were involved in the pursuit. One WPB vehicle was a marked black and white Ford SUV. The other two were unmarked police vehicles, a gray Dodge Durango SUV and a black Dodge Ram pickup truck."

29. In the *Synopsis* section of the Probable Cause Affidavit from the Office of the State Attorney 15th Judicial Circuit the following is stated:

"Synopsis:

Seven West Palm Beach police officers who were working the evening shift on Tuesday, July 30, 2024, elected to pursue Neoni Copeland after he failed to stop on Australian Avenue just south of 45th Street in WPB. **None of the officers used a radio, their work cellular devices, or their personal cellular devices to notify a dispatcher and/or a supervisor of the pursuit; this is in clear violation of department policy.** The seven officers left their jurisdiction as Copeland drove south out of the city limits of WPB. **The AVL data shows the speed of the marked Ford police vehicle went as high as 119 mph.**

The records indicate the two Dodges were traveling in close proximity of the marked Ford and the Kia driven by Neoni Copeland throughout the pursuit.

8

The officers did not notify the Florida Highway Patrol of the Palm Beach County Sheriff's Office they were pursuing someone in their jurisdictions. As the pursuit continued into the city limits of Boynton Beach, the WPB officers did not notify the Boynton Beach Police. The crash occurred, forcing the victims' Toyota off the roadway, Neoni Copeland ran from the Kia into a residential neighborhood. Despite the effort to stop Copeland after a high-speed pursuit lasting ten minutes and travelling 12 – 13 miles from its onset, none of the WPB officers made a post-crash effort to capture him. The seven WPB officers ended their pursuit and went back to their jurisdiction. **The officers left the scene of a vehicle crash in which they were integrally involved, failing to attempt to render aid or notify emergency medical personnel.** The two wrecked vehicles and a considerable amount of crash debris were just a few feet away.

Video footage obtained during this investigation revealed that Etienne, driving the Dodge Durango SUV, was southbound on Congress Avenue at 8:11:24. Twenty-two seconds later, at 8:11:46, the Dodge Durango SUV was northbound on Congress Avenue after making a U-turn. The same video footage shows the marked Ford Explorer driven by Danielovich was southbound on Congress Avenue at 8:11:30 P.M.[5] Twenty-three seconds later, at 8:11:53, the marked Ford Explorer was northbound on Congress Avenue after making a U-turn. Officer Rekdahl, driving the Ram truck, with Officers Borgen and Thomas as passengers, drove past the crash scene." (Emphasis added.)

30. The violent force of the impact from Neoni Copeland's vehicle severely and fatally injured both Marcia May Pochette and Jenice Monique Woods. Despite witnessing the catastrophic crash involving Marcia's and Jenice's vehicle, and resulting injuries, none of the pursuing DEFENDANT OFFICERS stopped to render aid to Marcia May Pochette and Jenice Monique Woods. In addition, despite the high-speed GHOST chase pursuit through multiple cities/municipalities in Palm Beach County and for many miles, there was also no effort to seize or arrest Neoni Copeland. He fled the scene on foot following the crash and evaded initial apprehension.

---

[5] The Synopsis section of the PC Affidavit also states "Officers Danielovich and Stedfelt stopped a motorist for a traffic violation on I-95 near Palm Beach Lakes Boulevard at 8:20 P.M., only ten minutes after the crash occurred. The 8:20 traffic stop was properly logged by the officers in the police computer-aided dispatch system, thus adhering to department policy. Officer Stedfelt activated his body camera during the 8:20 traffic stop. Lieutenant Dunleavy saw some of the involved officers that evening, post-crash but prior to being notified of it. The officers were going about their normal duty chores. None of them wrote a police report about the vehicle pursuit."

31. Despite the seven (7) DEFENDANT OFFICERS being fully aware of the violent crash and the grave injuries they had caused, they failed to provide and summon medical assistance and also fled the crash scene without reporting it. Their body-worn cameras remained purposely inactive, and they also failed to notify dispatch and/or a supervisor, in violation of departmental policy and officer training requirements.

32. As a result of the DEFENDANT OFFICERS' refusal to render aid and/or summon emergency medical assistance, Marcia May Pochette and Jenice Monique Woods were left at the crash scene without receiving emergency medical aid and/or treatment, relying instead on calls to 911 made by unrelated civilian witnesses.

33. The delay in medical response caused by the DEFENDANT OFFICERS' departure from the crash scene without rendering aid or summoning assistance exacerbated the consequence of injuries and resulted in excruciating and prolonged suffering by Marcia May Pochette and Jenice Monique Woods. Tragically, both women died from their injuries. Jenice's unborn child was also harmed by the collision which resulted in the traumatic termination of the pregnancy.

34. In further violation of departmental protocols and their sworn duties, none of the seven (7) DEFENDANT OFFICERS involved documented the pursuit, the crash, or their roles in the incident. There was no internal reporting, belated activation of body cameras, or completion of use-of-force or incident reports as required. The DEFENDANT OFFICERS implicitly and expressly agreed to cover up or conceal the pursuit and their actions which caused the motor vehicle collision with Marcia May Pochette and Jenice Monique Woods.

35. Eleven minutes after the crash, Defendants DANIELOVICH and STEDFELT conducted a traffic stop on Interstate 95 after reentering the City of West Palm Beach. For that stop they activated their body worn cameras, communicated with Dispatch by radio, and properly

documented the stop in the Department's computer aided dispatch system, having activated none of that equipment at any point during the pursuit. Other Officer Defendants similarly resumed proactive police activity after the crash, calling out those activities by radio and activating their body worn cameras.

36. At the time of the pursuit, both unmarked vehicles bore unregistered license tags that were not the tags assigned to those vehicles. The tag on the Dodge Ram was changed between the time of the crash and 12:56 a.m. on July 31, 2024, when Boynton Beach Police photographed the vehicle, and the unregistered tag was later found inside the Dodge Ram by a State Attorney's Office investigator.

37. On June 23, 2025, the Department concluded administrative investigation IA 24-005 concerning the July 30, 2024 pursuit. The investigation found, by a preponderance of the evidence, that Officer Defendants BORGEN, DANIELOVICH, ETIENNE, LOAYZA, REKDAHL, STEDFELT, and THOMAS violated the Department's Standard of Conduct, its rule requiring obedience to laws and directives, its rule requiring members to care for lost, helpless, injured, or ill persons, its Code of Conduct and Ethics, Policy III-18 governing supervisor notification, Policy III-20 governing body worn cameras, Policy III-25 governing vehicle pursuits, Policy III-31 governing traffic crash investigations, and Policy IV-21 governing radio procedures, and that Officer Defendants DANIELOVICH, ETIENNE, AND REKDAHL further violated Policy III-19, the Department's vehicle policy.

38. Pursuant to the West Palm Beach Police Department's written policies and training protocols, vehicle pursuits are expressly prohibited unless an officer has a reasonable belief that an occupant of the vehicle has committed a Forcible Felony as defined by the policy, or other narrow circumstances requiring supervisor approval are present. Even in such limited

11

circumstances, the policy requires officers to weigh the need for immediate apprehension against the risk created by the pursuit.

39.     Upon information and belief, however, a pattern of unauthorized pursuits has emerged within the West Palm Beach Police Department as officers have attempted to circumvent the department's vehicle pursuit policy. Public records disclose that between 2000 and 2024, the department has been involved in numerous at-fault vehicle collisions, some of which consist of serious injury and death, involving officer negligence and recklessness, including incidents in which officers ran red lights, entered intersections against the right of way, or drove in the wrong direction on public roadways during these operations.

40.     At the time of the subject motor vehicle crash of July 30, 2024, the Defendants, AUSTIN DANIELOVICH, PIERRE ETIENNE, CHRISTOPHER REKDAHL, MICHAEL BORGEN, WILLIAM LOAYZA, BRANDAN STEDFELT, and DARIAN THOMAS, had a duty to operate their motor vehicles in a safe and reasonable manner and also had a duty to follow and/or comply with all applicable West Palm Beach Police Department policies and procedures and other recognized law enforcement policies and procedures.

41.     The Defendants, AUSTIN DANIELOVICH, PIERRE ETIENNE, CHRISTOPHER REKDAHL, MICHAEL BORGEN, WILLIAM LOAYZA, BRANDAN STEDFELT, and DARIAN THOMAS, failed to follow and comply with West Palm Beach Police Department policies and procedures and other recognized law enforcement policies and procedures.

42.     The Defendants, AUSTIN DANIELOVICH, PIERRE ETIENNE, CHRISTOPHER REKDAHL, MICHAEL BORGEN, WILLIAM LOAYZA, BRANDAN STEDFELT, and DARIAN THOMAS, left the scene of the fatal crash and/or failed to render aid.

12

43.   The actions and inactions of the Defendants, AUSTIN DANIELOVICH, PIERRE ETIENNE, CHRISTOPHER REKDAHL, MICHAEL BORGEN, WILLIAM LOAYZA, BRANDAN STEDFELT, and DARIAN THOMAS, violated multiple provisions of West Palm Beach Police Department Policy III-25, Vehicle Pursuits (revised May 24, 2023), including Section III, which authorizes a pursuit only upon reasonable belief that an occupant of the vehicle has committed a Forcible Felony or, with the approval of a supervisor, where the violator poses an immediate threat to the safety of the public or other officers, and which does not authorize pursuit for motor vehicle offenses or traffic violations unless the violator's vehicle is being operated so as to pose an immediate threat to the safety of another person; Section IV, which requires an officer initiating a pursuit to immediately activate all emergency equipment and body worn camera and to make radio contact with the dispatcher and the field supervisor; Section X, which requires the initiating officer to submit a report documenting the circumstances of the pursuit before the end of his or her shift and requires all other involved officers to complete supplemental reports; and the Failure to Yield provisions, which require an officer to immediately discontinue following a vehicle that fails to yield and to document the failure to yield in the computer aided dispatch system. The Office of the State Attorney found that the officers' failure to notify a dispatcher and/or a supervisor of the pursuit was in clear violation of department policy.

44.   The actions and inactions of the Defendants, AUSTIN DANIELOVICH, PIERRE ETIENNE, CHRISTOPHER REKDAHL, MICHAEL BORGEN, WILLIAM LOAYZA, BRANDAN STEDFELT, and DARIAN THOMAS, resulted in the subject motor vehicle crash and the wrongful deaths of Marcia May Pochette and Jenice Monique Woods.

13

45. The decedent, Marcia May Pochette, was wrongfully killed by the acts of the Defendants, AUSTIN DANIELOVICH, PIERRE ETIENNE, CHRISTOPHER REKDAHL, MICHAEL BORGEN, WILLIAM LOAYZA, BRANDAN STEDFELT, and DARIAN THOMAS.

46. The decedent, Jenice Monique Woods, was wrongfully killed by the acts of the Defendants, AUSTIN DANIELOVICH, PIERRE ETIENNE, CHRISTOPHER REKDAHL, MICHAEL BORGEN, WILLIAM LOAYZA, BRANDAN STEDFELT, and DARIAN THOMAS.

47. This is an action brought, in part, pursuant to the provisions of the Florida Wrongful Death Act, §768.16 et seq., Florida Statutes, for the wrongful death of the decedents, Marcia May Pochette and Jenice Monique Woods.

48. At all times material hereto, the decedent, Marcia May Pochette, was the spouse and/or wife of her surviving spouse and/or husband, JUNEL POCHETTE.

49. At all times material hereto, the decedent, Jenice Monique Woods, was the spouse and/or wife of her surviving spouse and/or husband, DEVIN WOODS.

50. Marcia May Pochette, decedent, suffered serious bodily injuries and was wrongfully killed on July 30, 2024 due to the actions and inactions of West Palm Beach Police Department Officers AUSTIN DANIELOVICH, PIERRE ETIENNE, CHRISTOPHER REKDAHL, MICHAEL BORGEN, WILLIAM LOAYZA, BRANDAN STEDFELT, and DARIAN THOMAS.

51. Jenice Monique Woods, decedent, suffered serious bodily injuries and was wrongfully killed on July 30, 2024 due to the actions and inactions of West Palm Beach Police Department Officers AUSTIN DANIELOVICH, PIERRE ETIENNE, CHRISTOPHER REKDAHL, MICHAEL BORGEN, WILLIAM LOAYZA, BRANDAN STEDFELT, and DARIAN THOMAS.

14

52. On the date of her wrongful death of July 30, 2024, the decedent, Marcia May Pochette, had the following statutory survivor:

    a. JUNEL POCHETTE, spouse, and/or husband.

53. On the date of her wrongful death of July 30, 2024, the decedent, Jenice Monique Woods, had the following statutory survivor:

    a. DEVIN WOODS, spouse, and/or husband.

54. As a direct, proximate and legal result of the wrongful death of Marcia May Pochette, her surviving spouse/husband, JUNEL POCHETTE, and the Estate of Marcia May Pochette, have been harmed and suffered damages as follows:

    a. JUNEL POCHETTE has been caused to suffer devastating mental pain, mental suffering, mental anguish, extreme grief and extreme sorrow over the death of his wife, Marcia May Pochette, under such egregious circumstances, and he will continue to suffer such devastating damages for the remainder of his life.

    b. JUNEL POCHETTE and/or the Estate of Marcia May Pochette has/have lost support and services from the date of Marcia May Pochette's wrongful death and will continue to lose support and services for the remainder of JUNEL POCHETTE's life.

    c. JUNEL POCHETTE and/or the Estate of Marcia May Pochette has/have suffered medical, funeral, burial, travel, transportation and other expenses resulting from the wrongful death of Marcia May Pochette.

    d. JUNEL POCHETTE and/or the Estate of Marcia May Pochette have suffered and sustained lost wages and loss of prospective net accumulations due to the wrongful death of Marcia May Pochette.

    e. JUNEL POCHETTE has and will continue to suffer for the remainder of his life the loss of Marcia May Pochette's companionship, love, consortium, guidance and protection.

    f. All damages provided and/or permitted by Florida's Wrongful Death Act.

55.     As a direct, proximate and legal result of the wrongful death of Jenice Monique Woods, her surviving spouse/husband, DEVIN WOODS, and the Estate of Jenice Monique Woods, have been harmed and suffered damages as follows:

a.     DEVIN WOODS has been caused to suffer devastating mental pain, mental suffering, mental anguish, extreme grief and extreme sorrow over the death of his wife, Jenice Monique Woods, under such egregious circumstances, and he will continue to suffer such devastating damages for the remainder of his life.

b.     DEVIN WOODS and/or the Estate of Jenice Monique Woods has/have lost support and services from the date of Jenice Monique Wood's wrongful death and will continue to lose support and services for the remainder of DEVIN WOODS's life.

c.     DEVIN WOODS and/or the Estate of Jenice Monique Woods has/have suffered medical, funeral, burial, travel, transportation and other expenses resulting from the wrongful death of Jenice Monique Woods.

d.     DEVIN WOODS and/or the Estate of Jenice Monique Woods have suffered and sustained lost wages and loss of prospective net accumulations due to the wrongful death of Jenice Monique Woods.

e.     DEVIN WOODS has and will continue to suffer for the remainder of his life the loss of Jenice Monique Woods's companionship, love, consortium, guidance and protection.

f.     All damages provided and/or permitted by Florida's Wrongful Death Act.

**HISTORICAL/PRIOR INCIDENTS**

56.     On June 29, 2002, officers of the West Palm Beach Police Department engaged in a police pursuit, in an unmarked vehicle. This incident took place during a narcotics operation. In this incident, a pursuit was initiated resulting in the target vehicle slamming into a concrete utility pole at an estimated 100 plus mph, causing a catastrophic crash. The driver lost a leg; another occupant lost parts of both legs and the driver's girlfriend was killed in the resulting fire. This incident drew internal affairs scrutiny and public attention; at least one officer resigned shortly after this incident.

16

57.     On May 21, 2012, the decedent was riding a motorcycle when a city police officer of the West Palm Beach Police Department observed him commit a minor traffic infraction (changing lanes without signaling) from an unmarked police vehicle. Without activating lights or siren, the officer initiated a high-speed pursuit. During the chase, the officer caused his vehicle to collide with or otherwise force the decedent's motorcycle off the road, leading the motorcycle to crash into a tree causing death from his injuries.[6]

58.     On May 4, 2019, West Palm Beach Police officers initiated a vehicle pursuit after two juvenile suspects stole a car at knifepoint. Officers located the stolen Hyundai and attempted a stop, but the driver fled at high speed, leading multiple WPBPD units on a dangerous chase through city streets. During the pursuit, the fleeing vehicle disregarded traffic controls and ultimately caused a violent three-car collision, seriously damaging multiple vehicles and resulting in injuries to the juvenile occupants. The pursuit originated from an unarmed property crime involving juveniles and nonetheless escalated into a high-risk chase that endangered innocent motorists.

59.     On July 20, 2019, West Palm Beach Police Quick Response Team (QRT) or Criminal Apprehension Team (CAT)[7] police officers initiated a traffic stop that immediately escalated into a dangerous, high-speed pursuit. Rather than comply, the driver accelerated and struck a vehicle, then fled at extreme speeds, swerving unpredictably across multiple lanes of travel. Officers pursued southbound onto Interstate 95, where the driver continued driving recklessly and, at one point, exceeded speeds of over 100 miles per hour, forcing other motorists to take evasive action. The pursuit continued until the driver exited at Southern Boulevard, where

---

[6] *Spencer v. City of West Palm Beach*, No. 15-CV-80019 (S.D. Fla.)
[7] West Palm Beach Police unmarked or low-profile police unit were formally the Quick Response Team (QRT) or Criminal Apprehension Team (CAT).

the fleeing vehicle collided with a police unit, spun out, and became disabled, prompting the driver and his passenger to flee on foot before they were ultimately apprehended.

60.     On August 27, 2020, West Palm Beach police officers engaged in a high-speed pursuit of a stolen SUV which collided with an unmarked police vehicle during the attempted stop. The chase involved numerous police units, including both marked and unmarked vehicles, and continued at high speeds through the intersection of Palm Beach Lakes Boulevard and Forum Way near the Palm Beach Outlets in West Palm Beach, Florida.

61.     On July 30, 2021, a high speed pursuit involving GHOST unit detectives ended in a crash that killed four people. Three GHOST unit detectives, including Defendant PIERRE ETIENNE, each operating unmarked vehicles, attempted a traffic stop of a stolen vehicle driven by a seventeen-year-old whose identity, address, and personal information were known to the officers, and whose offense, the nonforcible theft of an unoccupied vehicle, was neither a forcible felony nor an immediate threat to public safety. When the juvenile failed to yield, the detectives commenced a high speed chase in direct contravention of the Department's written vehicular pursuit policy. The fleeing vehicle ultimately ran a red light at the intersection of Beeline Highway and PGA Boulevard, colliding with a vehicle occupied by Elizabeth Anderson and George Nienhouse. The crash killed both occupants of the Anderson vehicle, along with two teenage passengers in the fleeing vehicle.

62.     As a result of the July 30, 2021 chase, two wrongful death actions were brought against the City alleging that the detectives initiated and participated in the pursuit in violation of the Department's written pursuit policy. The City resolved those claims through a monetary settlement approved by the City Council of the City of West Palm Beach. The litigation and its settlement placed the City on notice, at the highest policymaking level, of the dangers of GHOST

unit pursuits conducted in unmarked vehicles in violation of the Department's pursuit policy, and of the risk that its officers' accounts of pursuit termination would be contradicted by their own body worn camera footage. Notwithstanding that notice, the City retained Defendant ETIENNE in the GHOST unit, where he remained assigned on July 30, 2024, when he and other GHOST unit officers conducted the unauthorized covert pursuit that killed Marcia May Pochette and Jenice Monique Woods. Upon information and belief, and based on the Department's personnel and disciplinary records, no discipline was imposed on Defendant ETIENNE related to the July 30, 2021 fatal crash.

63.    On January 5, 2023, West Palm Beach police detectives operating unmarked vehicles initiated a high-speed pursuit of a Ford Crown Victoria after the driver refused commands to stop and accelerated into officers. The driver immediately fled northbound through residential neighborhoods and commercial zones at unsafe speeds, including traveling the wrong way and forcing officers and uninvolved motorists to take evasive action to avoid serious injury. Throughout the chase, officers continued pursuit in darkened, unmarked units with emergency lights activated, despite clear and escalating risks to the public. The fleeing vehicle ultimately collided with a fire hydrant, caught fire, and crashed into a fence near the railroad tracks, ejecting the driver and injuring a West Palm Beach officer along with multiple civilians before additional officers arrived to apprehend the occupants.

19

**Timeline of High-Risk Vehicle Pursuits by the West Palm Beach Police Department**

| Date | WPBPD Units Involved | Nature of Pursuit | Resulting Harm / Consequences |
|---|---|---|---|
| June 29, 2002 | Unmarked narcotics units | High-speed pursuit during undercover narcotics operation; officers engaged despite known risk | Vehicle crashed into concrete utility pole at **100+ mph**; driver **lost a leg**; passenger suffered catastrophic **limb loss**; girlfriend **killed in resulting fire**; internal affairs scrutiny; at least one officer resigned |
| May 21, 2012 | Unmarked patrol vehicle | Minor traffic infraction escalated into concealed, high-speed pursuit without emergency signals | Officer's intentional contact forced decedent's motorcycle into a tree, causing his **death from crash** injuries |
| May 4, 2019 | Multiple WPBPD units | Juvenile carjacking-related pursuit escalated into high speeds through city streets | **Three-car crash**; suspects injured; innocent motorists placed at significant risk despite lack of armed-threat justification |
| July 20, 2019 | QRT / CAT tactical units (unmarked) | Traffic stop escalated into prolonged **100+ mph** interstate pursuit | **Collision with police vehicle**; vehicle disabled after spinning out; passengers fled on foot; extreme risk posed to public on I-95 |
| August 27, 2020 | Both marked and unmarked units | Stolen vehicle pursuit: suspect struck an unmarked police unit during attempted stop | High-speed pursuit through densely traveled commercial corridor near Palm Beach Outlets; suspects fled on foot |
| July 30, 2021 | **GHOST unit** | Stolen vehicle pursuit by three GHOST unit officers; identity of driver known. | High-speed pursuit along the B-line, ended with suspect crashing into a vehicle and killing 4 individuals. |

20

| Date | WPBPD Units Involved | Nature of Pursuit | Resulting Harm / Consequences |
|---|---|---|---|
| January 5, 2023 | unmarked units | Driver struck officers and fled at high speeds through neighborhoods and commercial areas | Vehicle ignited and **crashed into fence/railroad property**; driver ejected; WPBPD officer injured; multiple civilians endangered |
| July 30, 2024 | GHOST unit | Driver was being pursued for illegal window tint on his vehicle; pursuit involved five police vehicles mostly unmarked, lasted for 10+ minutes, reaching speeds of 118 mph and traveling against traffic at times, outside of jurisdiction. | Pursued vehicle crashed into a civilian vehicle, killing a mother and her pregnant daughter. |

## NOTICE AND DELIBERATE INDIFFERENCE

64. The police conduct that ultimately caused the deaths of Marcia May Pochette and Jenice Monique Woods did not arise from the conduct of a single unit operating in isolation. It was the product of a longstanding, department wide custom under which the West Palm Beach Police Department tolerated unauthorized and dangerous high speed vehicular pursuits, failed to enforce its own vehicular pursuit policy, and failed to supervise or discipline the officers who violated that policy.

65. For more than two decades preceding the subject incident, officers of the West Palm Beach Police Department engaged in a recurring practice of initiating high risk vehicular pursuits, including pursuits conducted in unmarked vehicles and pursuits undertaken for minor or nonviolent offenses, that resulted in crashes, serious injuries, and deaths.

66. The prior incidents set forth in the Historical and Prior Incidents section above span the period from 2002 through 2023, reflect this recurring practice, and many preceded the creation

21

of the GHOST unit in late 2019. These incidents demonstrate that the custom of unauthorized and dangerous pursuit activity was department wide and in place even before the GHOST unit.

67. The Department's written vehicular pursuit policy, Policy III-25, established department wide review mechanisms designed to detect and correct improper pursuit conduct, including the preparation of annual pursuit summaries and the review of pursuits by the Department's Pursuit Review Board. These pursuit related review mechanisms were part of a broader system of supervision, accountability, and discipline that, as further set forth below, broke down throughout the Department and its supervisory ranks.

68. In the spring of 2019, the Mayor of the City of West Palm Beach appointed Frank Adderley as Chief of Police of the West Palm Beach Police Department, and at all times during his tenure Chief Adderley served as the final policymaker for the Department with respect to law enforcement operations, policy, training, supervision, and discipline.

69. Chief Adderley assumed command after a law enforcement career spanning nearly four decades in Broward County, during which he had led and expanded plainclothes street crime units, including the Fort Lauderdale Police Department unit informally known as the Northwest Raiders.

70. Near the end of 2019, shortly after taking office, Chief Adderley created the Gang and Habitual Offender Suppression Team, known as GHOST, a plainclothes proactive policing unit that operated in unmarked vehicles and focused on drug, firearm, and quality of life enforcement in the north end of the City.

71. The GHOST unit was an acute expression of the longstanding Department practices described herein. Its combination of unmarked vehicles, a separate and unmonitored radio channel, deactivated body worn cameras, and the absence of any proactive supervisory review produced an

22

operation in which the Department's custom of unauthorized pursuit and lack of oversight operated without constraint. The conduct of the Officer Defendants on July 30, 2024 was the foreseeable result of these department wide customs.

72.     A written statement of GHOST detective responsibilities and expectations, expressly advised that GHOST detectives "are afforded the opportunity to work with limited supervision."

73.     In response to public records requests, the City disclosed that it maintained no written objectives, no training manuals, and no unit specific policies governing GHOST. The unit consisted of approximately 10-12 officers divided into two teams, each supervised by a sergeant, with a lieutenant and a captain assigned to oversee the unit as a whole.

74.     Chief Adderley remained the Department's Chief of Police and final policymaker on July 30, 2024, the date of the pursuit and crash that killed Marcia May Pochette and Jenice Monique Woods. Following the subject unauthorized chase and fatal crash, Chief Adderley dissolved the GHOST unit.

75.     In October 2024, the Mayor of the City of West Palm Beach terminated Chief Adderley for the stated reason of alleged financial mismanagement relating to the Department's overtime and off duty compensation practices. The City then appointed Tony Araujo as Interim Chief of Police in October 2024 and named him permanent Chief of Police in February 2025.

76.     During the tenure of Chief Adderley as chief and final policymaker for the West Palm Beach Police Department, the City conducted a 2021 Special Investigations Audit, which examined the operations of the Special Investigations Division, including the GHOST unit.

77. The 2021 Special Investigations Audit found that there was no clear policy in place requiring higher ranking officers or supervisors to periodically review the body worn camera footage of GHOST unit officers to ensure consistent compliance with law and Department policy.

78. The audit characterized the Department's existing practice as reactive, under which body worn camera footage was reviewed only after an allegation of misconduct, the filing of a complaint, or a similar triggering event, and advised that proactive, periodic random review would serve as a deterrent against misconduct because officers would know that a superior might review the recordings.

79. The 2021 Special Investigations Audit expressly warned that the absence of such supervisory review created a risk that officers would deactivate their body worn cameras in order to engage in improper conduct in violation of the Fourth Amendment and Department policy. The deficiency identified was not limited to any category of police conduct. The audit found that no clear policy required higher ranking officers or supervisors to periodically review body worn camera footage to ensure consistent compliance with laws and policies, and it explained that proactive review was necessary to deter misconduct of any kind because officers would know a superior might review the recordings.

80. The audit specifically recommended that the Department develop and implement a policy requiring supervisors to review and document body worn camera footage, beginning with periodic, random reviews. Such proactive review was the only supervisory mechanism capable of detecting officer conduct that the officers themselves did not report.

81. The City expressly declined to adopt the recommendation. In its management response, the City stated in substance that no change was necessary, asserting that a body worn camera policy was already in place, making any expanded review contingent on the allocation of

24

additional resources, and relying on its existing complaint process and the State Attorney's review of footage in cases resulting in arrest.

82.     The auditors rejected the adequacy of that response, noting that the Department's existing policy did not clearly address or require the review of body worn camera footage by a higher ranking officer.

83.     Proactive supervisory review deters and detects camera deactivation itself, because an officer subject to random review knows that the absence of a required recording is visible to his supervisors and is itself a policy violation. By expressly declining to implement the recommended review, the City ensured that an officer who deactivated his camera and filed no report would never come to supervisory attention, and thereby enabled and empowered its officers to violate Department policy and the constitutional rights of citizens without detection, deterrence, or consequence. The City's refusal to correct this identified deficiency, after written notice of the specific risk it created, constituted a deliberate choice not to act and reflected deliberate indifference to the known risk that its officers would conceal misconduct by deactivating their body worn cameras.

84.     Through the 2021 Special Investigations Audit, the City had actual notice, during Chief Adderley's tenure as final policymaker, that its officers, including those assigned to the GHOST unit, operated without any proactive supervisory review of their body worn camera footage, and that this absence of oversight created a risk that officers would deactivate their cameras to conceal improper conduct.

85.     On March 29, 2022, the City's Chief Internal Auditor issued a Police Internal Affairs Audit, AUD20 05, examining the Department's internal accountability processes for the

period January 2018 through October 2020. The audit was transmitted to the Mayor, the City Administrator, and Chief Adderley.

86. The Police Internal Affairs Audit documented systemic failures in the Department's mechanisms for investigating and disciplining officer misconduct. The audit found that 57 percent of citizen complaints exceeded the Department's 60-day internal requirement for closure and that 22 percent of cases exceeded the 180-day statutory requirement for imposing discipline on an officer, delays that can operate to foreclose discipline altogether. The audit further identified 122 instances of noncompliance with policy requirements governing investigations, found deficiencies in 13 of the 15 investigations selected for in depth quality review, including an investigation conducted by the subject officer himself, and found that although the Department's own database contained 348 use of force incidents during the audit period, the Internal Affairs Unit identified only 14 when asked, with the remaining incidents never entered or captured for comprehensive reporting or monitoring.

87. Through the Police Internal Affairs Audit, the City had actual notice that the internal accountability mechanisms on which it relied to detect, investigate, and discipline officer misconduct were systemically deficient. Those were the same reactive mechanisms, the complaint process and after the fact investigation, that the City invoked when it declined the 2021 Special Investigations Audit recommendation to institute proactive supervisory review of body worn camera footage. The City thus declined proactive oversight of its officers in reliance on reactive accountability systems that its own auditor found, upon review of the period from January 2018 through October 2020, to be systemically deficient.

88. Years prior to the subject fatal crash, the City made an express and deliberate decision to leave an identified oversight deficiency uncorrected, giving its officers the ability and

opportunity to use their power and official positions to engage in conduct that was dangerous and violative of citizens' constitutional rights.

89.     The City also had actual knowledge, through its own personnel and disciplinary records, that specific officers it assigned to or retained within policing operations, and even assigned to the GHOST unit, had documented histories of dangerous driving, pursuit related misconduct, and body worn camera and accountability violations. Despite this knowledge, the City advanced or retained these officers without imposing corrective supervision, training, or discipline sufficient to prevent the conduct that caused the deaths of the decedents.

90.     The OFFICER DEFENDANTS' own internal affairs histories reflect these deficiencies. The Department's Concise Internal Affairs Histories record vehicular pursuits by Officer Defendants ETIENNE, DANIELOVICH, BORGEN, AND LOAYZA, spanning 2017 through June 2024, for which the histories record no allegations, findings, discipline, or disposition of any kind, although the same records document dispositions of pursuit reviews when dispositions were made. Where the Department did sustain pursuit related violations against officers it later assigned to or retained within the GHOST unit, the discipline imposed was minimal, as set forth below.

91.     Upon information and belief, and based on the Department's personnel and disciplinary records, Officer Defendant Pierre ETIENNE had a documented history of dangerous pursuit conduct known to the City. On July 30, 2021, Defendant ETIENNE was one of three GHOST unit detectives who engaged in the high speed pursuit of a stolen vehicle driven by a known juvenile that ended in a crash killing four people, as set forth above, an incident that resulted in wrongful death litigation against the City that the City resolved through a settlement approved by the City Council. The City retained Defendant ETIENNE in the GHOST unit following that

27

incident. Defendant ETIENNE's 2018 discipline consisted of a substantiated internal affairs finding of unauthorized pursuit in violation of Policy III-25 arising from a May 30, 2018 pursuit during which he and other officers drove against the flow of traffic on Interstate 95, for which he received a written reprimand and remedial training. That remedial training consisted of instruction on the legal limits of vehicle pursuits conducted by a City Attorney on October 22, 2018. Defendant ETIENNE also had a sustained violation of Policy III-20, the Department's body worn camera policy, in June 2020, for which Chief Adderley personally ordered discipline, and an internal affairs history documenting five vehicle pursuits and five vehicle accidents between 2017 and 2023. Before his hire by the West Palm Beach Police Department, ETIENNE had resigned from the Palm Beach Gardens Police Department in 2015 to avoid termination after he was found unlikely to complete field training, with training records reflecting concerns regarding officer safety and his ability to perform under pressure. The City hired ETIENNE notwithstanding these records and ultimately assigned him to the GHOST unit.

92.     Upon information and belief, and based on the Department's personnel and disciplinary records, Officer Defendant, CHRISTOPHER REKDAHL, had a documented history of unsafe driving known to the City. Defendant REKDAHL had received written reprimands for at fault, on duty crashes, two suspensions in connection with crashes, including a suspension ordered personally by Chief Adderley in January 2020 and a suspension in connection with a crash identified in his disciplinary notice as his third preventable crash within a single year, and a sustained violation of Policy III-25, the Department's vehicular pursuit policy, arising from a November 10, 2023 pursuit and sustained on June 9, 2024, approximately seven weeks before the subject pursuit, after which the City retained him in the GHOST unit. The City retained REKDAHL and assigned him to the GHOST unit notwithstanding this record.

28

93. Upon information and belief, and based on the Department's personnel and disciplinary records, Officer Defendant Austin DANIELOVICH had a documented history of body worn camera and accountability violations known to the City. Defendant DANIELOVICH was involved in a vehicle pursuit under Department case number 20220001710 before the fatal pursuit. In 2023, DANIELOVICH received a written reprimand for a body worn camera violation, and the disciplinary record reflected that he had activated his body worn camera late on multiple occasions in 2022 and 2023 and had exhibited a prior lack of tactical communication. Following that reprimand, the Department directed that each of DANIELOVICH's use of force events be reviewed by a lieutenant to confirm, among other things, that his body worn camera was activated in a timely manner. The City retained DANIELOVICH notwithstanding this record. The nature of DANIELOVICH's documented body worn camera violations was of the same character as the oversight deficiency identified in the 2021 Special Investigations Audit, namely the risk that officers would fail to activate or would deactivate their body worn cameras in the absence of proactive supervisory review.

94. Upon information and belief, and based on the Department's personnel and disciplinary records, Officer Defendant, DARIAN THOMAS, received a written reprimand in 2020 for an at fault crash in which he failed to yield the right of way. The City retained THOMAS and assigned him to the GHOST unit notwithstanding this record.

95. Upon information and belief, and based on the Department's personnel and disciplinary records, before hiring Officer Defendant, WILLIAM LOAYZA, the City's background investigator documented that LOAYZA had an unusually high number of traffic citations and prior interactions with law enforcement. Defendant LOAYZA's internal affairs history documented his involvement in a vehicle pursuit on June 11, 2024, approximately seven

29

weeks before the subject pursuit. The City hired LOAYZA and later assigned him to the GHOST unit notwithstanding these records.

96.     Through its own personnel and disciplinary records, the City had actual knowledge before July 30, 2024, that officers it assigned to or retained within the GHOST unit had documented histories of dangerous driving, pursuit related misconduct, and body worn camera violations. The City nevertheless failed to impose heightened supervision, corrective training, or meaningful discipline upon these officers, and instead retained them and even assigned them to a plainclothes unit that conducted high speed pursuits in unmarked vehicles without proactive supervisory review. The City's decision to advance and retain these officers despite its knowledge of their documented histories reflected deliberate indifference to the known risk that they would engage in the very conduct that caused the deaths of Marcia May Pochette and Jenice Monique Woods.

97.     On July 30, 2024, the Officer Defendants conducted the high speed pursuit that killed Marcia May Pochette and Jenice Monique Woods with their body worn cameras deactivated and without supervisory oversight, realizing the precise risk that the 2021 Special Investigations Audit had identified and that the City had declined to address.

98.     In April 2025, during the tenure of Chief Tony Araujo, the City commissioned and received an Organizational Assessment of the West Palm Beach Police Department, performed and documented by an independent agency, the Jorge Colina Group.

99.     The April 2025 Organizational Assessment confirmed that several deficiencies identified in a 2021 assessment conducted by Santos and Santos concerning the implementation of Stratified Policing as a crime reduction strategy, an assessment separate and distinct from the City's

2021 Special Investigations Audit, still existed, and found that the recommendations made in the 2021 assessment had not been implemented.

100.  The 2021 Santos and Santos assessment had been delivered to Chief Adderley and had identified a lack of accountability among the Department's patrol sergeants, lieutenants, and captains.

101.  The April 2025 Organizational Assessment described an ongoing overall lack of accountability that had permeated the highest level of the Department and extended throughout its supervisory ranks.

102.  The April 2025 assessment further found that first line and mid-level supervisors holding the ranks of sergeant and lieutenant received no formal training from the agency before or immediately following their promotions, and warned that operational failures, injuries, casualties, and substantial liability are the typical consequences when personnel performing critical roles are not properly trained.

103.  Although the April 2025 Organizational Assessment postdates the subject incident, it confirms that the supervisory and accountability deficiencies alleged herein were longstanding, were known to the City's final policymakers, had been previously documented and reported directly to those policymakers including Chief Adderley, and remained unremedied through the date of the subject fatal crash.

## ENDORSEMENT AND CONDONATION BY THE FINAL POLICYMAKER

104.  The City of West Palm Beach, acting through its final policymaker, endorsed and approved of the GHOST unit and the aggressive plainclothes proactive policing practices the unit

31

employed, and maintained a custom of condoning officer misconduct arising from those practices rather than correcting it.

105.    Frank Adderley, as Chief of Police and final policymaker for the West Palm Beach Police Department, publicly endorsed the GHOST unit and its methods with both audits described above already in hand. In a televised interview on February 1, 2023, Chief Adderley stated that the GHOST unit "serves a good purpose" and that the City's residents wanted "more of them, they don't want less." Chief Adderley made this public endorsement of the unit and its style of policing while serving as the official with final policymaking authority over the Department's operations, policies, and practices.

106.    At the policymaking level, the City also declined to impose meaningful supervision over the GHOST unit even after being expressly advised of the need for it. As alleged above, the 2021 Special Investigations Audit informed the City that no policy required periodic or random supervisory review of GHOST officers' body worn camera footage and warned that the absence of such review created a risk that officers would deactivate their cameras to conceal improper conduct, and the City responded, in substance, that no change was necessary. The City's endorsement of the unit, coupled with its rejection of supervisory oversight, reflected a deliberate choice by the policymaking authority to embrace the GHOST unit's practices while leaving those practices unsupervised.

107.    Approximately three weeks after the crash, and while he was on administrative leave in connection with the fatal pursuit, Officer Defendant Austin DANIELOVICH received a favorable annual performance evaluation. The evaluation made no mention of the July 30, 2024 crash or of the administrative leave. The reviewing supervisor wrote that DANIELOVICH's "passion for police work is recognized by his peers and serves as encouragement to keep others on

32

task even when morale is low," and that DANIELOVICH "has established himself as someone worthy of respect in the community not only for his fair and honest treatment but his ability to communicate and make people smile." The Department issued this favorable evaluation to an officer with a documented history of sustained body worn camera violations whose involvement in a fatal pursuit was then under investigation.

108. Under Florida law, the Department's administrative investigation of the Officer Defendants was tolled pending the criminal investigation of their conduct. That administrative investigation concluded on June 23, 2025, when the Department sustained findings against all seven Officer Defendants for their conduct in the fatal pursuit, as alleged above, and the Department thereafter terminated the employment of Officer Defendants.

109. Through the conduct described above, including its conduct before and in the immediate aftermath of the fatal pursuit, the City, acting through its final policymaker, endorsed the GHOST unit and its practices, and maintained a custom of condoning, ratifying and acquiescing in the misconduct of its officers, including the ghost chase practices that caused the deaths of Marcia May Pochette and Jenice Monique Woods.

## CLAIMS BY AND FOR JUNEL POCHETTE, THE ESTATE OF MARCIA MAY POCHETTE AND THE SURVIVOR OF THE DECEDENT, MARCIA MAY POCHETTE

### COUNT I (1)

### WRONGFUL DEATH OF MARCIA MAY POCHETTE AGAINST THE CITY OF WEST PALM BEACH

110. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-63 of this Complaint as if fully set forth herein.

111. This Count is pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2). In this Count, Plaintiff alleges that the Officer Defendants acted negligently and within

33

the course and scope of their employment with the CITY OF WEST PALM BEACH. To the extent any other count in this Complaint alleges that any Officer Defendant acted in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property, those allegations are pleaded solely in the alternative and are expressly not incorporated into this Count.

112.    Plaintiff, JUNEL POCHETTE, is the duly appointed personal representative of the Estate of Marcia May Pochette, deceased.

113.    On July 30, 2024, Marcia May Pochette was lawfully traveling in a motor vehicle when she was killed because of a high-speed collision negligently created and caused by officers of the West Palm Beach Police Department during an unauthorized pursuit.

114.    On July 30, 2024, the Defendant West Palm Beach Police Department Officers, all acting within the course and scope of their employment with the West Palm Beach Police Department, negligently initiated, participated in and engaged in a high-speed vehicular pursuit in direct violation of departmental policy prohibiting such actions under the circumstances. AUSTIN DANIELOVICH negligently operated the involved fully marked black and white West Palm Beach Police Department patrol vehicle. PIERRE ETIENNE negligently operated the involved unmarked West Palm Beach Police Department Dodge Durango SUV. CHRISTOPHER REKDAHL negligently operated the involved unmarked West Palm Beach Police Department Dodge Ram pickup truck. MICHAEL BORGEN negligently participated in the unauthorized high-speed vehicular pursuit as a passenger in the involved West Palm Beach Police Department Dodge Ram pickup truck driven by CHRISTOPHER REKDAHL. WILLIAM LOAYZA negligently participated in the unauthorized high-speed vehicular pursuit as a passenger in the involved West Palm Beach Police Department Dodge Durango SUV driven by PIERRE ETIENNE. BRANDAN

34

STEDFELT negligently participated in the unauthorized high-speed vehicular pursuit as a passenger in the involved West Palm Beach Police Department fully marked black and white patrol vehicle driven by AUSTIN DANIELOVICH. DARIAN THOMAS negligently participated in the unauthorized high-speed vehicular pursuit as a passenger in the involved West Palm Beach Police Department Dodge Ram pickup truck driven by CHRISTOPHER REKDAHL.

115. The DEFENDANT OFFICERS' negligent inactions and conduct created a foreseeable and proximate risk of serious injury and death to innocent civilians, including Marcia May Pochette.

116. As a direct, legal and proximate result of the negligence of the subject West Palm Beach Police Department Officers, Marcia May Pochette was caused to suffer fatal injuries.

117. The CITY OF WEST PALM BEACH is responsible and liable pursuant to Florida's Wrongful Death Act, §§ 768.16 through 768.26, and § 768.28, Florida Statutes, for the wrongful death of Marcia May Pochette caused by the negligence of its employees, the DEFENDANT OFFICERS, committed within the course and scope of their employment.

118. The Personal Representative of the Estate of Marcia May Pochette seeks damages for the Estate and surviving spouse as a direct and proximate result of the DEFENDANT OFFICERS' negligent actions and inactions to include, but not limited to: severe mental pain and suffering, severe mental anguish, extreme grief and sorrow, the loss of the decedent's companionship, guidance, consortium and protection, and the loss of support and services previously provided by Marcia May Pochette, lost wages, funeral, burial and travel expenses and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, JUNEL POCHETTE, as personal representative of the Estate of Marcia May Pochette, demands judgment against the CITY OF WEST PALM BEACH for

damages recoverable under the Florida Wrongful Death Act for the Estate and survivor, together with fees and costs and any such further relief as the Court deems just. Plaintiff further demands a jury trial.

## COUNT II (2)

## FAILURE TO RENDER AID TO MARCIA MAY POCHETTE AGAINST THE CITY OF WEST PALM BEACH AS COGNIZABLE UNDER FLORIDA LAW

119.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-63 of this Complaint as if fully set forth herein.

120.    This Count is brought under Florida's Wrongful Death Act, §§ 768.16 through 768.26, Florida Statutes, upon a theory of breach distinct from that alleged in Count I, namely the DEFENDANT OFFICERS' negligent failure to render or summon aid following the crash.

121.    This Count is pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2). In this Count, Plaintiff alleges that the Officer Defendants acted negligently and within the course and scope of their employment with the CITY OF WEST PALM BEACH. To the extent any other count in this Complaint alleges that any Officer Defendant acted in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property, those allegations are pleaded solely in the alternative and are expressly not incorporated into this Count.

122.    On July 30, 2024, the Defendant West Palm Beach Police Department Officers caused a fatal motor vehicle collision by their own unauthorized pursuit yet failed to provide and/or request/summon emergency medical services to Marcia May Pochette and Jenice Monique Woods.

123.    Despite knowing Marcia May Pochette and Jenice Monique Woods sustained serious and life threatening injuries, the DEFENDANT OFFICERS failed to stop, render aid, or summon emergency medical assistance, in contravention of departmental training and department

policy.  The DEFENDANT OFFICERS had a duty to render medical aid and assistance or to summon emergency medical services. The DEFENDANT OFFICERS breached that duty by leaving the crash scene without stopping, without rendering any aid, without summoning emergency medical services, and without notifying any dispatcher, supervisor, or other agency of the crash.

124.    The DEFENDANT OFFICERS' failure to act and/or render aid resulted in Marcia's and Jenice's medical conditions worsening, leading to their immense suffering and was a direct, legal and proximate cause of their deaths.

125.    Having created the peril through their unauthorized pursuit, and having caused and observed the crash and the resulting injuries, the DEFENDANT OFFICERS owed a duty under Florida common law to render medical aid and assistance or to summon such help, and they had the means, opportunity and authority to do so.

126.    At all times material, the DEFENDANT OFFICERS were acting within the course and scope of their employment with the CITY OF WEST PALM BEACH, and the CITY OF WEST PALM BEACH is responsible and liable pursuant to §§ 768.16 through 768.26 and § 768.28, Florida Statutes, for the wrongful death of Marcia May Pochette caused by the negligence of its employees.

127.    The Personal Representative of the Estate of Marcia May Pochette seeks damages for the Estate and surviving spouse as a direct and proximate result of the DEFENDANT OFFICERS' negligent failure to render any medical aid following the collision including but not limited to: extreme mental pain and suffering, mental anguish, grief, sorrow, the loss of the decedent's companionship, guidance, and protection, and the loss of support and services previously provided by Marcia May Pochette, funeral and burial expenses and the loss of

prospective net accumulations of the estate had she survived.

WHEREFORE the Plaintiff, JUNEL POCHETTE as Personal Representative of the Estate of Marcia May Pochette, demands judgment for the Estate and survivor against the CITY OF WEST PALM BEACH for compensatory damages, together with fees and costs and further relief as appropriate. The Plaintiff demands a jury trial.

### COUNT III (3)

### VIOLATION OF THE FOURTEENTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS OF MARCIA MAY POCHETTE AGAINST AUSTIN DANIELOVICH, INDIVIDUALLY, COGNIZABLE UNDER 42 U.S.C. § 1983.

128. Plaintiff realleges and adopts, as if fully set forth, the allegations contained in paragraphs 1-63 and would further state as follows:

129. At all times material hereto, AUSTIN DANIELOVICH was a sworn law enforcement officer employed by and working for the City of West Palm Beach and the West Palm Beach Police Department, acting under color of law and within the course and scope of his employment as a law enforcement officer.

130. On July 30, 2024, Defendant AUSTIN DANIELOVICH was operating as part of a specialized police unit, the Gang and Habitual Offender Suppression Team (GHOST).

131. On July 30, 2024, Defendant AUSTIN DANIELOVICH, individually and while acting under color of law, initiated, joined, participated in, continued, assisted, encouraged, failed to stop, and/or otherwise engaged in a high-speed vehicular pursuit of NEONI COPELAND, based solely on a minor vehicular traffic infraction, while operating the fully marked black and white West Palm Beach Police Department patrol vehicle.

132. The pursuit was not sufficiently related to any lawful and recognizable basis for seizure or arrest under the circumstances. No forcible felony, violent felony, or other criminal

activity justifying the extreme danger of the pursuit was observed when the pursuit was initiated and continued. The high-speed pursuit was conducted using marked and unmarked police vehicles.

133.   The pursuit of NEONI COPELAND was an unlawful, unauthorized, and dangerous high-speed vehicular pursuit, colloquially known within the Department as a "ghost chase," conducted without required radio communication, without supervisory notification or monitoring, and without required body-worn camera activation, and was unlawfully concealed from supervisors notwithstanding the visible presence of a marked police vehicle.

134.   The pursuit was conducted through congested and populated public municipal roadways and on Interstate 95 in Palm Beach County, including roadways outside the territorial jurisdiction of the City of West Palm Beach, at speeds approaching and/or exceeding 118 miles per hour, with diminished visibility, heavy vehicular traffic, and travel in or near opposite lanes of travel.

135.   AUSTIN DANIELOVICH undertook and continued the high speed vehicular pursuit with a purpose to cause harm unrelated to the legitimate object of arrest. His conduct was not an instinctive or instantaneous reaction to a sudden emergency. He deliberately initiated and continued a prolonged, covert, and unauthorized pursuit over many minutes and many miles, in violation of the Department's pursuit policy, while deliberately concealing the pursuit from supervision, and he did so in circumstances in which actual deliberation was practical throughout.

136.   AUSTIN DANIELOVICH's purpose in conducting the pursuit was unrelated to any legitimate law enforcement objective, including the apprehension or arrest of NEONI COPELAND. This is evidenced by the fact that, following a high speed pursuit lasting approximately ten minutes and spanning twelve to thirteen miles across multiple jurisdictions, AUSTIN DANIELOVICH and the other pursuing officers made no effort whatsoever to apprehend

39

NEONI COPELAND after the crash, and instead departed the crash scene and returned to their jurisdiction. A pursuit genuinely undertaken to apprehend a fleeing suspect does not end with the pursuing officers abandoning both the suspect and the dying victims.

137. As a result of AUSTIN DANIELOVICH's intentional acts to cause harm during the high-speed pursuit, the decedent, an innocent third party lawfully traveling on the roadway who was not the subject of the pursuit and posed no threat of harm to anyone, sustained a loss of life, liberty, bodily integrity, and personal security cognizable under the Fourteenth Amendment which is actionable through 42 U.S.C. § 1983.

138. In the alternative, and pursuant to Federal Rule of Civil Procedure 8(d)(2), regardless of intent, the conduct of AUSTIN DANIELOVICH shocks the conscience because actual deliberation was practical throughout the prolonged pursuit, yet despite having the ability and opportunity to deliberate, AUSTIN DANIELOVICH continued the chase to its fatal conclusion and in so doing acted with deliberate indifference to the known and obvious risk that the unauthorized high speed pursuit would cause death or serious injury to innocent members of the public, including the decedent.

139. AUSTIN DANIELOVICH further exacerbated the harm against the decedent by intentionally abstaining from proper radio communication, without notifying dispatch and/or a supervisor, without ensuring proper body-worn camera activation, without complying with departmental pursuit reporting requirements, and without complying with the West Palm Beach Police Department's written pursuit policy regarding vehicular pursuits.

140. After the crash, AUSTIN DANIELOVICH knew, or reasonably should have known, that the decedent had sustained serious, life-threatening, and catastrophic injuries. Despite this knowledge, AUSTIN DANIELOVICH failed to stop, failed to render aid, failed to summon

40

emergency medical assistance, failed to notify dispatch, failed to report the crash, and failed to remain at the scene.

141. Rather than rendering aid or reporting the fatal crash, AUSTIN DANIELOVICH left the crash scene, failed to notify appropriate law enforcement officials, and also failed to notify emergency medical personnel, despite the wrecked vehicles and extensive crash debris being nearby.

142. The conduct of AUSTIN DANIELOVICH towards the decedent was objectively unreasonable, conscience-shocking, and constituted a violation of the clearly established constitutional rights of the decedent under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983.

143. The Estate of MARCIA MAY POCHETTE suffered damages, including but not limited to loss of income and earning capacity, conscious pain and suffering, medical expenses, death, funeral and burial costs, loss of support and services, loss of companionship, loss of protection, loss of consortium, loss of prospective net accumulations, legal costs and fees, and all other damages recoverable under federal law.

WHEREFORE, Plaintiff demands judgment against the Defendant, individually, for any and all damages allowable by law, including but not limited to compensatory and exemplary damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, post-judgment interest, any and all equitable relief allowed by law, and further demands trial by jury on all issues so triable.

## COUNT IV (4)

### VIOLATION OF THE FOURTEENTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS OF MARCIA MAY POCHETTE AGAINST PIERRE ETIENNE, INDIVIDUALLY, COGNIZABLE UNDER 42 U.S.C. § 1983.

144.    Plaintiff realleges and adopts, as if fully set forth, the allegations contained in paragraphs 1-63 and would further state as follows:

145.    At all times material hereto, PIERRE ETIENNE was a sworn law enforcement officer employed by and working for the City of West Palm Beach and the West Palm Beach Police Department, acting under color of law and within the course and scope of his employment as a law enforcement officer.

146.    On July 30, 2024, Defendant PIERRE ETIENNE was operating as part of a specialized police unit, the Gang and Habitual Offender Suppression Team (GHOST).

147.    On July 30, 2024, Defendant PIERRE ETIENNE, individually and while acting under color of law, initiated, joined, participated in, continued, assisted, encouraged, failed to stop, and/or otherwise engaged in a high-speed vehicular pursuit of NEONI COPELAND, based solely on a minor vehicular traffic infraction, while operating the unmarked West Palm Beach Police Department Dodge Durango SUV.

148.    The pursuit was not sufficiently related to any lawful and recognizable basis for seizure or arrest under the circumstances. No forcible felony, violent felony, or other criminal activity justifying the extreme danger of the pursuit was observed when the pursuit was initiated and continued. The high-speed pursuit was conducted using marked and unmarked police vehicles.

149.    The pursuit of NEONI COPELAND was an unlawful, unauthorized, and dangerous high-speed vehicular pursuit, colloquially known within the Department as a "ghost chase," conducted with the use of low-visibility and unmarked police vehicles, without required radio communication, without supervisory notification or monitoring, and without required body-worn camera activation.

42

150.    The pursuit was conducted through congested and populated public municipal roadways and on Interstate 95 in Palm Beach County, including roadways outside the territorial jurisdiction of the City of West Palm Beach, at speeds approaching and/or exceeding 118 miles per hour, with diminished visibility, heavy vehicular traffic, and travel in or near opposite lanes of travel.

151.    PIERRE ETIENNE undertook and continued the high speed vehicular pursuit with a purpose to cause harm unrelated to the legitimate object of arrest. His conduct was not an instinctive or instantaneous reaction to a sudden emergency. He deliberately initiated and continued a prolonged, covert, and unauthorized pursuit over many minutes and many miles, in violation of the Department's pursuit policy, while deliberately concealing the pursuit from supervision, and he did so in circumstances in which actual deliberation was practical throughout.

152.    PIERRE ETIENNE's purpose in conducting the pursuit was unrelated to any legitimate law enforcement objective, including the apprehension or arrest of NEONI COPELAND. This is evidenced by the fact that, following a high speed pursuit lasting approximately ten minutes and spanning twelve to thirteen miles across multiple jurisdictions, PIERRE ETIENNE and the other pursuing officers made no effort whatsoever to apprehend NEONI COPELAND after the crash, and instead departed the crash scene and returned to their jurisdiction. A pursuit genuinely undertaken to apprehend a fleeing suspect does not end with the pursuing officers abandoning both the suspect and the dying victims.

153.    As a result of PIERRE ETIENNE's intentional acts to cause harm during the high-speed pursuit, the decedent, an innocent third party lawfully traveling on the roadway who was not the subject of the pursuit and posed no threat of harm to anyone, sustained a loss of life, liberty,

bodily integrity, and personal security cognizable under the Fourteenth Amendment which is actionable through 42 U.S.C. § 1983.

154. In the alternative, and pursuant to Federal Rule of Civil Procedure 8(d)(2), regardless of intent, the conduct of PIERRE ETIENNE shocks the conscience because actual deliberation was practical throughout the prolonged pursuit, yet despite having the ability and opportunity to deliberate, PIERRE ETIENNE continued the chase to its fatal conclusion and in so doing acted with deliberate indifference to the known and obvious risk that the unauthorized high speed pursuit would cause death or serious injury to innocent members of the public, including the decedent.

155. PIERRE ETIENNE further exacerbated the harm against the decedent by intentionally abstaining from proper radio communication, without notifying dispatch and/or a supervisor, without ensuring proper body-worn camera activation, without complying with departmental pursuit reporting requirements, and without complying with the West Palm Beach Police Department's written pursuit policy regarding vehicular pursuits.

156. After the crash, PIERRE ETIENNE knew, or reasonably should have known, that the decedent had sustained serious, life-threatening, and catastrophic injuries. Despite this knowledge, PIERRE ETIENNE failed to stop, failed to render aid, failed to summon emergency medical assistance, failed to notify dispatch, failed to report the crash, and failed to remain at the scene.

157. Rather than rendering aid or reporting the fatal crash, PIERRE ETIENNE left the crash scene, failed to notify appropriate law enforcement officials, and also failed to notify emergency medical personnel, despite the wrecked vehicles and extensive crash debris being nearby.

158. The conduct of PIERRE ETIENNE towards the decedent was objectively unreasonable, conscience-shocking, and constituted a violation of the clearly established constitutional rights of the decedent under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983.

159. The Estate of MARCIA MAY POCHETTE suffered damages, including but not limited to loss of income and earning capacity, conscious pain and suffering, medical expenses, death, funeral and burial costs, loss of support and services, loss of companionship, loss of protection, loss of consortium, loss of prospective net accumulations, legal costs and fees, and all other damages recoverable under federal law.

WHEREFORE, Plaintiff demands judgment against the Defendant, individually, for any and all damages allowable by law, including but not limited to compensatory and exemplary damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, post-judgment interest, any and all equitable relief allowed by law, and further demands trial by jury on all issues so triable.

## COUNT V (5)

### VIOLATION OF THE FOURTEENTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS OF MARCIA MAY POCHETTE AGAINST CHRISTOPHER REKDAHL, INDIVIDUALLY, COGNIZABLE UNDER 42 U.S.C. § 1983.

160. Plaintiff realleges and adopts, as if fully set forth, the allegations contained in paragraphs 1-63 and would further state as follows:

161. At all times material hereto, CHRISTOPHER REKDAHL was a sworn law enforcement officer employed by and working for the City of West Palm Beach and the West Palm Beach Police Department, acting under color of law and within the course and scope of his employment as a law enforcement officer.

45

162.    On July 30, 2024, Defendant CHRISTOPHER REKDAHL was operating as part of a specialized police unit, the Gang and Habitual Offender Suppression Team (GHOST).

163.    On July 30, 2024, Defendant CHRISTOPHER REKDAHL, individually and while acting under color of law, initiated, joined, participated in, continued, assisted, encouraged, failed to stop, and/or otherwise engaged in a high-speed vehicular pursuit of NEONI COPELAND, based solely on a minor vehicular traffic infraction, while operating the unmarked West Palm Beach Police Department Dodge Ram pickup truck.

164.    The pursuit was not sufficiently related to any lawful and recognizable basis for seizure or arrest under the circumstances. No forcible felony, violent felony, or other criminal activity justifying the extreme danger of the pursuit was observed when the pursuit was initiated and continued. The high-speed pursuit was conducted using marked and unmarked police vehicles.

165.    The pursuit of NEONI COPELAND was an unlawful, unauthorized, and dangerous high-speed vehicular pursuit, colloquially known within the Department as a "ghost chase," conducted with the use of low-visibility and unmarked police vehicles, without required radio communication, without supervisory notification or monitoring, and without required body-worn camera activation.

166.    The pursuit was conducted through congested and populated public municipal roadways and on Interstate 95 in Palm Beach County, including roadways outside the territorial jurisdiction of the City of West Palm Beach, at speeds approaching and/or exceeding 118 miles per hour, with diminished visibility, heavy vehicular traffic, and travel in or near opposite lanes of travel.

167.    CHRISTOPHER REKDAHL undertook and continued the high speed vehicular pursuit with a purpose to cause harm unrelated to the legitimate object of arrest. His conduct was

46

not an instinctive or instantaneous reaction to a sudden emergency. He deliberately initiated and continued a prolonged, covert, and unauthorized pursuit over many minutes and many miles, in violation of the Department's pursuit policy, while deliberately concealing the pursuit from supervision, and he did so in circumstances in which actual deliberation was practical throughout.

168.    CHRISTOPHER REKDAHL's purpose in conducting the pursuit was unrelated to any legitimate law enforcement objective, including the apprehension or arrest of NEONI COPELAND. This is evidenced by the fact that, following a high speed pursuit lasting approximately ten minutes and spanning twelve to thirteen miles across multiple jurisdictions, CHRISTOPHER REKDAHL and the other pursuing officers made no effort whatsoever to apprehend NEONI COPELAND after the crash, and instead departed the crash scene and returned to their jurisdiction. A pursuit genuinely undertaken to apprehend a fleeing suspect does not end with the pursuing officers abandoning both the suspect and the dying victims.

169.    As a result of CHRISTOPHER REKDAHL's intentional acts to cause harm during the high-speed pursuit, the decedent, an innocent third party lawfully traveling on the roadway who was not the subject of the pursuit and posed no threat of harm to anyone, sustained a loss of life, liberty, bodily integrity, and personal security cognizable under the Fourteenth Amendment which is actionable through 42 U.S.C. § 1983.

170.    In the alternative, and pursuant to Federal Rule of Civil Procedure 8(d)(2), regardless of intent, the conduct of CHRISTOPHER REKDAHL shocks the conscience because actual deliberation was practical throughout the prolonged pursuit, yet despite having the ability and opportunity to deliberate, CHRISTOPHER REKDAHL continued the chase to its fatal conclusion and in so doing acted with deliberate indifference to the known and obvious risk that

47

the unauthorized high speed pursuit would cause death or serious injury to innocent members of the public, including the decedent.

171.    CHRISTOPHER REKDAHL further exacerbated the harm against the decedent by intentionally abstaining from proper radio communication, without notifying dispatch and/or a supervisor, without ensuring proper body-worn camera activation, without complying with departmental pursuit reporting requirements, and without complying with the West Palm Beach Police Department's written pursuit policy regarding vehicular pursuits.

172.    After the crash, CHRISTOPHER REKDAHL knew, or reasonably should have known, that the decedent had sustained serious, life-threatening, and catastrophic injuries. Despite this knowledge, CHRISTOPHER REKDAHL failed to stop, failed to render aid, failed to summon emergency medical assistance, failed to notify dispatch, failed to report the crash, and failed to remain at the scene.

173.    Rather than rendering aid or reporting the fatal crash, CHRISTOPHER REKDAHL left the crash scene, failed to notify appropriate law enforcement officials, and also failed to notify emergency medical personnel, despite the wrecked vehicles and extensive crash debris being nearby.

174.    The conduct of CHRISTOPHER REKDAHL towards the decedent was objectively unreasonable, conscience-shocking, and constituted a violation of the clearly established constitutional rights of the decedent under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983.

175.    The Estate of MARCIA MAY POCHETTE suffered damages, including but not limited to loss of income and earning capacity, conscious pain and suffering, medical expenses, death, funeral and burial costs, loss of support and services, loss of companionship, loss of

protection, loss of consortium, loss of prospective net accumulations, legal costs and fees, and all other damages recoverable under federal law.

WHEREFORE, Plaintiff demands judgment against the Defendant, individually, for any and all damages allowable by law, including but not limited to compensatory and exemplary damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, post-judgment interest, any and all equitable relief allowed by law, and further demands trial by jury on all issues so triable.

## COUNT VI (6)

## VIOLATION OF THE FOURTEENTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS OF MARCIA MAY POCHETTE AGAINST MICHAEL BORGEN, INDIVIDUALLY, COGNIZABLE UNDER 42 U.S.C. § 1983.

176.    Plaintiff realleges and adopts, as if fully set forth, the allegations contained in paragraphs 1-63 and would further state as follows:

177.    At all times material hereto, MICHAEL BORGEN was a sworn law enforcement officer employed by and working for the City of West Palm Beach and the West Palm Beach Police Department, acting under color of law and within the course and scope of his employment as a law enforcement officer.

178.    On July 30, 2024, Defendant MICHAEL BORGEN was operating as part of a specialized police unit, the Gang and Habitual Offender Suppression Team (GHOST).

179.    On July 30, 2024, Defendant MICHAEL BORGEN, individually and while acting under color of law, joined, participated in, continued, assisted, encouraged, and/or otherwise engaged in a high-speed vehicular pursuit of NEONI COPELAND, based solely on a minor vehicular traffic infraction, as a passenger in the unmarked West Palm Beach Police Department Dodge Ram pickup truck driven by CHRISTOPHER REKDAHL.

49

180.     The pursuit was not sufficiently related to any lawful and recognizable basis for seizure or arrest under the circumstances. No forcible felony, violent felony, or other criminal activity justifying the extreme danger of the pursuit was observed when the pursuit was initiated and continued. The high-speed pursuit was conducted using marked and unmarked police vehicles.

181.     The pursuit of NEONI COPELAND was an unlawful, unauthorized, and dangerous high-speed vehicular pursuit, colloquially known within the Department as a "ghost chase," conducted with the use of low-visibility and unmarked police vehicles, without required radio communication, without supervisory notification or monitoring, and without required body-worn camera activation.

182.     The pursuit was conducted through congested and populated public municipal roadways and on Interstate 95 in Palm Beach County, including roadways outside the territorial jurisdiction of the City of West Palm Beach, at speeds approaching and/or exceeding 118 miles per hour, with diminished visibility, heavy vehicular traffic, and travel in or near opposite lanes of travel.

183.     MICHAEL BORGEN actively participated in, encouraged, and failed to intervene in the high speed vehicular pursuit, despite having both the authority and the opportunity to do so throughout its duration. His conduct was not an instinctive or instantaneous reaction to a sudden emergency. He deliberately continued his participation in a prolonged, covert, and unauthorized pursuit over many minutes and many miles, in violation of the Department's pursuit policy, while knowingly permitting the pursuit to be concealed from supervision, and he did so in circumstances in which actual deliberation was practical throughout.

184.     MICHAEL BORGEN's participation in the pursuit was unrelated to any legitimate law enforcement objective, including the apprehension or arrest of NEONI COPELAND. This is

evidenced by the fact that, following a high speed pursuit lasting approximately ten minutes and spanning twelve to thirteen miles across multiple jurisdictions, MICHAEL BORGEN and the other pursuing officers made no effort whatsoever to apprehend NEONI COPELAND after the crash, and instead departed the crash scene and returned to their jurisdiction. A pursuit genuinely undertaken to apprehend a fleeing suspect does not end with the pursuing officers abandoning both the suspect and the dying victims.

185.    As a result of MICHAEL BORGEN's intentional participation in and failure to intervene in the high-speed pursuit, the decedent, an innocent third party lawfully traveling on the roadway who was not the subject of the pursuit and posed no threat of harm to anyone, sustained a loss of life, liberty, bodily integrity, and personal security cognizable under the Fourteenth Amendment which is actionable through 42 U.S.C. § 1983.

186.    In the alternative, and pursuant to Federal Rule of Civil Procedure 8(d)(2), regardless of intent, the conduct of MICHAEL BORGEN shocks the conscience because actual deliberation was practical throughout the prolonged pursuit, yet despite having the ability and opportunity to deliberate, MICHAEL BORGEN continued his participation in the chase to its fatal conclusion and in so doing acted with deliberate indifference to the known and obvious risk that the unauthorized high speed pursuit would cause death or serious injury to innocent members of the public, including the decedent.

187.    MICHAEL BORGEN further exacerbated the harm against the decedent by intentionally abstaining from proper radio communication, without notifying dispatch and/or a supervisor, without ensuring proper body-worn camera activation, without complying with departmental pursuit reporting requirements, and without complying with the West Palm Beach Police Department's written pursuit policy regarding vehicular pursuits.

188. After the crash, MICHAEL BORGEN knew, or reasonably should have known, that the decedent had sustained serious, life-threatening, and catastrophic injuries. Despite this knowledge, MICHAEL BORGEN failed to stop, failed to render aid, failed to summon emergency medical assistance, failed to notify dispatch, failed to report the crash, and failed to remain at the scene.

189. Rather than rendering aid or reporting the fatal crash, MICHAEL BORGEN was in the unmarked West Palm Beach Police Department Dodge Ram pickup truck that drove past the crash scene without stopping, failed to notify appropriate law enforcement officials, and also failed to notify emergency medical personnel, despite the wrecked vehicles and extensive crash debris being nearby.

190. The conduct of MICHAEL BORGEN towards the decedent was objectively unreasonable, conscience-shocking, and constituted a violation of the clearly established constitutional rights of the decedent under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983.

191. The Estate of MARCIA MAY POCHETTE suffered damages, including but not limited to loss of income and earning capacity, conscious pain and suffering, medical expenses, death, funeral and burial costs, loss of support and services, loss of companionship, loss of protection, loss of consortium, loss of prospective net accumulations, legal costs and fees, and all other damages recoverable under federal law.

WHEREFORE, Plaintiff demands judgment against the Defendant, individually, for any and all damages allowable by law, including but not limited to compensatory and exemplary damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, post-judgment interest,

any and all equitable relief allowed by law, and further demands trial by jury on all issues so triable.

## COUNT VII (7)

### VIOLATION OF THE FOURTEENTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS OF MARCIA MAY POCHETTE AGAINST WILLIAM LOAYZA, INDIVIDUALLY, COGNIZABLE UNDER 42 U.S.C. § 1983.

192.    Plaintiff realleges and adopts, as if fully set forth, the allegations contained in paragraphs 1-63 and would further state as follows:

193.    At all times material hereto, WILLIAM LOAYZA was a sworn law enforcement officer employed by and working for the City of West Palm Beach and the West Palm Beach Police Department, acting under color of law and within the course and scope of his employment as a law enforcement officer.

194.    On July 30, 2024, Defendant WILLIAM LOAYZA was operating as part of a specialized police unit, the Gang and Habitual Offender Suppression Team (GHOST).

195.    On July 30, 2024, Defendant WILLIAM LOAYZA, individually and while acting under color of law, joined, participated in, continued, assisted, encouraged, and/or otherwise engaged in a high-speed vehicular pursuit of NEONI COPELAND, based solely on a minor vehicular traffic infraction, as a passenger in the unmarked West Palm Beach Police Department Dodge Durango SUV driven by PIERRE ETIENNE.

196.    The pursuit was not sufficiently related to any lawful and recognizable basis for seizure or arrest under the circumstances. No forcible felony, violent felony, or other criminal activity justifying the extreme danger of the pursuit was observed when the pursuit was initiated and continued. The high-speed pursuit was conducted using marked and unmarked police vehicles.

197.   The pursuit of NEONI COPELAND was an unlawful, unauthorized, and dangerous high-speed vehicular pursuit, colloquially known within the Department as a "ghost chase," conducted with the use of low-visibility and unmarked police vehicles, without required radio communication, without supervisory notification or monitoring, and without required body-worn camera activation.

198.   The pursuit was conducted through congested and populated public municipal roadways and on Interstate 95 in Palm Beach County, including roadways outside the territorial jurisdiction of the City of West Palm Beach, at speeds approaching and/or exceeding 118 miles per hour, with diminished visibility, heavy vehicular traffic, and travel in or near opposite lanes of travel.

199.   WILLIAM LOAYZA actively participated in, encouraged, and failed to intervene in the high speed vehicular pursuit, despite having both the authority and the opportunity to do so throughout its duration. His conduct was not an instinctive or instantaneous reaction to a sudden emergency. He deliberately continued his participation in a prolonged, covert, and unauthorized pursuit over many minutes and many miles, in violation of the Department's pursuit policy, while knowingly permitting the pursuit to be concealed from supervision, and he did so in circumstances in which actual deliberation was practical throughout.

200.   WILLIAM LOAYZA's participation in the pursuit was unrelated to any legitimate law enforcement objective, including the apprehension or arrest of NEONI COPELAND. This is evidenced by the fact that, following a high speed pursuit lasting approximately ten minutes and spanning twelve to thirteen miles across multiple jurisdictions, WILLIAM LOAYZA and the other pursuing officers made no effort whatsoever to apprehend NEONI COPELAND after the crash, and instead departed the crash scene and returned to their jurisdiction. A pursuit genuinely

undertaken to apprehend a fleeing suspect does not end with the pursuing officers abandoning both the suspect and the dying victims.

201. As a result of WILLIAM LOAYZA's intentional participation in and failure to intervene in the high-speed pursuit, the decedent, an innocent third party lawfully traveling on the roadway who was not the subject of the pursuit and posed no threat of harm to anyone, sustained a loss of life, liberty, bodily integrity, and personal security cognizable under the Fourteenth Amendment which is actionable through 42 U.S.C. § 1983.

202. In the alternative, and pursuant to Federal Rule of Civil Procedure 8(d)(2), regardless of intent, the conduct of WILLIAM LOAYZA shocks the conscience because actual deliberation was practical throughout the prolonged pursuit, yet despite having the ability and opportunity to deliberate, WILLIAM LOAYZA continued his participation in the chase to its fatal conclusion and in so doing acted with deliberate indifference to the known and obvious risk that the unauthorized high speed pursuit would cause death or serious injury to innocent members of the public, including the decedent.

203. WILLIAM LOAYZA further exacerbated the harm against the decedent by intentionally abstaining from proper radio communication, without notifying dispatch and/or a supervisor, without ensuring proper body-worn camera activation, without complying with departmental pursuit reporting requirements, and without complying with the West Palm Beach Police Department's written pursuit policy regarding vehicular pursuits.

204. After the crash, WILLIAM LOAYZA knew, or reasonably should have known, that the decedent had sustained serious, life-threatening, and catastrophic injuries. Despite this knowledge, WILLIAM LOAYZA failed to stop, failed to render aid, failed to summon emergency

medical assistance, failed to notify dispatch, failed to report the crash, and failed to remain at the scene.

205.    Rather than rendering aid or reporting the fatal crash, WILLIAM LOAYZA was in the unmarked West Palm Beach Police Department Dodge Durango SUV that drove past the crash scene without stopping, failed to notify appropriate law enforcement officials, and also failed to notify emergency medical personnel, despite the wrecked vehicles and extensive crash debris being nearby.

206.    The conduct of WILLIAM LOAYZA towards the decedent was objectively unreasonable, conscience-shocking, and constituted a violation of the clearly established constitutional rights of the decedent under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983.

207.    The Estate of MARCIA MAY POCHETTE suffered damages, including but not limited to loss of income and earning capacity, conscious pain and suffering, medical expenses, death, funeral and burial costs, loss of support and services, loss of companionship, loss of protection, loss of consortium, loss of prospective net accumulations, legal costs and fees, and all other damages recoverable under federal law.

WHEREFORE, Plaintiff demands judgment against the Defendant, individually, for any and all damages allowable by law, including but not limited to compensatory and exemplary damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, post-judgment interest, any and all equitable relief allowed by law, and further demands trial by jury on all issues so triable.

## COUNT VIII (8)

## VIOLATION OF THE FOURTEENTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS OF MARCIA MAY POCHETTE AGAINST BRANDAN STEDFELT, INDIVIDUALLY, COGNIZABLE UNDER 42 U.S.C. § 1983.

208. Plaintiff realleges and adopts, as if fully set forth, the allegations contained in paragraphs 1-63 and would further state as follows:

209. At all times material hereto, BRANDAN STEDFELT was a sworn law enforcement officer employed by and working for the City of West Palm Beach and the West Palm Beach Police Department, acting under color of law and within the course and scope of his employment as a law enforcement officer.

210. On July 30, 2024, Defendant BRANDAN STEDFELT was operating as part of a specialized police unit, the Gang and Habitual Offender Suppression Team (GHOST).

211. On July 30, 2024, Defendant BRANDAN STEDFELT, individually and while acting under color of law, joined, participated in, continued, assisted, encouraged, and/or otherwise engaged in a high-speed vehicular pursuit of NEONI COPELAND, based solely on a minor vehicular traffic infraction, as a passenger in the fully marked black and white West Palm Beach Police Department patrol vehicle driven by AUSTIN DANIELOVICH.

212. The pursuit was not sufficiently related to any lawful and recognizable basis for seizure or arrest under the circumstances. No forcible felony, violent felony, or other criminal activity justifying the extreme danger of the pursuit was observed when the pursuit was initiated and continued. The high-speed pursuit was conducted using marked and unmarked police vehicles.

213. The pursuit of NEONI COPELAND was an unlawful, unauthorized, and dangerous high-speed vehicular pursuit, colloquially known within the Department as a "ghost chase," conducted without required radio communication, without supervisory notification or monitoring, and without required body-worn camera activation, and was unlawfully concealed from supervisors notwithstanding the visible presence of a marked police vehicle.

214. The pursuit was conducted through congested and populated public municipal roadways and on Interstate 95 in Palm Beach County, including roadways outside the territorial jurisdiction of the City of West Palm Beach, at speeds approaching and/or exceeding 118 miles per hour, with diminished visibility, heavy vehicular traffic, and travel in or near opposite lanes of travel.

215. BRANDAN STEDFELT actively participated in, encouraged, and failed to intervene in the high speed vehicular pursuit, despite having both the authority and the opportunity to do so throughout its duration. His conduct was not an instinctive or instantaneous reaction to a sudden emergency. He deliberately continued his participation in a prolonged, covert, and unauthorized pursuit over many minutes and many miles, in violation of the Department's pursuit policy, while knowingly permitting the pursuit to be concealed from supervision, and he did so in circumstances in which actual deliberation was practical throughout.

216. BRANDAN STEDFELT's participation in the pursuit was unrelated to any legitimate law enforcement objective, including the apprehension or arrest of NEONI COPELAND. This is evidenced by the fact that, following a high speed pursuit lasting approximately ten minutes and spanning twelve to thirteen miles across multiple jurisdictions, BRANDAN STEDFELT and the other pursuing officers made no effort whatsoever to apprehend NEONI COPELAND after the crash, and instead departed the crash scene and returned to their jurisdiction. A pursuit genuinely undertaken to apprehend a fleeing suspect does not end with the pursuing officers abandoning both the suspect and the dying victims.

217. As a result of BRANDAN STEDFELT's intentional participation in and failure to intervene in the high-speed pursuit, the decedent, an innocent third party lawfully traveling on the roadway who was not the subject of the pursuit and posed no threat of harm to anyone, sustained

a loss of life, liberty, bodily integrity, and personal security cognizable under the Fourteenth Amendment which is actionable through 42 U.S.C. § 1983.

218.    In the alternative, and pursuant to Federal Rule of Civil Procedure 8(d)(2), regardless of intent, the conduct of BRANDAN STEDFELT shocks the conscience because actual deliberation was practical throughout the prolonged pursuit, yet despite having the ability and opportunity to deliberate, BRANDAN STEDFELT continued his participation in the chase to its fatal conclusion and in so doing acted with deliberate indifference to the known and obvious risk that the unauthorized high speed pursuit would cause death or serious injury to innocent members of the public, including the decedent.

219.    BRANDAN STEDFELT further exacerbated the harm against the decedent by intentionally abstaining from proper radio communication, without notifying dispatch and/or a supervisor, without ensuring proper body-worn camera activation, without complying with departmental pursuit reporting requirements, and without complying with the West Palm Beach Police Department's written pursuit policy regarding vehicular pursuits.

220.    After the crash, BRANDAN STEDFELT knew, or reasonably should have known, that the decedent had sustained serious, life-threatening, and catastrophic injuries. Despite this knowledge, BRANDAN STEDFELT failed to stop, failed to render aid, failed to summon emergency medical assistance, failed to notify dispatch, failed to report the crash, and failed to remain at the scene.

221.    Rather than rendering aid or reporting the fatal crash, BRANDAN STEDFELT was in the fully marked black and white West Palm Beach Police Department patrol vehicle that drove past the crash scene without stopping, failed to notify appropriate law enforcement officials, and

also failed to notify emergency medical personnel, despite the wrecked vehicles and extensive crash debris being nearby.

222. The conduct of BRANDAN STEDFELT towards the decedent was objectively unreasonable, conscience-shocking, and constituted a violation of the clearly established constitutional rights of the decedent under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983.

223. The Estate of MARCIA MAY POCHETTE suffered damages, including but not limited to loss of income and earning capacity, conscious pain and suffering, medical expenses, death, funeral and burial costs, loss of support and services, loss of companionship, loss of protection, loss of consortium, loss of prospective net accumulations, legal costs and fees, and all other damages recoverable under federal law.

WHEREFORE, Plaintiff demands judgment against the Defendant, individually, for any and all damages allowable by law, including but not limited to compensatory and exemplary damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, post-judgment interest, any and all equitable relief allowed by law, and further demands trial by jury on all issues so triable.

## COUNT IX (9)

### VIOLATION OF THE FOURTEENTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS OF MARCIA MAY POCHETTE AGAINST DARIAN THOMAS, INDIVIDUALLY, COGNIZABLE UNDER 42 U.S.C. § 1983

224. Plaintiff realleges and adopts, as if fully set forth, the allegations contained in paragraphs 1-63 and would further state as follows:

225. At all times material hereto, DARIAN THOMAS was a sworn law enforcement officer employed by and working for the City of West Palm Beach and the West Palm Beach Police

60

Department, acting under color of law and within the course and scope of his employment as a law enforcement officer.

226. On July 30, 2024, Defendant DARIAN THOMAS was operating as part of a specialized police unit, the Gang and Habitual Offender Suppression Team (GHOST).

227. On July 30, 2024, Defendant DARIAN THOMAS, individually and while acting under color of law, joined, participated in, continued, assisted, encouraged, and/or otherwise engaged in a high-speed vehicular pursuit of NEONI COPELAND, based solely on a minor vehicular traffic infraction, as a passenger in the unmarked West Palm Beach Police Department Dodge Ram pickup truck driven by CHRISTOPHER REKDAHL.

228. The pursuit was not sufficiently related to any lawful and recognizable basis for seizure or arrest under the circumstances. No forcible felony, violent felony, or other criminal activity justifying the extreme danger of the pursuit was observed when the pursuit was initiated and continued. The high-speed pursuit was conducted using marked and unmarked police vehicles.

229. The pursuit of NEONI COPELAND was an unlawful, unauthorized, and dangerous high-speed vehicular pursuit, colloquially known within the Department as a "ghost chase," conducted with the use of low-visibility and unmarked police vehicles, without required radio communication, without supervisory notification or monitoring, and without required body-worn camera activation.

230. The pursuit was conducted through congested and populated public municipal roadways and on Interstate 95 in Palm Beach County, including roadways outside the territorial jurisdiction of the City of West Palm Beach, at speeds approaching and/or exceeding 118 miles per hour, with diminished visibility, heavy vehicular traffic, and travel in or near opposite lanes of travel.

231.    DARIAN THOMAS actively participated in, encouraged, and failed to intervene in the high speed vehicular pursuit, despite having both the authority and the opportunity to do so throughout its duration. His conduct was not an instinctive or instantaneous reaction to a sudden emergency. He deliberately continued his participation in a prolonged, covert, and unauthorized pursuit over many minutes and many miles, in violation of the Department's pursuit policy, while knowingly permitting the pursuit to be concealed from supervision, and he did so in circumstances in which actual deliberation was practical throughout.

232.    DARIAN THOMAS's participation in the pursuit was unrelated to any legitimate law enforcement objective, including the apprehension or arrest of NEONI COPELAND. This is evidenced by the fact that, following a high speed pursuit lasting approximately ten minutes and spanning twelve to thirteen miles across multiple jurisdictions, DARIAN THOMAS and the other pursuing officers made no effort whatsoever to apprehend NEONI COPELAND after the crash, and instead departed the crash scene and returned to their jurisdiction. A pursuit genuinely undertaken to apprehend a fleeing suspect does not end with the pursuing officers abandoning both the suspect and the dying victims.

233.    As a result of DARIAN THOMAS's intentional participation in and failure to intervene in the high-speed pursuit, the decedent, an innocent third party lawfully traveling on the roadway who was not the subject of the pursuit and posed no threat of harm to anyone, sustained a loss of life, liberty, bodily integrity, and personal security cognizable under the Fourteenth Amendment which is actionable through 42 U.S.C. § 1983.

234.    In the alternative, and pursuant to Federal Rule of Civil Procedure 8(d)(2), regardless of intent, the conduct of DARIAN THOMAS shocks the conscience because actual deliberation was practical throughout the prolonged pursuit, yet despite having the ability and

62

opportunity to deliberate, DARIAN THOMAS continued his participation in the chase to its fatal conclusion and in so doing acted with deliberate indifference to the known and obvious risk that the unauthorized high speed pursuit would cause death or serious injury to innocent members of the public, including the decedent.

235.   DARIAN THOMAS further exacerbated the harm against the decedent by intentionally abstaining from proper radio communication, without notifying dispatch and/or a supervisor, without ensuring proper body-worn camera activation, without complying with departmental pursuit reporting requirements, and without complying with the West Palm Beach Police Department's written pursuit policy regarding vehicular pursuits.

236.   After the crash, DARIAN THOMAS knew, or reasonably should have known, that the decedent had sustained serious, life-threatening, and catastrophic injuries. Despite this knowledge, DARIAN THOMAS failed to stop, failed to render aid, failed to summon emergency medical assistance, failed to notify dispatch, failed to report the crash, and failed to remain at the scene.

237.   Rather than rendering aid or reporting the fatal crash, DARIAN THOMAS was in the unmarked West Palm Beach Police Department Dodge Ram pickup truck that drove past the crash scene without stopping, failed to notify appropriate law enforcement officials, and also failed to notify emergency medical personnel, despite the wrecked vehicles and extensive crash debris being nearby.

238.   The conduct of DARIAN THOMAS towards the decedent was objectively unreasonable, conscience-shocking, and constituted a violation of the clearly established constitutional rights of the decedent under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983.

63

239.    The Estate of MARCIA MAY POCHETTE suffered damages, including but not limited to loss of income and earning capacity, conscious pain and suffering, medical expenses, death, funeral and burial costs, loss of support and services, loss of companionship, loss of protection, loss of consortium, loss of prospective net accumulations, legal costs and fees, and all other damages recoverable under federal law.

WHEREFORE, Plaintiff demands judgment against the Defendant, individually, for any and all damages allowable by law, including but not limited to compensatory and exemplary damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, post-judgment interest, any and all equitable relief allowed by law, and further demands trial by jury on all issues so triable.

## COUNT X (10)

### CLAIM AGAINST THE CITY OF WEST PALM BEACH COGNIZABLE UNDER 42 U.S.C. § 1983 FOR THE WRONGFUL DEATH OF MARCIA MAY POCHETTE

240.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-109 of this Complaint as if fully set forth herein.

241.    At all material times, the OFFICER DEFENDANTS acted under color of state law and, in the course of the unauthorized high speed pursuit described above, deprived Marcia May Pochette of her rights under the Fourteenth Amendment to the United States Constitution, as further alleged herein.

242.    The City of West Palm Beach is liable for that deprivation under 42 U.S.C. § 1983 on two independent bases. First, the deprivation was caused by a longstanding, department wide custom of the West Palm Beach Police Department. Second, the Department's final policymaker endorsed and condoned that custom and the practices of the GHOST unit through which that

64

custom operated.

243.    Long before the creation of the GHOST unit, and continuing through the date of the subject incident, the West Palm Beach Police Department maintained a widespread and persistent custom of tolerating unauthorized and dangerous high speed vehicular pursuits, including pursuits conducted in unmarked vehicles and pursuits undertaken for minor or nonviolent offenses, and of failing to enforce its own vehicular pursuit policy against the officers who conducted them. This custom is reflected in the recurring pattern of pursuit related crashes, serious injuries, and deaths described in the Historical and Prior Incidents section above, which span the period from 2002 through 2023.

244.    The practice of conducting unauthorized and covert high speed pursuits, including the practice known within the Department as a ghost chase, was not an isolated or aberrant occurrence. It was a persistent and widespread practice engaged in by multiple officers of the West Palm Beach Police Department over a period of years, and it was so common and well settled as to constitute a custom carrying the force of law. The Department tolerated and acquiesced in this practice as a matter of custom rather than treating it as a deviation to be detected, corrected, and disciplined.

245.    The Department's vehicular pursuit policy, Policy III-25, imposed a series of requirements designed to keep pursuits visible to supervisors and subject to review. Officers involved in a pursuit were required to give continuous radio updates as the pursuit evolved, to ensure that their body worn cameras were recording throughout the duration of the pursuit, and to document the pursuit through a report by the initiating officer before the end of his or her shift and supplemental reports by the other officers involved, and every pursuit was required to be monitored by a supervisor. On July 30, 2024, the OFFICER DEFENDANTS disregarded each of these

65

requirements. They conducted the pursuit in unmarked vehicles without radio updates, with their body worn cameras deactivated, without supervisory monitoring, and without filing the reports the policy required, thereby concealing the pursuit from the supervisory oversight the policy was designed to ensure.

246. The OFFICER DEFENDANTS' ability to conduct the pursuit in this manner was not the product of an isolated supervisory lapse. It was the direct result of the City's longstanding failure to enforce the supervisory requirements of its own vehicular pursuit policy, and of its refusal to correct a deficiency in supervision that had been specifically identified to it. As alleged above, unauthorized and policy violating high speed pursuits were a persistent and widespread practice within the West Palm Beach Police Department, and the City had for years failed to enforce Policy III-25 against the officers who engaged in them.

247. The City had also been expressly advised, through the 2021 Special Investigations Audit, that no clear policy required periodic or random supervisory review of its officers' body worn camera footage, that this absence of review created a risk that officers would deactivate their cameras to conceal improper conduct, and that supervisory review should be implemented, and the City declined to make that change. Having left both the enforcement of its pursuit policy and the supervision of its officers' body worn camera use uncorrected, the City permitted the very conduct it had been warned of to occur. The deaths of Marcia May Pochette and Jenice Monique Woods on July 30, 2024 were a foreseeable consequence of that established custom and that uncorrected deficiency.

248. The GHOST unit was the setting in which this department wide custom reached its most acute expression. The unit's combination of unmarked vehicles, a separate and unmonitored radio channel, deactivated body worn cameras, and the absence of any proactive supervisory

review produced an operation in which the Department's custom of unauthorized pursuit and lack of oversight operated without constraint. The practice colloquially known within the Department as a ghost chase, by which officers conducted covert high speed pursuits while withholding radio transmissions and deactivating emergency equipment, was designed to evade supervisory detection. The absence of formal departmental documentation of ghost chases is itself probative of the Department's failure of supervision, because the practice was conducted for the purpose of avoiding such documentation.

249.     The City had actual and constructive knowledge of this custom at the policymaking level. The City was expressly warned in the 2021 Special Investigations Audit that its officers operated without any proactive supervisory review of their body worn camera footage and that this deficiency created a risk that officers would deactivate their cameras to conceal improper conduct. The City possessed further knowledge of the custom and the deficiencies that sustained it through the Police Internal Affairs Audit issued March 29, 2022, through the documented disciplinary histories of the officers it assigned to the GHOST unit, and through the recurring pursuit related crashes, injuries, and deaths described above. The April 2025 Organizational Assessment confirmed that the supervisory and accountability deficiencies underlying this custom were longstanding and had never been remedied.

250.     The City's failure to act in the face of this knowledge constituted deliberate indifference to the known and obvious risk of death and serious injury created by unsupervised and unauthorized pursuits. The City consciously chose not to correct that risk. When the City was presented in the 2021 Special Investigations Audit with a specific recommendation to institute supervisory review of body worn camera footage, it declined to adopt the recommendation and represented that no change was necessary, leaving the known deficiency in place through the date

67

of the subject incident.

251. The City's final policymaker endorsed and condoned the GHOST unit and the customs through which it operated. As alleged above, the Chief of Police, as final policymaker, publicly endorsed the unit and its methods and declined to impose the supervisory oversight the City had been advised to adopt, and the City condoned the misconduct of the OFFICER DEFENDANTS following the deaths of the decedents by imposing no discipline upon the OFFICER DEFENDANTS through its own accountability mechanisms and by issuing a favorable annual performance evaluation to an officer involved in the fatal pursuit while he was on administrative leave.

252. The involved officers intentionally initiated, continued, and concealed an unlawful vehicular pursuit for the purpose of causing harm unrelated to any legitimate seizure or arrest. Their conduct occurred despite the obvious and foreseeable risk of serious injury or death to innocent bystanders and was undertaken pursuant to the department wide custom described above, including the City's endorsement, acquiescence, and condonation of that custom and the practices of the GHOST unit. The City's deliberate indifference, custom, and endorsement and condonation of that custom were the moving force behind the constitutional violations that caused the wrongful death of Marcia May Pochette.

253. The Personal Representative of the Estate of Marcia May Pochette seeks damages for the Estate and the surviving spouse as a direct and proximate result of the constitutional deprivation alleged herein including but not limited to the decedent's conscious pain and suffering until death, survivor's mental pain and suffering, mental anguish, extreme grief and sorrow, loss of the decedent's companionship, guidance, consortium and protection, and the loss of support and services previously provided by Marcia May Pochette, funeral and burial expenses, lost wages,

and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, JUNEL POCHETTE as Personal Representative of the Estate of Marcia May Pochette and as the surviving husband of Marcia May Pochette, demands judgment against the CITY OF WEST PALM BEACH for all damages allowed under 42 U.S.C. § 1983, and reasonable attorneys' fees under § 1988. The Plaintiff demands a jury trial.

**COUNT XI (11)**

**CONSPIRACY TO VIOLATE CIVIL RIGHTS AGAINST AUSTIN DANIELOVICH FOR THE WRONGFUL DEATH OF MARCIA MAY POCHETTE COGNIZABLE UNDER 42 U.S.C. § 1983**

254. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-63 of this Complaint as if fully set forth herein.

255. AUSTIN DANIELOVICH and the other subject DEFENDANT OFFICERS reached an understanding and agreement, either explicitly or implicitly, to initiate an unauthorized pursuit, disengage required body-worn cameras, avoid radio communication, and refrain from reporting the fatal incident involving Marcia May Pochette and Jenice Monique Woods. In furtherance of their unlawful conspiracy to violate Plaintiffs' clearly established constitutional rights, Defendants intentionally initiated and continued an unauthorized high-risk vehicular pursuit using low profile and unmarked vehicles, deliberately disengaged or failed to activate body-worn cameras, knowingly avoided radio and supervisory communications to prevent monitoring and termination of the pursuit, failed to report and affirmatively concealed the pursuit and resulting fatal crash, abandoned injured civilians without rendering or summoning emergency medical aid, and coordinated false and misleading omissions and non-reporting to conceal their unconstitutional conduct and evade accountability.

256. This agreement and coordinated inaction violated and was deliberately indifferent

69

to Plaintiffs' constitutional rights.

257.     As a result of Defendants' actions, the decedents endured immense physical suffering from their injuries, which contributed to and caused their death that otherwise may have been preventable.

258.     The Estate of Marcia May Pochette seeks damages as a direct and proximate result of the DEFENDANT OFFICERS' actions including but not limited to: the decedent's conscious pain and suffering until death, mental pain and suffering of the survivor, loss of the decedent's companionship, guidance, and protection, and the loss of support and services previously provided by Marcia May Pochette, funeral and burial expenses and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, JUNEL POCHETTE as Personal Representative of the Estate of Marcia May Pochette, seeks compensatory and exemplary damages, attorneys' fees, and any other relief the Court deems just and proper against AUSTIN DANIELOVICH. Plaintiff further demands a jury trial.

## COUNT XII (12)

### CONSPIRACY TO VIOLATE CIVIL RIGHTS AGAINST PIERRE ETIENNE FOR THE WRONGFUL DEATH OF MARCIA MAY POCHETTE COGNIZABLE UNDER 42 U.S.C. § 1983

259.     Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-63 of this Complaint as if fully set forth herein.

260.     PIERRE ETIENNE and the other subject DEFENDANT OFFICERS reached an understanding and agreement, either explicitly or implicitly, to initiate an unauthorized pursuit, disengage required body-worn cameras, avoid radio communication, and refrain from reporting the fatal incident involving Marcia May Pochette and Jenice Monique Woods. In furtherance of

70

their unlawful conspiracy to violate Plaintiffs' clearly established constitutional rights, Defendants intentionally initiated and continued an unauthorized high-risk vehicular pursuit using low profile and unmarked vehicles, deliberately disengaged or failed to activate body-worn cameras, knowingly avoided radio and supervisory communications to prevent monitoring and termination of the pursuit, failed to report and affirmatively concealed the pursuit and resulting fatal crash, abandoned injured civilians without rendering or summoning emergency medical aid, and coordinated false and misleading omissions and non-reporting to conceal their unconstitutional conduct and evade accountability.

261.   This agreement and coordinated inaction violated and was deliberately indifferent to Plaintiffs' constitutional rights.

262.   As a result of Defendants' actions, the decedents endured immense physical suffering from their injuries, which contributed to and caused their death that otherwise may have been preventable.

263.   The Estate of Marcia May Pochette seeks damages as a direct and proximate result of the DEFENDANT OFFICERS' actions including but not limited to: the decedent's conscious pain and suffering until death, mental pain and suffering of the survivor, loss of the decedent's companionship, guidance, and protection, and the loss of support and services previously provided by Marcia May Pochette, funeral and burial expenses and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, JUNEL POCHETTE as Personal Representative of the Estate of Marcia May Pochette, seeks compensatory and exemplary damages, attorneys' fees, and any other relief the Court deems just and proper against PIERRE ETIENNE. Plaintiff further demands a jury trial.

71

## COUNT XIII (13)

### CONSPIRACY TO VIOLATE CIVIL RIGHTS AGAINST CHRISTOPHER REKDAHL FOR THE WRONGFUL DEATH OF MARCIA MAY POCHETTE COGNIZABLE UNDER 42 U.S.C. § 1983

264. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-63 of this Complaint as if fully set forth herein.

265. CHRISTOPHER REKDAHL and the other subject DEFENDANT OFFICERS reached an understanding and agreement, either explicitly or implicitly, to initiate an unauthorized pursuit, disengage required body-worn cameras, avoid radio communication, and refrain from reporting the fatal incident involving Marcia May Pochette and Jenice Monique Woods. In furtherance of their unlawful conspiracy to violate Plaintiffs' clearly established constitutional rights, Defendants intentionally initiated and continued an unauthorized high-risk vehicular pursuit using low profile and unmarked vehicles, deliberately disengaged or failed to activate body-worn cameras, knowingly avoided radio and supervisory communications to prevent monitoring and termination of the pursuit, failed to report and affirmatively concealed the pursuit and resulting fatal crash, abandoned injured civilians without rendering or summoning emergency medical aid, and coordinated false and misleading omissions and non-reporting to conceal their unconstitutional conduct and evade accountability.

266. This agreement and coordinated inaction violated and was deliberately indifferent to Plaintiffs' constitutional rights.

267. As a result of Defendants' actions, the decedents endured immense physical suffering from their injuries, which contributed to and caused their death that otherwise may have been preventable.

268. The Estate of Marcia May Pochette seeks damages as a direct and proximate result

72

of the DEFENDANT OFFICERS' actions including but not limited to: the decedent's conscious pain and suffering until death, mental pain and suffering of the survivor, loss of the decedent's companionship, guidance, and protection, and the loss of support and services previously provided by Marcia May Pochette, funeral and burial expenses and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, JUNEL POCHETTE as Personal Representative of the Estate of Marcia May Pochette, seeks compensatory and exemplary damages, attorneys' fees, and any other relief the Court deems just and proper against CHRISTOPHER REKDAHL. Plaintiff further demands a jury trial.

## COUNT XIV (14)

### CONSPIRACY TO VIOLATE CIVIL RIGHTS AGAINST MICHAEL BORGEN FOR THE WRONGFUL DEATH OF MARCIA MAY POCHETTE COGNIZABLE UNDER 42 U.S.C. § 1983

269.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-63 of this Complaint as if fully set forth herein.

270.    MICHAEL BORGEN and the other subject DEFENDANT OFFICERS reached an understanding and agreement, either explicitly or implicitly, to initiate an unauthorized pursuit, disengage required body-worn cameras, avoid radio communication, and refrain from reporting the fatal incident involving Marcia May Pochette and Jenice Monique Woods. In furtherance of their unlawful conspiracy to violate Plaintiffs' clearly established constitutional rights, Defendants intentionally initiated and continued an unauthorized high-risk vehicular pursuit using low profile and unmarked vehicles, deliberately disengaged or failed to activate body-worn cameras, knowingly avoided radio and supervisory communications to prevent monitoring and termination of the pursuit, failed to report and affirmatively concealed the pursuit and resulting fatal crash,

73

abandoned injured civilians without rendering or summoning emergency medical aid, and coordinated false and misleading omissions and non-reporting to conceal their unconstitutional conduct and evade accountability.

271. This agreement and coordinated inaction violated and was deliberately indifferent to Plaintiffs' constitutional rights.

272. As a result of Defendants' actions, the decedents endured immense physical suffering from their injuries, which contributed to and caused their death that otherwise may have been preventable.

273. The Estate of Marcia May Pochette seeks damages as a direct and proximate result of the DEFENDANT OFFICERS' actions including but not limited to: the decedent's conscious pain and suffering until death, mental pain and suffering of the survivor, loss of the decedent's companionship, guidance, and protection, and the loss of support and services previously provided by Marcia May Pochette, funeral and burial expenses and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, JUNEL POCHETTE as Personal Representative of the Estate of Marcia May Pochette, seeks compensatory and exemplary damages, attorneys' fees, and any other relief the Court deems just and proper against MICHAEL BORGEN. Plaintiff further demands a jury trial.

## COUNT XV (15)

### CONSPIRACY TO VIOLATE CIVIL RIGHTS AGAINST WILLIAM LOAYZA FOR THE WRONGFUL DEATH OF MARCIA MAY POCHETTE COGNIZABLE UNDER 42 U.S.C. § 1983

274. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-63 of this Complaint as if fully set forth herein.

74

275.    WILLIAM LOAYZA and the other subject DEFENDANT OFFICERS reached an understanding and agreement, either explicitly or implicitly, to initiate an unauthorized pursuit, disengage required body-worn cameras, avoid radio communication, and refrain from reporting the fatal incident involving Marcia May Pochette and Jenice Monique Woods. In furtherance of their unlawful conspiracy to violate Plaintiffs' clearly established constitutional rights, Defendants intentionally initiated and continued an unauthorized high-risk vehicular pursuit using low profile and unmarked vehicles, deliberately disengaged or failed to activate body-worn cameras, knowingly avoided radio and supervisory communications to prevent monitoring and termination of the pursuit, failed to report and affirmatively concealed the pursuit and resulting fatal crash, abandoned injured civilians without rendering or summoning emergency medical aid, and coordinated false and misleading omissions and non-reporting to conceal their unconstitutional conduct and evade accountability.

276.    This agreement and coordinated inaction violated and was deliberately indifferent to Plaintiffs' constitutional rights.

277.    As a result of Defendants' actions, the decedents endured immense physical suffering from their injuries, which contributed to and caused their death that otherwise may have been preventable.

278.    The Estate of Marcia May Pochette seeks damages as a direct and proximate result of the DEFENDANT OFFICERS' actions including but not limited to: the decedent's conscious pain and suffering until death, mental pain and suffering of the survivor, loss of the decedent's companionship, guidance, and protection, and the loss of support and services previously provided by Marcia May Pochette, funeral and burial expenses and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, JUNEL POCHETTE as Personal Representative of the Estate of Marcia May Pochette, seeks compensatory and exemplary damages, attorneys' fees, and any other relief the Court deems just and proper against WILLIAM LOAYZA. Plaintiff further demands a jury trial.

## COUNT XVI (16)

### CONSPIRACY TO VIOLATE CIVIL RIGHTS AGAINST BRANDAN STEDFELT FOR THE WRONGFUL DEATH OF MARCIA MAY POCHETTE COGNIZABLE UNDER 42 U.S.C. § 1983

279.     Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-63 of this Complaint as if fully set forth herein.

280.     BRANDAN STEDFELT and the other subject DEFENDANT OFFICERS reached an understanding and agreement, either explicitly or implicitly, to initiate an unauthorized pursuit, disengage required body-worn cameras, avoid radio communication, and refrain from reporting the fatal incident involving Marcia May Pochette and Jenice Monique Woods. In furtherance of their unlawful conspiracy to violate Plaintiffs' clearly established constitutional rights, Defendants intentionally initiated and continued an unauthorized high-risk vehicular pursuit using low profile and unmarked vehicles, deliberately disengaged or failed to activate body-worn cameras, knowingly avoided radio and supervisory communications to prevent monitoring and termination of the pursuit, failed to report and affirmatively concealed the pursuit and resulting fatal crash, abandoned injured civilians without rendering or summoning emergency medical aid, and coordinated false and misleading omissions and non-reporting to conceal their unconstitutional conduct and evade accountability.

281.     This agreement and coordinated inaction violated and was deliberately indifferent to Plaintiffs' constitutional rights.

76

282.     As a result of Defendants' actions, the decedents endured immense physical suffering from their injuries, which contributed to and caused their death that otherwise may have been preventable.

283.     The Estate of Marcia May Pochette seeks damages as a direct and proximate result of the DEFENDANT OFFICERS' actions including but not limited to: the decedent's conscious pain and suffering until death, mental pain and suffering of the survivor, loss of the decedent's companionship, guidance, and protection, and the loss of support and services previously provided by Marcia May Pochette, funeral and burial expenses and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, JUNEL POCHETTE as Personal Representative of the Estate of Marcia May Pochette, seeks compensatory and exemplary damages, attorneys' fees, and any other relief the Court deems just and proper against BRANDAN STEDFELT. Plaintiff further demands a jury trial.

## COUNT XVII (17)

### CONSPIRACY TO VIOLATE CIVIL RIGHTS AGAINST DARIAN THOMAS FOR THE WRONGFUL DEATH OF MARCIA MAY POCHETTE COGNIZABLE UNDER 42 U.S.C. § 1983

284.     Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-63 of this Complaint as if fully set forth herein.

285.     DARIAN THOMAS and the other subject DEFENDANT OFFICERS reached an understanding and agreement, either explicitly or implicitly, to initiate an unauthorized pursuit, disengage required body-worn cameras, avoid radio communication, and refrain from reporting the fatal incident involving Marcia May Pochette and Jenice Monique Woods. In furtherance of their unlawful conspiracy to violate Plaintiffs' clearly established constitutional rights, Defendants

77

intentionally initiated and continued an unauthorized high-risk vehicular pursuit using low profile and unmarked vehicles, deliberately disengaged or failed to activate body-worn cameras, knowingly avoided radio and supervisory communications to prevent monitoring and termination of the pursuit, failed to report and affirmatively concealed the pursuit and resulting fatal crash, abandoned injured civilians without rendering or summoning emergency medical aid, and coordinated false and misleading omissions and non-reporting to conceal their unconstitutional conduct and evade accountability.

286.    This agreement and coordinated inaction violated and was deliberately indifferent to Plaintiffs' constitutional rights.

287.    As a result of Defendants' actions, the decedents endured immense physical suffering from their injuries, which contributed to and caused their death that otherwise may have been preventable.

288.    The Estate of Marcia May Pochette seeks damages as a direct and proximate result of the DEFENDANT OFFICERS' actions including but not limited to: the decedent's conscious pain and suffering until death, mental pain and suffering of the survivor, loss of the decedent's companionship, guidance, and protection, and the loss of support and services previously provided by Marcia May Pochette, funeral and burial expenses and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, JUNEL POCHETTE as Personal Representative of the Estate of Marcia May Pochette, seeks compensatory and exemplary damages, attorneys' fees, and any other relief the Court deems just and proper against DARIAN THOMAS. Plaintiff further demands a jury trial.

## COUNT XVIII (18)

78

## FAILURE TO TRAIN AGAINST THE CITY OF WEST PALM BEACH COGNIZABLE UNDER 42 U.S.C. § 1983 FOR THE WRONGFUL DEATH OF MARCIA MAY POCHETTE

289.    Plaintiff realleges and incorporate by reference the allegations set forth in paragraphs 1-109 of this Complaint as if fully set forth herein.

290.    At all material times, the individually named DEFENDANT OFFICERS were employees of Defendant CITY OF WEST PALM BEACH, acting under color of state law and within the course and scope of their employment.

291.    Defendant CITY OF WEST PALM BEACH had a duty to adequately train its police officers, including Defendants AUSTIN DANIELOVICH, PIERRE ETIENNE, CHRISTOPHER REKDAHL, MICHAEL BORGEN, WILLIAM LOAYZA, BRANDAN STEDFELT, and DARIAN THOMAS, to prevent the violation of constitutional rights including the right to life and liberty protected by the substantive component of the Due Process Clause of the Fourteenth Amendment.

292.    Defendant CITY OF WEST PALM BEACH failed to properly train its officers in the implementation of (a) the Department's vehicular pursuit policy, including the limitations on pursuits conducted in unmarked vehicles and the prohibition against high speed pursuits for nonviolent offenses; (b) the required use and activation of body worn cameras and radio communication during pursuits; (c) the duty to render or summon emergency medical assistance at the scene of a crash; and (d) the supervisory responsibilities of first line and mid level supervisors, who, as the City's own April 2025 Organizational Assessment found, received no formal training from the agency before or immediately following their promotions.

293.    The City's failure to train persisted after the City had actual notice, through the pattern of pursuit related crashes, injuries, and deaths described above, through the 2021 Special

Investigations Audit, through the Police Internal Affairs Audit issued March 29, 2022, and through the wrongful death litigation and settlement arising from the July 30, 2021 GHOST unit pursuit, that its existing training was inadequate to prevent its officers from conducting unauthorized and dangerous pursuits. The City's decision to continue its training program unchanged in the face of that notice constituted deliberate indifference to the known and obvious consequence that its officers would violate the constitutional rights of the public.

294.  The City's failure to train extended to the supervisory ranks responsible for enforcing the Department's vehicular pursuit policy. First line and mid level supervisors holding the ranks of sergeant and lieutenant received no formal training from the agency before or immediately following their promotions. Every mechanism by which Policy III-25 was to be enforced, including the supervisor's duty to monitor and control an active pursuit, the supervisor's authority and obligation to order termination of a pursuit, and the command review of pursuit documentation, depended upon supervisors whom the City had never trained to perform those functions. The GHOST unit itself was structured around this untrained supervisory layer, with each of its teams overseen by a sergeant and the unit as a whole overseen by a lieutenant and a captain.

295.  The City had notice of this supervisory training deficiency years before the subject incident. The 2021 Stratified Policing Assessment, delivered to Chief Adderley, identified a lack of accountability among the Department's patrol sergeants, lieutenants, and captains. The April 2025 Organizational Assessment confirmed that this deficiency had never been corrected, finding that sergeants and lieutenants received no formal training before or immediately following promotion and warning that operational failures, injuries, casualties, and substantial liability are the typical consequences when personnel performing critical roles are not properly trained. The City thus maintained, through the date of the fatal crash, a supervisory structure it had been warned

lacked accountability, staffed by supervisors it had never trained.

296.   The manner in which the City implemented or failed to implement its pursuit policies resulted in a custom and practice of authorizing, tolerating, and acquiescing in unauthorized, low profile and high risk vehicular pursuits, including the use of unmarked vehicles, ghost chases, non-radio pursuits, failure to activate body-worn cameras, and failure to render or summon emergency medical aid after crashes.

297.   The City had actual and constructive notice of this pattern of unconstitutional conduct by its officers involving unauthorized vehicular pursuits, concealment of pursuit activity, and post-crash abandonment of injured civilians, as demonstrated by the prior incidents alleged above spanning 2002 through 2023, the July 30, 2021 GHOST unit pursuit and the resulting wrongful death litigation resolved by a City Council approved settlement, the 2021 Special Investigations Audit, the Police Internal Affairs Audit issued March 29, 2022, and the documented disciplinary histories of the officers the City assigned to and retained within the GHOST unit.

298.   Despite this notice, the City failed to implement adequate training to enforce its policies in each of the respects identified above, including the limitations on vehicular pursuits, radio communication and supervisory notification, body worn camera activation, the duty to render emergency medical aid, and the termination of pursuits when the danger to the public outweighs the need for immediate apprehension.

299.   On July 30, 2024, the OFFICER DEFENDANTS violated each of the very requirements as to which the City had failed to train, conducting an unauthorized high speed pursuit for a nonviolent offense, in unmarked and marked vehicles, without radio communication or supervisory notification, with their body worn cameras deactivated, and abandoning the scene without rendering or summoning aid. The City's deliberately indifferent failure to train was the

81

moving force behind and a legal cause of the constitutional violations that resulted in the deaths of Marcia May Pochette and Jenice Monique Woods.

300. This deliberate indifference is evidenced by prior complaints, documented incidents, or patterns of misconduct involving the City's officers and their failure to take remedial or corrective action.

301. In the alternative, and pursuant to Federal Rule of Civil Procedure 8(d)(2), the need to train officers on the constitutional limits of high speed vehicular pursuit and on the duty to aid persons injured by police conduct is so obvious, and the consequence of failing to do so is so predictably a deprivation of life, that the City's failure to train constituted deliberate indifference even in the absence of a pattern of prior similar violations.

302. As a direct and proximate result of Defendant CITY OF WEST PALM BEACH's failure to train, the wrongful death of Marcia May Pochette is compensable under 42 U.S.C. § 1983.

303. The Personal Representative of the Estate of Marcia May Pochette seeks damages for the Estate and the surviving spouse as a direct and proximate result of the constitutional deprivation alleged herein, including but not limited to: the decedent's conscious pain and suffering until death, survivor's mental pain and suffering, mental anguish, extreme grief and sorrow, loss of the decedent's companionship, guidance, consortium and protection, and the loss of support and services previously provided by Marcia May Pochette, funeral and burial expenses and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, JUNEL POCHETTE as Personal Representative of the Estate of Marcia May Pochette, demands judgment against the CITY OF WEST PALM BEACH for compensatory damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs, and any other relief

82

this Court deems just and proper and demands a trial by jury on all issues so triable.

## COUNT XIX (19)

### FAILURE TO SUPERVISE AGAINST THE CITY OF WEST PALM BEACH COGNIZABLE UNDER 42 U.S.C. § 1983 FOR THE WRONGFUL DEATH OF MARCIA MAY POCHETTE

304.   Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-109 of this Complaint as if fully set forth herein.

305.   At all material times, the individually named DEFENDANT OFFICERS were employees of Defendant CITY OF WEST PALM BEACH, acting under color of state law and within the course and scope of their employment, and by conducting the unauthorized high speed pursuit described above they deprived Marcia May Pochette of her right to life and liberty protected by the substantive component of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

306.   Defendant CITY OF WEST PALM BEACH had a duty to adequately supervise, discipline, and control its police officers, including the DEFENDANT OFFICERS, to prevent the violation of constitutional rights regarding vehicular pursuit.

307.   Defendant CITY OF WEST PALM BEACH failed to properly supervise its officers to ensure (a) compliance with the Department's vehicular pursuit policy, including the limitations on pursuits conducted in unmarked vehicles and the prohibition against low profile and high speed pursuits for nonviolent offenses; (b) the use and activation of body worn cameras and radio communication during pursuits; and (c) the duty to render or summon emergency medical assistance at the scene of a crash.

308.   The City maintained a custom and practice of failing to supervise and discipline officers who engaged in unauthorized vehicular pursuits, ghost chases, concealment of pursuits,

83

and abandonment of injured civilians following police caused crashes. This custom was longstanding and widespread, predated the creation of the GHOST unit, and is reflected in the recurring pattern of pursuit related crashes, serious injuries, and deaths described in the Historical and Prior Incidents section above. Within the GHOST unit, which operated in unmarked vehicles, on a separate and unmonitored radio channel, and without proactive supervisory review, this custom of non supervision reached its most acute expression and enabled the OFFICER DEFENDANTS to conduct and conceal the pursuit that killed the decedents.

309. The City had actual and constructive notice of this custom and of the supervisory deficiencies that sustained it. The 2021 Special Investigations Audit expressly advised the City that no clear policy required random or periodic supervisory review of its officers' body worn camera footage and warned that this deficiency created a risk that officers would deactivate their cameras to conceal improper conduct. The City possessed further notice through the 2022 Police Internal Affairs Audit; through the 2021 Stratified Policing Assessment, which identified a lack of accountability among the Department's patrol sergeants, lieutenants, and captains; through the documented disciplinary histories of the officers it assigned to the GHOST unit; and through the recurring pursuit related crashes, injuries, and deaths described above. The April 2025 Organizational Assessment confirmed that these supervisory and accountability deficiencies were longstanding and had never been remedied. The disciplinary histories are alleged as notice of the need for supervision and not as prior adjudicated constitutional violations.

310. Despite this notice, the City failed to take corrective or remedial action, failed to impose discipline, and failed to implement supervisory safeguards to prevent recurrence. When the 2021 Special Investigations Audit recommended that the City institute supervisory review of body worn camera footage, the City declined to adopt the recommendation and represented that

no change was necessary, leaving the deficiency in place through the date of the subject incident.

311. The City's failure of supervision consisted not merely of a failure to review body worn camera footage after the fact, but of its providing no means of supervisory oversight that did not depend on the officers reporting their own conduct. Camera activation, radio updates, notification of a supervisor, and the filing of pursuit reports each depended entirely on the voluntary compliance of the officers being supervised, and the unit operated on a separate radio channel unmonitored by anyone outside the GHOST unit, as alleged above. The City employed no independent means by which a supervisor could detect or intervene in a pursuit the officers attempted to conceal.

312. The absence of the officers' camera footage of the July 30, 2024 pursuit is not a defense to the City's failure of supervision but a demonstration of it, because oversight entrusted solely to the discretion of the officers being overseen fails precisely when it is most needed. Having been advised in the 2021 Special Investigations Audit that its review of footage occurred only reactively and that proactive review would deter misconduct, the City declined to adopt such review and continued to rely on officer self reporting, thereby tolerating the conditions that allowed the OFFICER DEFENDANTS to conduct an unauthorized high speed pursuit, kill Marcia May Pochette and Jenice Monique Woods, and return to their jurisdiction undetected.

313. The City's failure to supervise and discipline its officers, in the face of its knowledge of the custom and the deficiencies described above, constituted deliberate indifference to the known and obvious risk that its officers would conduct unauthorized and unsupervised pursuits endangering the public, including Marcia May Pochette. That deliberately indifferent failure to supervise was the moving force behind and the legal cause of the constitutional violations that resulted in the death of Marcia May Pochette.

85

314.   The Personal Representative of the Estate of Marcia May Pochette seeks damages for the Estate and the surviving spouse as a direct and proximate result of the constitutional deprivation alleged herein, including but not limited to: the decedent's conscious pain and suffering until death, survivor's mental pain and suffering, mental anguish, extreme grief and sorrow, loss of the decedent's companionship, guidance, consortium and protection, and the loss of support and services previously provided by Marcia May Pochette, funeral and burial expenses and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, JUNEL POCHETTE as Personal Representative of the Estate of Marcia May Pochette, demands judgment against the CITY OF WEST PALM BEACH for compensatory damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs, and any other relief this Court deems just and proper and demands a trial by jury on all issues so triable.

## COUNT XX (20)

### NEGLIGENT RETENTION AGAINST THE CITY OF WEST PALM BEACH COGNIZABLE UNDER FLORIDA LAW FOR THE WRONGFUL DEATH OF MARCIA MAY POCHETTE.

315.   Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-109 of this Complaint as if fully set forth herein.

316.   This Count is pleaded in the alternative to Count I pursuant to Federal Rule of Civil Procedure 8(d)(2). To the extent the conduct of any Officer Defendant is found to have been committed outside the course and scope of his employment, or in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property within the meaning of section 768.28(9)(a), Florida Statutes, the CITY OF WEST PALM BEACH remains directly liable under this Count for its own negligence in retaining and assigning the OFFICER DEFENDANTS.

86

317.   Defendant CITY OF WEST PALM BEACH owed a duty to exercise reasonable care in the retention and assignment of its police officers, including a duty to act upon knowledge acquired during an officer's employment that the officer was unfit for his assignment or posed a foreseeable risk of harm to the public, by means of reassignment, corrective supervision, retraining, discipline, or termination. The retention and assignment of individual officers, and the decision to place particular officers in particular assignments, were operational functions.

318.   During the employment of the OFFICER DEFENDANTS, the City acquired actual knowledge, through its own personnel and disciplinary records, that specific officers had documented histories of dangerous driving, pursuit related misconduct, and body worn camera and accountability violations, as alleged above. That knowledge included, among other things, that Defendant ETIENNE had received a written reprimand for his role in a pursuit during which officers drove against the flow of traffic on Interstate 95, and that he was one of three GHOST unit detectives involved in the July 30, 2021 pursuit that ended in a crash killing four people and that resulted in wrongful death litigation resolved by a City Council approved settlement; that Defendant REKDAHL had received written reprimands for at fault, on duty crashes and a suspension in connection with a crash identified in his disciplinary notice as his third preventable crash within a single year; that Defendant Danielovich had received a written reprimand for a body worn camera violation, had activated his body worn camera late on multiple occasions, and had been placed under a lieutenant level review requirement for his use of force events; and that Defendant THOMAS had received a written reprimand for an at fault crash in which he failed to yield the right of way.

319.   Despite this knowledge, the City retained each of these officers and assigned or continued to assign them to duties involving the operation of police vehicles and to the GHOST

unit, a plainclothes unit that operated in unmarked vehicles, on a separate and unmonitored radio channel, and without proactive supervisory review, an assignment in which the risks reflected in their documented histories were most likely to result in harm to the public and least likely to be detected. The City imposed no heightened supervision, corrective training, reassignment, or meaningful discipline sufficient to prevent the foreseeable recurrence of the conduct reflected in their records.

320. The City knew or should have known that retaining these officers in these assignments without corrective action posed an unreasonable risk of death or serious bodily injury to members of the public, including persons using the public roadways.

321. The City's failure to exercise reasonable care in the retention and assignment of the OFFICER DEFENDANTS constituted negligence under Florida law.

322. The City's negligent retention and assignment of the OFFICER DEFENDANTS was a direct and proximate cause of the unauthorized pursuit of July 30, 2024, the abandonment of the crash scene, and the wrongful death of MARCIA MAY POCHETTE.

323. The Personal Representative of the Estate of Marcia May Pochette seeks damages for the Estate and surviving spouse as a direct and proximate result of the CITY OF WEST PALM BEACH's negligent retention and assignment of the OFFICER DEFENDANTS, to include, but not limited to: severe mental pain and suffering, severe mental anguish, extreme grief and sorrow, the loss of the decedent's companionship, guidance, consortium and protection, and the loss of support and services previously provided by Marcia May Pochette, lost wages, medical, funeral, burial and travel expenses and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, JUNEL POCHETTE, as personal representative of the Estate

of Marcia May Pochette, demands judgment against the CITY OF WEST PALM BEACH for compensatory damages for the Estate and survivor, together with fees and costs and any such further relief as the Court deems just. Plaintiff further demands a jury trial.

## COUNT XXI (21)

### NEGLIGENT TRAINING AGAINST THE CITY OF WEST PALM BEACH COGNIZABLE UNDER FLORIDA LAW FOR THE WRONGFUL DEATH OF MARCIA MAY POCHETTE

324. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-109 of this Complaint as if fully set forth herein.

325. This Count is pleaded in the alternative to Count I pursuant to Federal Rule of Civil Procedure 8(d)(2). To the extent the conduct of any Officer Defendant is found to have been committed outside the course and scope of his employment, or in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property within the meaning of section 768.28(9)(a), Florida Statutes, the CITY OF WEST PALM BEACH remains directly liable under this Count for its own negligence, through its supervisory and training personnel, in implementing the training required by its own policies.

326. To the extent any incorporated allegation describes a discretionary, judgmental, planning level, or policymaking decision of the CITY OF WEST PALM BEACH, that allegation is incorporated solely as background and as notice to the City, and not as the basis of the negligence alleged in this Count. The negligence alleged in this Count is the City's failure to carry out, at the operational level, the training and supervisory functions its own established policies required.

327. Defendant CITY OF WEST PALM BEACH, having adopted written policies and training protocols governing vehicular pursuits, the operation of unmarked vehicles, the activation of body worn cameras, radio communications, and the rendering and summoning of emergency

89

medical assistance, owed a duty to implement and carry out the training its own policies and protocols required, and to do so with reasonable care. The implementation of the City's established training requirements was an operational function.

328.    The City knew or should have known that its failure to implement its established training requirements posed an unreasonable risk of death or serious bodily injury to the public. The City had actual or constructive notice of that risk through the prior incidents alleged above spanning 2002 through 2023, the July 30, 2021 GHOST unit pursuit and the resulting wrongful death litigation resolved by a City Council approved settlement, the 2021 Special Investigations Audit, the Police Internal Affairs Audit issued March 29, 2022, and the 2021 Stratified Policing Assessment, which identified a lack of accountability among the Department's patrol sergeants, lieutenants, and captains.

329.    Despite this knowledge, the City failed to implement and carry out the training required by its own policies and protocols regarding the initiation and termination of vehicular pursuits, the limitations on pursuits conducted in unmarked vehicles, the required radio communication and supervisory notification during pursuits, the mandatory activation of body worn cameras, and the duty to render and summon emergency medical aid. The City likewise failed to provide its first line and mid level supervisors the training its own supervisory structure required, as reflected in the assessments alleged above.

330.    The City's failure to implement and carry out its established training requirements constituted negligence under Florida law.

331.    The negligent training of Defendant Officers DANIELOVICH, ETIENNE, REKDAHL, BORGEN, LOAYZA, STEDFELT, and THOMAS directly and proximately caused

the unauthorized pursuit, the abandonment of the crash scene, and the wrongful death of MARCIA MAY POCHETTE.

332.    The Personal Representative of the Estate of MARCIA MAY POCHETTE seeks damages for the Estate and surviving spouse as a direct and proximate result of the CITY OF WEST PALM BEACH's negligent failure to implement and carry out its established training requirements, to include, but not limited to: severe mental pain and suffering, severe mental anguish, extreme grief and sorrow, the loss of the decedent's companionship, guidance, consortium and protection, and the loss of support and services previously provided by Marcia May Pochette, lost wages, medical, funeral, burial and travel expenses and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, JUNEL POCHETTE, as personal representative of the Estate of MARCIA MAY POCHETTE, demands judgment against the CITY OF WEST PALM BEACH for compensatory damages for the Estate and survivor, together with fees and costs and any such further relief as the Court deems just. Plaintiff further demands a jury trial.

## COUNT XXII (22)

### NEGLIGENT SUPERVISION AGAINST THE CITY OF WEST PALM BEACH COGNIZABLE UNDER FLORIDA LAW FOR THE WRONGFUL DEATH OF MARCIA MAY POCHETTE

333.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-109 of this Complaint as if fully set forth herein.

334.    This Count is pleaded in the alternative to Count I pursuant to Federal Rule of Civil Procedure 8(d)(2). To the extent the conduct of any Officer Defendant is found to have been committed outside the course and scope of his employment, or in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property within

91

the meaning of section 768.28(9)(a), Florida Statutes, the CITY OF WEST PALM BEACH remains directly liable under this Count for its own negligence in supervising, monitoring, and disciplining its officers pursuant to its own established policies and procedures.

335. To the extent any incorporated allegation describes a discretionary, judgmental, planning level, or policymaking decision of the CITY OF WEST PALM BEACH, that allegation is incorporated solely as background and as notice to the City, and not as the basis of the negligence alleged in this Count. The negligence alleged in this Count is the City's failure to carry out, at the operational level, the training and supervisory functions its own established policies required.

336. Defendant CITY OF WEST PALM BEACH, having adopted written policies establishing supervisory responsibilities over vehicular pursuits, including the requirements of Policy III-25 that pursuits be reported to and monitored by supervisors, reviewed through the chain of command and by the Pursuit Review Board, and documented through required reports, and having established internal accountability processes for the investigation and discipline of officer misconduct, owed a duty to implement and carry out those established supervisory and disciplinary functions with reasonable care. The implementation of the City's established supervisory and disciplinary mechanisms was an operational function.

337. The City knew or should have known that its officers were engaging in unauthorized ghost chases, concealment of pursuits, deactivation of body worn cameras, and abandonment of injured civilians following crashes caused by police pursuits. The City had actual or constructive notice through the prior incidents alleged above spanning 2002 through 2023, the July 30, 2021 GHOST unit pursuit and the resulting wrongful death litigation resolved by a City Council approved settlement, the 2021 Special Investigations Audit, which advised the City that no clear policy required periodic supervisory review of its officers' body worn camera footage and

warned of the risk that officers would deactivate their cameras to conceal improper conduct, the Police Internal Affairs Audit issued March 29, 2022, which documented systemic deficiencies in the Department's mechanisms for investigating and disciplining officer misconduct, the 2021 Stratified Policing Assessment, which identified a lack of accountability among the Department's patrol sergeants, lieutenants, and captains, and the documented disciplinary histories of the officers the City assigned to and retained within the GHOST unit.

338. Despite such knowledge, the City failed to carry out its established supervisory and disciplinary functions, failed to take corrective action, failed to impose discipline, and failed to implement the supervisory safeguards its own auditor had recommended, including by declining, in substance, to make any change in response to the 2021 Special Investigations Audit recommendation for proactive supervisory review of body worn camera footage. The City's supervision of its officers depended entirely on the officers reporting their own conduct, and the City employed no independent means by which a supervisor could detect or intervene in a pursuit the officers attempted to conceal.

339. The City's failure to carry out its established supervisory and disciplinary functions constituted negligence under Florida law.

340. The negligent supervision of Defendant Officers DANIELOVICH, ETIENNE, REKDAHL, BORGEN, LOAYZA, STEDFELT, and THOMAS was a direct and proximate cause of the fatal pursuit, the abandonment of the crash scene, and the wrongful death of MARCIA MAY POCHETTE.

341. The Personal Representative of the Estate of Marcia May Pochette seeks damages for the Estate and surviving spouse as a direct and proximate result of the CITY OF WEST PALM BEACH's negligent failure to carry out its established supervisory and disciplinary functions, to

include, but not limited to: severe mental pain and suffering, severe mental anguish, extreme grief and sorrow, the loss of the decedent's companionship, guidance, consortium and protection, and the loss of support and services previously provided by Marcia May Pochette, lost wages, medical, funeral, burial and travel expenses and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, JUNEL POCHETTE, as personal representative of the Estate of Marcia May Pochette, demands judgment against the CITY OF WEST PALM BEACH for compensatory damages for the Estate and survivor, together with fees and costs and any such further relief as the Court deems just. Plaintiff further demands a jury trial.

## CLAIMS BY AND FOR DEVIN WOODS, THE ESTATE OF JENICE MONIQUE WOODS AND SURVIVOR OF THE DECEDENT, JENICE MONIQUE WOODS

## COUNT XXIII (23)

## WRONGFUL DEATH OF JENICE MONIQUE WOODS AGAINST THE CITY OF WEST PALM BEACH

342.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-63 of this Complaint as if fully set forth herein.

343.    This Count is pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2). In this Count, Plaintiff alleges that the OFFICER DEFENDANTS acted negligently and within the course and scope of their employment with the CITY OF WEST PALM BEACH. To the extent any other count in this Complaint alleges that any Officer Defendant acted in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property, those allegations are pleaded solely in the alternative and are expressly not incorporated into this Count.

94

344. Plaintiff, DEVIN WOODS, is the duly appointed personal representative of the Estate of Jenice Monique Woods, deceased.

345. On July 30, 2024, Jenice Monique Woods was lawfully traveling in a motor vehicle when she was killed because of a high-speed collision negligently created and caused by officers of the West Palm Beach Police Department during an unauthorized pursuit.

346. On July 30, 2024, the Defendant West Palm Beach Police Department Officers, all acting within the course and scope of their employment with the West Palm Beach Police Department, negligently initiated, participated in and engaged in a high-speed vehicular pursuit in direct violation of departmental policy prohibiting such actions under the circumstances. AUSTIN DANIELOVICH negligently operated the involved fully marked black and white West Palm Beach Police Department patrol vehicle. PIERRE ETIENNE negligently operated the involved unmarked West Palm Beach Police Department Dodge Durango SUV. CHRISTOPHER REKDAHL negligently operated the involved unmarked West Palm Beach Police Department Dodge Ram pickup truck. MICHAEL BORGEN negligently participated in the unauthorized high-speed vehicular pursuit as a passenger in the involved West Palm Beach Police Department Dodge Ram pickup truck driven by CHRISTOPHER REKDAHL. WILLIAM LOAYZA negligently participated in the unauthorized high-speed vehicular pursuit as a passenger in the involved West Palm Beach Police Department Dodge Durango SUV driven by PIERRE ETIENNE. BRANDAN STEDFELT negligently participated in the unauthorized high-speed vehicular pursuit as a passenger in the involved West Palm Beach Police Department fully marked black and white patrol vehicle driven by AUSTIN DANIELOVICH. DARIAN THOMAS negligently participated in the unauthorized high-speed vehicular pursuit as a passenger in the involved West Palm Beach Police Department Dodge Ram pickup truck driven by CHRISTOPHER REKDAHL.

347. The DEFENDANT OFFICERS' negligent inactions and conduct created a foreseeable and proximate risk of serious injury and death to innocent civilians, including Jenice Monique Woods.

348. As a direct, legal and proximate result of the negligence of the subject West Palm Beach Police Department Officers, Jenice Monique Woods was caused to suffer fatal injuries.

349. The CITY OF WEST PALM BEACH is responsible and liable pursuant to Florida's Wrongful Death Act, §§ 768.16 through 768.26, and § 768.28, Florida Statutes, for the wrongful death of Jenice Monique Woods caused by the negligence of its employees, the DEFENDANT OFFICERS, committed within the course and scope of their employment.

350. The Personal Representative of the Estate of Jenice Monique Woods seeks damages for the Estate and surviving spouse as a direct and proximate result of the DEFENDANT OFFICERS' negligent actions and inactions to include, but not limited to: severe mental pain and suffering, severe mental anguish, extreme grief and sorrow, the loss of the decedent's companionship, guidance, consortium and protection, and the loss of support and services previously provided by Jenice Monique Woods, lost wages, funeral, burial and travel expenses and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, DEVIN WOODS, as personal representative of the Estate of Jenice Monique Woods, demands judgment against the CITY OF WEST PALM BEACH for damages recoverable under the Florida Wrongful Death Act for the Estate and survivor, together with fees and costs and any such further relief as the Court deems just. Plaintiff further demands a jury trial.

**COUNT XXIV (24)**

96

**FAILURE TO RENDER AID TO JENICE MONIQUE WOODS AGAINST THE CITY OF WEST PALM BEACH AS COGNIZABLE UNDER FLORIDA LAW**

351.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-63 of this Complaint as if fully set forth herein.

352.    This Count is brought under Florida's Wrongful Death Act, §§ 768.16 through 768.26, Florida Statutes, upon a theory of breach distinct from that alleged in Count XXIII, namely the DEFENDANT OFFICERS' negligent failure to render or summon aid following the crash.

353.    This Count is pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2). In this Count, Plaintiff alleges that the OFFICER DEFENDANTS acted negligently and within the course and scope of their employment with the CITY OF WEST PALM BEACH. To the extent any other count in this Complaint alleges that any Officer Defendant acted in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property, those allegations are pleaded solely in the alternative and are expressly not incorporated into this Count.

354.    On July 30, 2024, the Defendant West Palm Beach Police Department Officers caused a fatal motor vehicle collision by their own unauthorized pursuit yet failed to provide and/or request/summon emergency medical services to Marcia May Pochette and Jenice Monique Woods.

355.    Despite knowing Marcia May Pochette and Jenice Monique Woods sustained serious and life threatening injuries, the DEFENDANT OFFICERS failed to stop, render aid, or summon emergency medical assistance, in contravention of departmental training and department policy. The DEFENDANT OFFICERS had a duty to render medical aid and assistance or to summon emergency medical services. The DEFENDANT OFFICERS breached that duty by leaving the crash scene without stopping, without rendering any aid, without summoning emergency medical services, and without notifying any dispatcher, supervisor, or other agency of

97

the crash.

356.    The DEFENDANT OFFICERS' failure to act and/or render aid resulted in Marcia's and Jenice's medical conditions worsening, leading to their immense suffering and was a direct, legal and proximate cause of their deaths.

357.    Having created the peril through their unauthorized pursuit, and having caused and observed the crash and the resulting injuries, the DEFENDANT OFFICERS owed a duty under Florida common law to render medical aid and assistance or to summon such help, and they had the means, opportunity and authority to do so.

358.    At all times material, the DEFENDANT OFFICERS were acting within the course and scope of their employment with the CITY OF WEST PALM BEACH, and the CITY OF WEST PALM BEACH is responsible and liable pursuant to §§ 768.16 through 768.26 and § 768.28, Florida Statutes, for the wrongful death of Jenice Monique Woods caused by the negligence of its employees.

359.    The Personal Representative of the Estate of Jenice Monique Woods seeks damages for the Estate and surviving spouse as a direct and proximate result of the DEFENDANT OFFICERS' negligent failure to render any medical aid following the collision including but not limited to: extreme mental pain and suffering, mental anguish, grief, sorrow, the loss of the decedent's companionship, guidance, and protection, and the loss of support and services previously provided by Jenice Monique Woods, funeral and burial expenses and the loss of prospective net accumulations of the estate had she survived.

WHEREFORE the Plaintiff, DEVIN WOODS as Personal Representative of the Estate of Jenice Monique Woods, demands judgment for the Estate and survivor against the CITY OF WEST PALM BEACH for compensatory damages, together with fees and costs and further relief

as appropriate. The Plaintiff demands a jury trial.

## COUNT XXV (25)

### VIOLATION OF THE FOURTEENTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS OF JENICE MONIQUE WOODS AGAINST AUSTIN DANIELOVICH, INDIVIDUALLY, COGNIZABLE UNDER 42 U.S.C. § 1983.

360. Plaintiff realleges and adopts, as if fully set forth, the allegations contained in paragraphs 1-63 and would further state as follows:

361. At all times material hereto, AUSTIN DANIELOVICH was a sworn law enforcement officer employed by and working for the City of West Palm Beach and the West Palm Beach Police Department, acting under color of law and within the course and scope of his employment as a law enforcement officer.

362. On July 30, 2024, Defendant AUSTIN DANIELOVICH was operating as part of a specialized police unit, the Gang and Habitual Offender Suppression Team (GHOST).

363. On July 30, 2024, Defendant AUSTIN DANIELOVICH, individually and while acting under color of law, initiated, joined, participated in, continued, assisted, encouraged, failed to stop, and/or otherwise engaged in a high-speed vehicular pursuit of NEONI COPELAND, based solely on a minor vehicular traffic infraction, while operating the fully marked black and white West Palm Beach Police Department patrol vehicle.

364. The pursuit was not sufficiently related to any lawful and recognizable basis for seizure or arrest under the circumstances. No forcible felony, violent felony, or other criminal activity justifying the extreme danger of the pursuit was observed when the pursuit was initiated and continued. The high-speed pursuit was conducted using marked and unmarked police vehicles.

365. The pursuit of NEONI COPELAND was an unlawful, unauthorized, and dangerous high-speed vehicular pursuit, colloquially known within the Department as a "ghost chase," conducted without required radio communication, without supervisory notification or monitoring,

99

and without required body-worn camera activation, and was unlawfully concealed from supervisors notwithstanding the visible presence of a marked police vehicle.

366.   The pursuit was conducted through congested and populated public municipal roadways and on Interstate 95 in Palm Beach County, including roadways outside the territorial jurisdiction of the City of West Palm Beach, at speeds approaching and/or exceeding 118 miles per hour, with diminished visibility, heavy vehicular traffic, and travel in or near opposite lanes of travel.

367.   AUSTIN DANIELOVICH undertook and continued the high speed vehicular pursuit with a purpose to cause harm unrelated to the legitimate object of arrest. His conduct was not an instinctive or instantaneous reaction to a sudden emergency. He deliberately initiated and continued a prolonged, covert, and unauthorized pursuit over many minutes and many miles, in violation of the Department's pursuit policy, while deliberately concealing the pursuit from supervision, and he did so in circumstances in which actual deliberation was practical throughout.

368.   AUSTIN DANIELOVICH's purpose in conducting the pursuit was unrelated to any legitimate law enforcement objective, including the apprehension or arrest of NEONI COPELAND. This is evidenced by the fact that, following a high speed pursuit lasting approximately ten minutes and spanning twelve to thirteen miles across multiple jurisdictions, AUSTIN DANIELOVICH and the other pursuing officers made no effort whatsoever to apprehend NEONI COPELAND after the crash, and instead departed the crash scene and returned to their jurisdiction. A pursuit genuinely undertaken to apprehend a fleeing suspect does not end with the pursuing officers abandoning both the suspect and the dying victims.

369.   As a result of AUSTIN DANIELOVICH's intentional acts to cause harm during the high-speed pursuit, the decedent, an innocent third party lawfully traveling on the roadway

100

who was not the subject of the pursuit and posed no threat of harm to anyone, sustained a loss of life, liberty, bodily integrity, and personal security cognizable under the Fourteenth Amendment which is actionable through 42 U.S.C. § 1983.

370.   In the alternative, and pursuant to Federal Rule of Civil Procedure 8(d)(2), regardless of intent, the conduct of AUSTIN DANIELOVICH shocks the conscience because actual deliberation was practical throughout the prolonged pursuit, yet despite having the ability and opportunity to deliberate, AUSTIN DANIELOVICH continued the chase to its fatal conclusion and in so doing acted with deliberate indifference to the known and obvious risk that the unauthorized high speed pursuit would cause death or serious injury to innocent members of the public, including the decedent.

371.   AUSTIN DANIELOVICH further exacerbated the harm against the decedent by intentionally abstaining from proper radio communication, without notifying dispatch and/or a supervisor, without ensuring proper body-worn camera activation, without complying with departmental pursuit reporting requirements, and without complying with the West Palm Beach Police Department's written pursuit policy regarding vehicular pursuits.

372.   After the crash, AUSTIN DANIELOVICH knew, or reasonably should have known, that the decedent had sustained serious, life-threatening, and catastrophic injuries. Despite this knowledge, AUSTIN DANIELOVICH failed to stop, failed to render aid, failed to summon emergency medical assistance, failed to notify dispatch, failed to report the crash, and failed to remain at the scene.

373.   Rather than rendering aid or reporting the fatal crash, AUSTIN DANIELOVICH left the crash scene, failed to notify appropriate law enforcement officials, and also failed to notify

101

emergency medical personnel, despite the wrecked vehicles and extensive crash debris being nearby.

374.    The conduct of AUSTIN DANIELOVICH towards the decedent was objectively unreasonable, conscience-shocking, and constituted a violation of the clearly established constitutional rights of the decedent under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983.

375.    The Estate of JENICE MONIQUE WOODS suffered damages, including but not limited to loss of income and earning capacity, conscious pain and suffering, including the physical and mental pain and suffering associated with the traumatic termination of her pregnancy, medical expenses, death, funeral and burial costs, loss of support and services, loss of companionship, loss of protection, loss of consortium, loss of prospective net accumulations, legal costs and fees, and all other damages recoverable under federal law.

WHEREFORE, Plaintiff demands judgment against the Defendant, individually, for any and all damages allowable by law, including but not limited to compensatory and exemplary damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, post-judgment interest, any and all equitable relief allowed by law, and further demands trial by jury on all issues so triable.

### COUNT XXVI (26)

### VIOLATION OF THE FOURTEENTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS OF JENICE MONIQUE WOODS AGAINST PIERRE ETIENNE, INDIVIDUALLY, COGNIZABLE UNDER 42 U.S.C. § 1983.

376.    Plaintiff realleges and adopts, as if fully set forth, the allegations contained in paragraphs 1-63 and would further state as follows:

102

377. At all times material hereto, PIERRE ETIENNE was a sworn law enforcement officer employed by and working for the City of West Palm Beach and the West Palm Beach Police Department, acting under color of law and within the course and scope of his employment as a law enforcement officer.

378. On July 30, 2024, Defendant PIERRE ETIENNE was operating as part of a specialized police unit, the Gang and Habitual Offender Suppression Team (GHOST).

379. On July 30, 2024, Defendant PIERRE ETIENNE, individually and while acting under color of law, initiated, joined, participated in, continued, assisted, encouraged, failed to stop, and/or otherwise engaged in a high-speed vehicular pursuit of NEONI COPELAND, based solely on a minor vehicular traffic infraction, while operating the unmarked West Palm Beach Police Department Dodge Durango SUV.

380. The pursuit was not sufficiently related to any lawful and recognizable basis for seizure or arrest under the circumstances. No forcible felony, violent felony, or other criminal activity justifying the extreme danger of the pursuit was observed when the pursuit was initiated and continued. The high-speed pursuit was conducted using marked and unmarked police vehicles.

381. The pursuit of NEONI COPELAND was an unlawful, unauthorized, and dangerous high-speed vehicular pursuit, colloquially known within the Department as a "ghost chase," conducted with the use of low-visibility and unmarked police vehicles, without required radio communication, without supervisory notification or monitoring, and without required body-worn camera activation.

382. The pursuit was conducted through congested and populated public municipal roadways and on Interstate 95 in Palm Beach County, including roadways outside the territorial jurisdiction of the City of West Palm Beach, at speeds approaching and/or exceeding 118 miles

per hour, with diminished visibility, heavy vehicular traffic, and travel in or near opposite lanes of travel.

383.    PIERRE ETIENNE undertook and continued the high speed vehicular pursuit with a purpose to cause harm unrelated to the legitimate object of arrest. His conduct was not an instinctive or instantaneous reaction to a sudden emergency. He deliberately initiated and continued a prolonged, covert, and unauthorized pursuit over many minutes and many miles, in violation of the Department's pursuit policy, while deliberately concealing the pursuit from supervision, and he did so in circumstances in which actual deliberation was practical throughout.

384.    PIERRE ETIENNE's purpose in conducting the pursuit was unrelated to any legitimate law enforcement objective, including the apprehension or arrest of NEONI COPELAND. This is evidenced by the fact that, following a high speed pursuit lasting approximately ten minutes and spanning twelve to thirteen miles across multiple jurisdictions, PIERRE ETIENNE and the other pursuing officers made no effort whatsoever to apprehend NEONI COPELAND after the crash, and instead departed the crash scene and returned to their jurisdiction. A pursuit genuinely undertaken to apprehend a fleeing suspect does not end with the pursuing officers abandoning both the suspect and the dying victims.

385.    As a result of PIERRE ETIENNE's intentional acts to cause harm during the high-speed pursuit, the decedent, an innocent third party lawfully traveling on the roadway who was not the subject of the pursuit and posed no threat of harm to anyone, sustained a loss of life, liberty, bodily integrity, and personal security cognizable under the Fourteenth Amendment which is actionable through 42 U.S.C. § 1983.

386.    In the alternative, and pursuant to Federal Rule of Civil Procedure 8(d)(2), regardless of intent, the conduct of PIERRE ETIENNE shocks the conscience because actual

deliberation was practical throughout the prolonged pursuit, yet despite having the ability and opportunity to deliberate, PIERRE ETIENNE continued the chase to its fatal conclusion and in so doing acted with deliberate indifference to the known and obvious risk that the unauthorized high speed pursuit would cause death or serious injury to innocent members of the public, including the decedent.

387.   PIERRE ETIENNE further exacerbated the harm against the decedent by intentionally abstaining from proper radio communication, without notifying dispatch and/or a supervisor, without ensuring proper body-worn camera activation, without complying with departmental pursuit reporting requirements, and without complying with the West Palm Beach Police Department's written pursuit policy regarding vehicular pursuits.

388.   After the crash, PIERRE ETIENNE knew, or reasonably should have known, that the decedent had sustained serious, life-threatening, and catastrophic injuries. Despite this knowledge, PIERRE ETIENNE failed to stop, failed to render aid, failed to summon emergency medical assistance, failed to notify dispatch, failed to report the crash, and failed to remain at the scene.

389.   Rather than rendering aid or reporting the fatal crash, PIERRE ETIENNE left the crash scene, failed to notify appropriate law enforcement officials, and also failed to notify emergency medical personnel, despite the wrecked vehicles and extensive crash debris being nearby.

390.   The conduct of PIERRE ETIENNE towards the decedent was objectively unreasonable, conscience-shocking, and constituted a violation of the clearly established constitutional rights of the decedent under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983.

391. The Estate of JENICE MONIQUE WOODS suffered damages, including but not limited to loss of income and earning capacity, conscious pain and suffering, including the physical and mental pain and suffering associated with the traumatic termination of her pregnancy, medical expenses, death, funeral and burial costs, loss of support and services, loss of companionship, loss of protection, loss of consortium, loss of prospective net accumulations, legal costs and fees, and all other damages recoverable under federal law.

WHEREFORE, Plaintiff demands judgment against the Defendant, individually, for any and all damages allowable by law, including but not limited to compensatory and exemplary damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, post-judgment interest, any and all equitable relief allowed by law, and further demands trial by jury on all issues so triable.

## COUNT XXVII (27)

### VIOLATION OF THE FOURTEENTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS OF JENICE MONIQUE WOODS AGAINST CHRISTOPHER REKDAHL, INDIVIDUALLY, COGNIZABLE UNDER 42 U.S.C. § 1983.

392. Plaintiff realleges and adopts, as if fully set forth, the allegations contained in paragraphs 1-63 and would further state as follows:

393. At all times material hereto, CHRISTOPHER REKDAHL was a sworn law enforcement officer employed by and working for the City of West Palm Beach and the West Palm Beach Police Department, acting under color of law and within the course and scope of his employment as a law enforcement officer.

394. On July 30, 2024, Defendant CHRISTOPHER REKDAHL was operating as part of a specialized police unit, the Gang and Habitual Offender Suppression Team (GHOST).

106

395. On July 30, 2024, Defendant CHRISTOPHER REKDAHL, individually and while acting under color of law, initiated, joined, participated in, continued, assisted, encouraged, failed to stop, and/or otherwise engaged in a high-speed vehicular pursuit of NEONI COPELAND, based solely on a minor vehicular traffic infraction, while operating the unmarked West Palm Beach Police Department Dodge Ram pickup truck.

396. The pursuit was not sufficiently related to any lawful and recognizable basis for seizure or arrest under the circumstances. No forcible felony, violent felony, or other criminal activity justifying the extreme danger of the pursuit was observed when the pursuit was initiated and continued. The high-speed pursuit was conducted using marked and unmarked police vehicles.

397. The pursuit of NEONI COPELAND was an unlawful, unauthorized, and dangerous high-speed vehicular pursuit, colloquially known within the Department as a "ghost chase," conducted with the use of low-visibility and unmarked police vehicles, without required radio communication, without supervisory notification or monitoring, and without required body-worn camera activation.

398. The pursuit was conducted through congested and populated public municipal roadways and on Interstate 95 in Palm Beach County, including roadways outside the territorial jurisdiction of the City of West Palm Beach, at speeds approaching and/or exceeding 118 miles per hour, with diminished visibility, heavy vehicular traffic, and travel in or near opposite lanes of travel.

399. CHRISTOPHER REKDAHL undertook and continued the high speed vehicular pursuit with a purpose to cause harm unrelated to the legitimate object of arrest. His conduct was not an instinctive or instantaneous reaction to a sudden emergency. He deliberately initiated and continued a prolonged, covert, and unauthorized pursuit over many minutes and many miles, in

107

violation of the Department's pursuit policy, while deliberately concealing the pursuit from supervision, and he did so in circumstances in which actual deliberation was practical throughout.

400.    CHRISTOPHER REKDAHL's purpose in conducting the pursuit was unrelated to any legitimate law enforcement objective, including the apprehension or arrest of NEONI COPELAND. This is evidenced by the fact that, following a high speed pursuit lasting approximately ten minutes and spanning twelve to thirteen miles across multiple jurisdictions, CHRISTOPHER REKDAHL and the other pursuing officers made no effort whatsoever to apprehend NEONI COPELAND after the crash, and instead departed the crash scene and returned to their jurisdiction. A pursuit genuinely undertaken to apprehend a fleeing suspect does not end with the pursuing officers abandoning both the suspect and the dying victims.

401.    As a result of CHRISTOPHER REKDAHL's intentional acts to cause harm during the high-speed pursuit, the decedent, an innocent third party lawfully traveling on the roadway who was not the subject of the pursuit and posed no threat of harm to anyone, sustained a loss of life, liberty, bodily integrity, and personal security cognizable under the Fourteenth Amendment which is actionable through 42 U.S.C. § 1983.

402.    In the alternative, and pursuant to Federal Rule of Civil Procedure 8(d)(2), regardless of intent, the conduct of CHRISTOPHER REKDAHL shocks the conscience because actual deliberation was practical throughout the prolonged pursuit, yet despite having the ability and opportunity to deliberate, CHRISTOPHER REKDAHL continued the chase to its fatal conclusion and in so doing acted with deliberate indifference to the known and obvious risk that the unauthorized high speed pursuit would cause death or serious injury to innocent members of the public, including the decedent.

108

403. CHRISTOPHER REKDAHL further exacerbated the harm against the decedent by intentionally abstaining from proper radio communication, without notifying dispatch and/or a supervisor, without ensuring proper body-worn camera activation, without complying with departmental pursuit reporting requirements, and without complying with the West Palm Beach Police Department's written pursuit policy regarding vehicular pursuits.

404. After the crash, CHRISTOPHER REKDAHL knew, or reasonably should have known, that the decedent had sustained serious, life-threatening, and catastrophic injuries. Despite this knowledge, CHRISTOPHER REKDAHL failed to stop, failed to render aid, failed to summon emergency medical assistance, failed to notify dispatch, failed to report the crash, and failed to remain at the scene.

405. Rather than rendering aid or reporting the fatal crash, CHRISTOPHER REKDAHL left the crash scene, failed to notify appropriate law enforcement officials, and also failed to notify emergency medical personnel, despite the wrecked vehicles and extensive crash debris being nearby.

406. The conduct of CHRISTOPHER REKDAHL towards the decedent was objectively unreasonable, conscience-shocking, and constituted a violation of the clearly established constitutional rights of the decedent under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983.

407. The Estate of JENICE MONIQUE WOODS suffered damages, including but not limited to loss of income and earning capacity, conscious pain and suffering, including the physical and mental pain and suffering associated with the traumatic termination of her pregnancy, medical expenses, death, funeral and burial costs, loss of support and services, loss of companionship, loss

109

of protection, loss of consortium, loss of prospective net accumulations, legal costs and fees, and all other damages recoverable under federal law.

WHEREFORE, Plaintiff demands judgment against the Defendant, individually, for any and all damages allowable by law, including but not limited to compensatory and exemplary damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, post-judgment interest, any and all equitable relief allowed by law, and further demands trial by jury on all issues so triable.

**COUNT XXVIII (28)**

**VIOLATION OF THE FOURTEENTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS OF JENICE MONIQUE WOODS AGAINST MICHAEL BORGEN, INDIVIDUALLY, COGNIZABLE UNDER 42 U.S.C. § 1983.**

408.	Plaintiff realleges and adopts, as if fully set forth, the allegations contained in paragraphs 1-63 and would further state as follows:

409.	At all times material hereto, MICHAEL BORGEN was a sworn law enforcement officer employed by and working for the City of West Palm Beach and the West Palm Beach Police Department, acting under color of law and within the course and scope of his employment as a law enforcement officer.

410.	On July 30, 2024, Defendant MICHAEL BORGEN was operating as part of a specialized police unit, the Gang and Habitual Offender Suppression Team (GHOST).

411.	On July 30, 2024, Defendant MICHAEL BORGEN, individually and while acting under color of law, joined, participated in, continued, assisted, encouraged, and/or otherwise engaged in a high-speed vehicular pursuit of NEONI COPELAND, based solely on a minor vehicular traffic infraction, as a passenger in the unmarked West Palm Beach Police Department Dodge Ram pickup truck driven by CHRISTOPHER REKDAHL.

110

412. The pursuit was not sufficiently related to any lawful and recognizable basis for seizure or arrest under the circumstances. No forcible felony, violent felony, or other criminal activity justifying the extreme danger of the pursuit was observed when the pursuit was initiated and continued. The high-speed pursuit was conducted using marked and unmarked police vehicles.

413. The pursuit of NEONI COPELAND was an unlawful, unauthorized, and dangerous high-speed vehicular pursuit, colloquially known within the Department as a "ghost chase," conducted with the use of low-visibility and unmarked police vehicles, without required radio communication, without supervisory notification or monitoring, and without required body-worn camera activation.

414. The pursuit was conducted through congested and populated public municipal roadways and on Interstate 95 in Palm Beach County, including roadways outside the territorial jurisdiction of the City of West Palm Beach, at speeds approaching and/or exceeding 118 miles per hour, with diminished visibility, heavy vehicular traffic, and travel in or near opposite lanes of travel.

415. MICHAEL BORGEN actively participated in, encouraged, and failed to intervene in the high speed vehicular pursuit, despite having both the authority and the opportunity to do so throughout its duration. His conduct was not an instinctive or instantaneous reaction to a sudden emergency. He deliberately continued his participation in a prolonged, covert, and unauthorized pursuit over many minutes and many miles, in violation of the Department's pursuit policy, while knowingly permitting the pursuit to be concealed from supervision, and he did so in circumstances in which actual deliberation was practical throughout.

416. MICHAEL BORGEN's participation in the pursuit was unrelated to any legitimate law enforcement objective, including the apprehension or arrest of NEONI COPELAND. This is

evidenced by the fact that, following a high speed pursuit lasting approximately ten minutes and spanning twelve to thirteen miles across multiple jurisdictions, MICHAEL BORGEN and the other pursuing officers made no effort whatsoever to apprehend NEONI COPELAND after the crash, and instead departed the crash scene and returned to their jurisdiction. A pursuit genuinely undertaken to apprehend a fleeing suspect does not end with the pursuing officers abandoning both the suspect and the dying victims.

417.    As a result of MICHAEL BORGEN's intentional participation in and failure to intervene in the high-speed pursuit, the decedent, an innocent third party lawfully traveling on the roadway who was not the subject of the pursuit and posed no threat of harm to anyone, sustained a loss of life, liberty, bodily integrity, and personal security cognizable under the Fourteenth Amendment which is actionable through 42 U.S.C. § 1983.

418.    In the alternative, and pursuant to Federal Rule of Civil Procedure 8(d)(2), regardless of intent, the conduct of MICHAEL BORGEN shocks the conscience because actual deliberation was practical throughout the prolonged pursuit, yet despite having the ability and opportunity to deliberate, MICHAEL BORGEN continued his participation in the chase to its fatal conclusion and in so doing acted with deliberate indifference to the known and obvious risk that the unauthorized high speed pursuit would cause death or serious injury to innocent members of the public, including the decedent.

419.    MICHAEL BORGEN further exacerbated the harm against the decedent by intentionally abstaining from proper radio communication, without notifying dispatch and/or a supervisor, without ensuring proper body-worn camera activation, without complying with departmental pursuit reporting requirements, and without complying with the West Palm Beach Police Department's written pursuit policy regarding vehicular pursuits.

420.    After the crash, MICHAEL BORGEN knew, or reasonably should have known, that the decedent had sustained serious, life-threatening, and catastrophic injuries. Despite this knowledge, MICHAEL BORGEN failed to stop, failed to render aid, failed to summon emergency medical assistance, failed to notify dispatch, failed to report the crash, and failed to remain at the scene.

421.    Rather than rendering aid or reporting the fatal crash, MICHAEL BORGEN was in the unmarked West Palm Beach Police Department Dodge Ram pickup truck that drove past the crash scene without stopping, failed to notify appropriate law enforcement officials, and also failed to notify emergency medical personnel, despite the wrecked vehicles and extensive crash debris being nearby.

422.    The conduct of MICHAEL BORGEN towards the decedent was objectively unreasonable, conscience-shocking, and constituted a violation of the clearly established constitutional rights of the decedent under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983.

423.    The Estate of JENICE MONIQUE WOODS suffered damages, including but not limited to loss of income and earning capacity, conscious pain and suffering, including the physical and mental pain and suffering associated with the traumatic termination of her pregnancy, medical expenses, death, funeral and burial costs, loss of support and services, loss of companionship, loss of protection, loss of consortium, loss of prospective net accumulations, legal costs and fees, and all other damages recoverable under federal law.

WHEREFORE, Plaintiff demands judgment against the Defendant, individually, for any and all damages allowable by law, including but not limited to compensatory and exemplary damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, post-judgment interest,

any and all equitable relief allowed by law, and further demands trial by jury on all issues so triable.

## COUNT XXIX (29)

## VIOLATION OF THE FOURTEENTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS OF JENICE MONIQUE WOODS AGAINST WILLIAM LOAYZA, INDIVIDUALLY, COGNIZABLE UNDER 42 U.S.C. § 1983.

424.     Plaintiff realleges and adopts, as if fully set forth, the allegations contained in paragraphs 1-63 and would further state as follows:

425.     At all times material hereto, WILLIAM LOAYZA was a sworn law enforcement officer employed by and working for the City of West Palm Beach and the West Palm Beach Police Department, acting under color of law and within the course and scope of his employment as a law enforcement officer.

426.     On July 30, 2024, Defendant WILLIAM LOAYZA was operating as part of a specialized police unit, the Gang and Habitual Offender Suppression Team (GHOST).

427.     On July 30, 2024, Defendant WILLIAM LOAYZA, individually and while acting under color of law, joined, participated in, continued, assisted, encouraged, and/or otherwise engaged in a high-speed vehicular pursuit of NEONI COPELAND, based solely on a minor vehicular traffic infraction, as a passenger in the unmarked West Palm Beach Police Department Dodge Durango SUV driven by PIERRE ETIENNE.

428.     The pursuit was not sufficiently related to any lawful and recognizable basis for seizure or arrest under the circumstances. No forcible felony, violent felony, or other criminal activity justifying the extreme danger of the pursuit was observed when the pursuit was initiated and continued. The high-speed pursuit was conducted using marked and unmarked police vehicles.

114

429. The pursuit of NEONI COPELAND was an unlawful, unauthorized, and dangerous high-speed vehicular pursuit, colloquially known within the Department as a "ghost chase," conducted with the use of low-visibility and unmarked police vehicles, without required radio communication, without supervisory notification or monitoring, and without required body-worn camera activation.

430. The pursuit was conducted through congested and populated public municipal roadways and on Interstate 95 in Palm Beach County, including roadways outside the territorial jurisdiction of the City of West Palm Beach, at speeds approaching and/or exceeding 118 miles per hour, with diminished visibility, heavy vehicular traffic, and travel in or near opposite lanes of travel.

431. WILLIAM LOAYZA actively participated in, encouraged, and failed to intervene in the high speed vehicular pursuit, despite having both the authority and the opportunity to do so throughout its duration. His conduct was not an instinctive or instantaneous reaction to a sudden emergency. He deliberately continued his participation in a prolonged, covert, and unauthorized pursuit over many minutes and many miles, in violation of the Department's pursuit policy, while knowingly permitting the pursuit to be concealed from supervision, and he did so in circumstances in which actual deliberation was practical throughout.

432. WILLIAM LOAYZA's participation in the pursuit was unrelated to any legitimate law enforcement objective, including the apprehension or arrest of NEONI COPELAND. This is evidenced by the fact that, following a high speed pursuit lasting approximately ten minutes and spanning twelve to thirteen miles across multiple jurisdictions, WILLIAM LOAYZA and the other pursuing officers made no effort whatsoever to apprehend NEONI COPELAND after the crash, and instead departed the crash scene and returned to their jurisdiction. A pursuit

genuinely undertaken to apprehend a fleeing suspect does not end with the pursuing officers abandoning both the suspect and the dying victims.

433. As a result of WILLIAM LOAYZA's intentional participation in and failure to intervene in the high-speed pursuit, the decedent, an innocent third party lawfully traveling on the roadway who was not the subject of the pursuit and posed no threat of harm to anyone, sustained a loss of life, liberty, bodily integrity, and personal security cognizable under the Fourteenth Amendment which is actionable through 42 U.S.C. § 1983.

434. In the alternative, and pursuant to Federal Rule of Civil Procedure 8(d)(2), regardless of intent, the conduct of WILLIAM LOAYZA shocks the conscience because actual deliberation was practical throughout the prolonged pursuit, yet despite having the ability and opportunity to deliberate, WILLIAM LOAYZA continued his participation in the chase to its fatal conclusion and in so doing acted with deliberate indifference to the known and obvious risk that the unauthorized high speed pursuit would cause death or serious injury to innocent members of the public, including the decedent.

435. WILLIAM LOAYZA further exacerbated the harm against the decedent by intentionally abstaining from proper radio communication, without notifying dispatch and/or a supervisor, without ensuring proper body-worn camera activation, without complying with departmental pursuit reporting requirements, and without complying with the West Palm Beach Police Department's written pursuit policy regarding vehicular pursuits.

436. After the crash, WILLIAM LOAYZA knew, or reasonably should have known, that the decedent had sustained serious, life-threatening, and catastrophic injuries. Despite this knowledge, WILLIAM LOAYZA failed to stop, failed to render aid, failed to summon

116

emergency medical assistance, failed to notify dispatch, failed to report the crash, and failed to remain at the scene.

437.   Rather than rendering aid or reporting the fatal crash, WILLIAM LOAYZA was in the unmarked West Palm Beach Police Department Dodge Durango SUV that drove past the crash scene without stopping, failed to notify appropriate law enforcement officials, and also failed to notify emergency medical personnel, despite the wrecked vehicles and extensive crash debris being nearby.

438.   The conduct of WILLIAM LOAYZA towards the decedent was objectively unreasonable, conscience-shocking, and constituted a violation of the clearly established constitutional rights of the decedent under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983.

439.   The Estate of JENICE MONIQUE WOODS suffered damages, including but not limited to loss of income and earning capacity, conscious pain and suffering, including the physical and mental pain and suffering associated with the traumatic termination of her pregnancy, medical expenses, death, funeral and burial costs, loss of support and services, loss of companionship, loss of protection, loss of consortium, loss of prospective net accumulations, legal costs and fees, and all other damages recoverable under federal law.

WHEREFORE, Plaintiff demands judgment against the Defendant, individually, for any and all damages allowable by law, including but not limited to compensatory and exemplary damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, post-judgment interest, any and all equitable relief allowed by law, and further demands trial by jury on all issues so triable.

**COUNT XXX (30)**

117

## VIOLATION OF THE FOURTEENTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS OF JENICE MONIQUE WOODS AGAINST BRANDAN STEDFELT, INDIVIDUALLY, COGNIZABLE UNDER 42 U.S.C. § 1983.

440.    Plaintiff realleges and adopts, as if fully set forth, the allegations contained in paragraphs 1-63 and would further state as follows:

441.    At all times material hereto, BRANDAN STEDFELT was a sworn law enforcement officer employed by and working for the City of West Palm Beach and the West Palm Beach Police Department, acting under color of law and within the course and scope of his employment as a law enforcement officer.

442.    On July 30, 2024, Defendant BRANDAN STEDFELT was operating as part of a specialized police unit, the Gang and Habitual Offender Suppression Team (GHOST).

443.    On July 30, 2024, Defendant BRANDAN STEDFELT, individually and while acting under color of law, joined, participated in, continued, assisted, encouraged, and/or otherwise engaged in a high-speed vehicular pursuit of NEONI COPELAND, based solely on a minor vehicular traffic infraction, as a passenger in the fully marked black and white West Palm Beach Police Department patrol vehicle driven by AUSTIN DANIELOVICH.

444.    The pursuit was not sufficiently related to any lawful and recognizable basis for seizure or arrest under the circumstances. No forcible felony, violent felony, or other criminal activity justifying the extreme danger of the pursuit was observed when the pursuit was initiated and continued. The high-speed pursuit was conducted using marked and unmarked police vehicles.

445.    The pursuit of NEONI COPELAND was an unlawful, unauthorized, and dangerous high-speed vehicular pursuit, colloquially known within the Department as a "ghost chase," conducted without required radio communication, without supervisory notification or monitoring,

118

and without required body-worn camera activation, and was unlawfully concealed from supervisors notwithstanding the visible presence of a marked police vehicle.

446. The pursuit was conducted through congested and populated public municipal roadways and on Interstate 95 in Palm Beach County, including roadways outside the territorial jurisdiction of the City of West Palm Beach, at speeds approaching and/or exceeding 118 miles per hour, with diminished visibility, heavy vehicular traffic, and travel in or near opposite lanes of travel.

447. BRANDAN STEDFELT actively participated in, encouraged, and failed to intervene in the high speed vehicular pursuit, despite having both the authority and the opportunity to do so throughout its duration. His conduct was not an instinctive or instantaneous reaction to a sudden emergency. He deliberately continued his participation in a prolonged, covert, and unauthorized pursuit over many minutes and many miles, in violation of the Department's pursuit policy, while knowingly permitting the pursuit to be concealed from supervision, and he did so in circumstances in which actual deliberation was practical throughout.

448. BRANDAN STEDFELT's participation in the pursuit was unrelated to any legitimate law enforcement objective, including the apprehension or arrest of NEONI COPELAND. This is evidenced by the fact that, following a high speed pursuit lasting approximately ten minutes and spanning twelve to thirteen miles across multiple jurisdictions, BRANDAN STEDFELT and the other pursuing officers made no effort whatsoever to apprehend NEONI COPELAND after the crash, and instead departed the crash scene and returned to their jurisdiction. A pursuit genuinely undertaken to apprehend a fleeing suspect does not end with the pursuing officers abandoning both the suspect and the dying victims.

119

449. As a result of BRANDAN STEDFELT's intentional participation in and failure to intervene in the high-speed pursuit, the decedent, an innocent third party lawfully traveling on the roadway who was not the subject of the pursuit and posed no threat of harm to anyone, sustained a loss of life, liberty, bodily integrity, and personal security cognizable under the Fourteenth Amendment which is actionable through 42 U.S.C. § 1983.

450. In the alternative, and pursuant to Federal Rule of Civil Procedure 8(d)(2), regardless of intent, the conduct of BRANDAN STEDFELT shocks the conscience because actual deliberation was practical throughout the prolonged pursuit, yet despite having the ability and opportunity to deliberate, BRANDAN STEDFELT continued his participation in the chase to its fatal conclusion and in so doing acted with deliberate indifference to the known and obvious risk that the unauthorized high speed pursuit would cause death or serious injury to innocent members of the public, including the decedent.

451. BRANDAN STEDFELT further exacerbated the harm against the decedent by intentionally abstaining from proper radio communication, without notifying dispatch and/or a supervisor, without ensuring proper body-worn camera activation, without complying with departmental pursuit reporting requirements, and without complying with the West Palm Beach Police Department's written pursuit policy regarding vehicular pursuits.

452. After the crash, BRANDAN STEDFELT knew, or reasonably should have known, that the decedent had sustained serious, life-threatening, and catastrophic injuries. Despite this knowledge, BRANDAN STEDFELT failed to stop, failed to render aid, failed to summon emergency medical assistance, failed to notify dispatch, failed to report the crash, and failed to remain at the scene.

453. Rather than rendering aid or reporting the fatal crash, BRANDAN STEDFELT was in the fully marked black and white West Palm Beach Police Department patrol vehicle that drove past the crash scene without stopping, failed to notify appropriate law enforcement officials, and also failed to notify emergency medical personnel, despite the wrecked vehicles and extensive crash debris being nearby.

454. The conduct of BRANDAN STEDFELT towards the decedent was objectively unreasonable, conscience-shocking, and constituted a violation of the clearly established constitutional rights of the decedent under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983.

455. The Estate of JENICE MONIQUE WOODS suffered damages, including but not limited to loss of income and earning capacity, conscious pain and suffering, including the physical and mental pain and suffering associated with the traumatic termination of her pregnancy, medical expenses, death, funeral and burial costs, loss of support and services, loss of companionship, loss of protection, loss of consortium, loss of prospective net accumulations, legal costs and fees, and all other damages recoverable under federal law.

WHEREFORE, Plaintiff demands judgment against the Defendant, individually, for any and all damages allowable by law, including but not limited to compensatory and exemplary damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, post-judgment interest, any and all equitable relief allowed by law, and further demands trial by jury on all issues so triable.

## COUNT XXXI (31)

### VIOLATION OF THE FOURTEENTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS OF JENICE MONIQUE WOODS AGAINST DARIAN THOMAS, INDIVIDUALLY, COGNIZABLE UNDER 42 U.S.C. § 1983.

121

456.    Plaintiff realleges and adopts, as if fully set forth, the allegations contained in paragraphs 1-63 and would further state as follows:

457.    At all times material hereto, DARIAN THOMAS was a sworn law enforcement officer employed by and working for the City of West Palm Beach and the West Palm Beach Police Department, acting under color of law and within the course and scope of his employment as a law enforcement officer.

458.    On July 30, 2024, Defendant DARIAN THOMAS was operating as part of a specialized police unit, the Gang and Habitual Offender Suppression Team (GHOST).

459.    On July 30, 2024, Defendant DARIAN THOMAS, individually and while acting under color of law, joined, participated in, continued, assisted, encouraged, and/or otherwise engaged in a high-speed vehicular pursuit of NEONI COPELAND, based solely on a minor vehicular traffic infraction, as a passenger in the unmarked West Palm Beach Police Department Dodge Ram pickup truck driven by CHRISTOPHER REKDAHL.

460.    The pursuit was not sufficiently related to any lawful and recognizable basis for seizure or arrest under the circumstances. No forcible felony, violent felony, or other criminal activity justifying the extreme danger of the pursuit was observed when the pursuit was initiated and continued. The high-speed pursuit was conducted using marked and unmarked police vehicles.

461.    The pursuit of NEONI COPELAND was an unlawful, unauthorized, and dangerous high-speed vehicular pursuit, colloquially known within the Department as a "ghost chase," conducted with the use of low-visibility and unmarked police vehicles, without required radio communication, without supervisory notification or monitoring, and without required body-worn camera activation.

122

462. The pursuit was conducted through congested and populated public municipal roadways and on Interstate 95 in Palm Beach County, including roadways outside the territorial jurisdiction of the City of West Palm Beach, at speeds approaching and/or exceeding 118 miles per hour, with diminished visibility, heavy vehicular traffic, and travel in or near opposite lanes of travel.

463. DARIAN THOMAS actively participated in, encouraged, and failed to intervene in the high speed vehicular pursuit, despite having both the authority and the opportunity to do so throughout its duration. His conduct was not an instinctive or instantaneous reaction to a sudden emergency. He deliberately continued his participation in a prolonged, covert, and unauthorized pursuit over many minutes and many miles, in violation of the Department's pursuit policy, while knowingly permitting the pursuit to be concealed from supervision, and he did so in circumstances in which actual deliberation was practical throughout.

464. DARIAN THOMAS's participation in the pursuit was unrelated to any legitimate law enforcement objective, including the apprehension or arrest of NEONI COPELAND. This is evidenced by the fact that, following a high speed pursuit lasting approximately ten minutes and spanning twelve to thirteen miles across multiple jurisdictions, DARIAN THOMAS and the other pursuing officers made no effort whatsoever to apprehend NEONI COPELAND after the crash, and instead departed the crash scene and returned to their jurisdiction. A pursuit genuinely undertaken to apprehend a fleeing suspect does not end with the pursuing officers abandoning both the suspect and the dying victims.

465. As a result of DARIAN THOMAS's intentional participation in and failure to intervene in the high-speed pursuit, the decedent, an innocent third party lawfully traveling on the roadway who was not the subject of the pursuit and posed no threat of harm to anyone, sustained

a loss of life, liberty, bodily integrity, and personal security cognizable under the Fourteenth Amendment which is actionable through 42 U.S.C. § 1983.

466.    In the alternative, and pursuant to Federal Rule of Civil Procedure 8(d)(2), regardless of intent, the conduct of DARIAN THOMAS shocks the conscience because actual deliberation was practical throughout the prolonged pursuit, yet despite having the ability and opportunity to deliberate, DARIAN THOMAS continued his participation in the chase to its fatal conclusion and in so doing acted with deliberate indifference to the known and obvious risk that the unauthorized high speed pursuit would cause death or serious injury to innocent members of the public, including the decedent.

467.    DARIAN THOMAS further exacerbated the harm against the decedent by intentionally abstaining from proper radio communication, without notifying dispatch and/or a supervisor, without ensuring proper body-worn camera activation, without complying with departmental pursuit reporting requirements, and without complying with the West Palm Beach Police Department's written pursuit policy regarding vehicular pursuits.

468.    After the crash, DARIAN THOMAS knew, or reasonably should have known, that the decedent had sustained serious, life-threatening, and catastrophic injuries. Despite this knowledge, DARIAN THOMAS failed to stop, failed to render aid, failed to summon emergency medical assistance, failed to notify dispatch, failed to report the crash, and failed to remain at the scene.

469.    Rather than rendering aid or reporting the fatal crash, DARIAN THOMAS was in the unmarked West Palm Beach Police Department Dodge Ram pickup truck that drove past the crash scene without stopping, failed to notify appropriate law enforcement officials, and also failed

124

to notify emergency medical personnel, despite the wrecked vehicles and extensive crash debris being nearby.

470.   The conduct of DARIAN THOMAS towards the decedent was objectively unreasonable, conscience-shocking, and constituted a violation of the clearly established constitutional rights of the decedent under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983.

471.   The Estate of JENICE MONIQUE WOODS suffered damages, including but not limited to loss of income and earning capacity, conscious pain and suffering, including the physical and mental pain and suffering associated with the traumatic termination of her pregnancy, medical expenses, death, funeral and burial costs, loss of support and services, loss of companionship, loss of protection, loss of consortium, loss of prospective net accumulations, legal costs and fees, and all other damages recoverable under federal law.

WHEREFORE, Plaintiff demands judgment against the Defendant, individually, for any and all damages allowable by law, including but not limited to compensatory and exemplary damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, post-judgment interest, any and all equitable relief allowed by law, and further demands trial by jury on all issues so triable.

## COUNT XXXII (32)

### CLAIM AGAINST THE CITY OF WEST PALM BEACH COGNIZABLE UNDER 42 U.S.C. § 1983 FOR THE WRONGFUL DEATH OF JENICE MONIQUE WOODS

472.	Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-109 of this Complaint as if fully set forth herein.

473.	At all material times, the OFFICER DEFENDANTS acted under color of state law and, in the course of the unauthorized high speed pursuit described above, deprived Jenice Monique Woods of her rights under the Fourteenth Amendment to the United States Constitution, as further alleged herein.

474.	The City of West Palm Beach is liable for that deprivation under 42 U.S.C. § 1983 on two independent bases. First, the deprivation was caused by a longstanding, department wide custom of the West Palm Beach Police Department. Second, the Department's final policymaker endorsed and condoned that custom and the practices of the GHOST unit through which that custom operated.

475.	Long before the creation of the GHOST unit, and continuing through the date of the subject incident, the West Palm Beach Police Department maintained a widespread and persistent custom of tolerating unauthorized and dangerous high speed vehicular pursuits, including pursuits conducted in unmarked vehicles and pursuits undertaken for minor or nonviolent offenses, and of failing to enforce its own vehicular pursuit policy against the officers who conducted them. This custom is reflected in the recurring pattern of pursuit related crashes, serious injuries, and deaths described in the Historical and Prior Incidents section above, which span the period from 2002 through 2023.

476.	The practice of conducting unauthorized and covert high speed pursuits, including the practice known within the Department as a ghost chase, was not an isolated or aberrant occurrence. It was a persistent and widespread practice engaged in by multiple officers of the West Palm Beach Police Department over a period of years, and it was so common and well settled as

to constitute a custom carrying the force of law. The Department tolerated and acquiesced in this practice as a matter of custom rather than treating it as a deviation to be detected, corrected, and disciplined.

477.   The Department's vehicular pursuit policy, Policy III-25, imposed a series of requirements designed to keep pursuits visible to supervisors and subject to review. Officers involved in a pursuit were required to give continuous radio updates as the pursuit evolved, to ensure that their body worn cameras were recording throughout the duration of the pursuit, and to document the pursuit through a report by the initiating officer before the end of his or her shift and supplemental reports by the other officers involved, and every pursuit was required to be monitored by a supervisor. On July 30, 2024, the OFFICER DEFENDANTS disregarded each of these requirements. They conducted the pursuit in unmarked vehicles without radio updates, with their body worn cameras deactivated, without supervisory monitoring, and without filing the reports the policy required, thereby concealing the pursuit from the supervisory oversight the policy was designed to ensure.

478.   The OFFICER DEFENDANTS' ability to conduct the pursuit in this manner was not the product of an isolated supervisory lapse. It was the direct result of the City's longstanding failure to enforce the supervisory requirements of its own vehicular pursuit policy, and of its refusal to correct a deficiency in supervision that had been specifically identified to it. As alleged above, unauthorized and policy violating high speed pursuits were a persistent and widespread practice within the West Palm Beach Police Department, and the City had for years failed to enforce Policy III-25 against the officers who engaged in them.

479.   The City had also been expressly advised, through the 2021 Special Investigations Audit, that no clear policy required periodic or random supervisory review of its officers' body

127

worn camera footage, that this absence of review created a risk that officers would deactivate their cameras to conceal improper conduct, and that supervisory review should be implemented, and the City declined to make that change. Having left both the enforcement of its pursuit policy and the supervision of its officers' body worn camera use uncorrected, the City permitted the very conduct it had been warned of to occur. The deaths of Marcia May Pochette and Jenice Monique Woods on July 30, 2024 were a foreseeable consequence of that established custom and that uncorrected deficiency.

480.    The GHOST unit was the setting in which this department wide custom reached its most acute expression. The unit's combination of unmarked vehicles, a separate and unmonitored radio channel, deactivated body worn cameras, and the absence of any proactive supervisory review produced an operation in which the Department's custom of unauthorized pursuit and lack of oversight operated without constraint. The practice colloquially known within the Department as a ghost chase, by which officers conducted covert high speed pursuits while withholding radio transmissions and deactivating emergency equipment, was designed to evade supervisory detection. The absence of formal departmental documentation of ghost chases is itself probative of the Department's failure of supervision, because the practice was conducted for the purpose of avoiding such documentation.

481.    The City had actual and constructive knowledge of this custom at the policymaking level. The City was expressly warned in the 2021 Special Investigations Audit that its officers operated without any proactive supervisory review of their body worn camera footage and that this deficiency created a risk that officers would deactivate their cameras to conceal improper conduct. The City possessed further knowledge of the custom and the deficiencies that sustained it through the Police Internal Affairs Audit issued March 29, 2022, through the documented disciplinary

128

histories of the officers it assigned to the GHOST unit, and through the recurring pursuit related crashes, injuries, and deaths described above. The April 2025 Organizational Assessment confirmed that the supervisory and accountability deficiencies underlying this custom were longstanding and had never been remedied.

482. The City's failure to act in the face of this knowledge constituted deliberate indifference to the known and obvious risk of death and serious injury created by unsupervised and unauthorized pursuits. The City consciously chose not to correct that risk. When the City was presented in the 2021 Special Investigations Audit with a specific recommendation to institute supervisory review of body worn camera footage, it declined to adopt the recommendation and represented that no change was necessary, leaving the known deficiency in place through the date of the subject incident.

483. The City's final policymaker endorsed and condoned the GHOST unit and the customs through which it operated. As alleged above, the Chief of Police, as final policymaker, publicly endorsed the unit and its methods and declined to impose the supervisory oversight the City had been advised to adopt, and the City condoned the misconduct of the OFFICER DEFENDANTS following the deaths of the decedents by imposing no discipline upon the OFFICER DEFENDANTS through its own accountability mechanisms and by issuing a favorable annual performance evaluation to an officer involved in the fatal pursuit while he was on administrative leave.

484. The involved officers intentionally initiated, continued, and concealed an unlawful vehicular pursuit for the purpose of causing harm unrelated to any legitimate seizure or arrest. Their conduct occurred despite the obvious and foreseeable risk of serious injury or death to innocent bystanders and was undertaken pursuant to the department wide custom described above,

including the City's endorsement, acquiescence, and condonation of that custom and the practices of the GHOST unit. The City's deliberate indifference, custom, and endorsement and condonation of that custom were the moving force behind the constitutional violations that caused the wrongful death of Jenice Monique Woods.

485.    The Personal Representative of the Estate of Jenice Monique Woods seeks damages for the Estate and the surviving spouse as a direct and proximate result of the constitutional deprivation alleged herein including but not limited to the decedent's conscious pain and suffering until death, including the physical and mental pain and suffering associated with the traumatic termination of her pregnancy, survivor's mental pain and suffering, mental anguish, extreme grief and sorrow, loss of the decedent's companionship, guidance, consortium and protection, and the loss of support and services previously provided by Jenice Monique Woods, funeral and burial expenses, lost wages, and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, DEVIN WOODS as Personal Representative of the Estate of Jenice Monique Woods and as the surviving husband of Jenice Monique Woods, demands judgment against the CITY OF WEST PALM BEACH for all damages allowed under 42 U.S.C. § 1983, and reasonable attorneys' fees under § 1988. The Plaintiff demands a jury trial.

## COUNT XXXIII (33)

### CONSPIRACY TO VIOLATE CIVIL RIGHTS AGAINST AUSTIN DANIELOVICH FOR THE WRONGFUL DEATH OF JENICE MONIQUE WOODS COGNIZABLE UNDER 42 U.S.C. § 1983

486.    Plaintiff realleges and incorporates by reference the allegations set forth in

130

paragraphs 1-63 of this Complaint as if fully set forth herein.

487. AUSTIN DANIELOVICH and the other subject DEFENDANT OFFICERS reached an understanding and agreement, either explicitly or implicitly, to initiate an unauthorized pursuit, disengage required body-worn cameras, avoid radio communication, and refrain from reporting the fatal incident involving Marcia May Pochette and Jenice Monique Woods. In furtherance of their unlawful conspiracy to violate Plaintiffs' clearly established constitutional rights, Defendants intentionally initiated and continued an unauthorized high-risk vehicular pursuit using low profile and unmarked vehicles, deliberately disengaged or failed to activate body-worn cameras, knowingly avoided radio and supervisory communications to prevent monitoring and termination of the pursuit, failed to report and affirmatively concealed the pursuit and resulting fatal crash, abandoned injured civilians without rendering or summoning emergency medical aid, and coordinated false and misleading omissions and non-reporting to conceal their unconstitutional conduct and evade accountability.

488. This agreement and coordinated inaction violated and was deliberately indifferent to Plaintiffs' constitutional rights.

489. As a result of Defendants' actions, the decedents endured immense physical suffering from their injuries, which contributed to and caused their death that otherwise may have been preventable.

490. The Estate of Jenice Monique Woods seeks damages as a direct and proximate result of the DEFENDANT OFFICERS' actions including but not limited to: the decedent's conscious pain and suffering until death, mental pain and suffering of the survivor, loss of the decedent's companionship, guidance, and protection, and the loss of support and services previously provided by Jenice Monique Woods, funeral and burial expenses and the loss of

131

prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, DEVIN WOODS as Personal Representative of the Estate of Jenice Monique Woods, seeks compensatory and exemplary damages, attorneys' fees, and any other relief the Court deems just and proper against AUSTIN DANIELOVICH. Plaintiff further demands a jury trial.

**COUNT XXXIV (34)**

**CONSPIRACY TO VIOLATE CIVIL RIGHTS AGAINST PIERRE ETIENNE FOR THE WRONGFUL DEATH OF JENICE MONIQUE WOODS COGNIZABLE UNDER 42 U.S.C. § 1983**

491.     Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-63 of this Complaint as if fully set forth herein.

492.     PIERRE ETIENNE and the other subject DEFENDANT OFFICERS reached an understanding and agreement, either explicitly or implicitly, to initiate an unauthorized pursuit, disengage required body-worn cameras, avoid radio communication, and refrain from reporting the fatal incident involving Marcia May Pochette and Jenice Monique Woods. In furtherance of their unlawful conspiracy to violate Plaintiffs' clearly established constitutional rights, Defendants intentionally initiated and continued an unauthorized high-risk vehicular pursuit using low profile and unmarked vehicles, deliberately disengaged or failed to activate body-worn cameras, knowingly avoided radio and supervisory communications to prevent monitoring and termination of the pursuit, failed to report and affirmatively concealed the pursuit and resulting fatal crash, abandoned injured civilians without rendering or summoning emergency medical aid, and coordinated false and misleading omissions and non-reporting to conceal their unconstitutional conduct and evade accountability.

493.     This agreement and coordinated inaction violated and was deliberately indifferent

132

to Plaintiffs' constitutional rights.

494. As a result of Defendants' actions, the decedents endured immense physical suffering from their injuries, which contributed to and caused their death that otherwise may have been preventable.

495. The Estate of Jenice Monique Woods seeks damages as a direct and proximate result of the DEFENDANT OFFICERS' actions including but not limited to: the decedent's conscious pain and suffering until death, mental pain and suffering of the survivor, loss of the decedent's companionship, guidance, and protection, and the loss of support and services previously provided by Jenice Monique Woods, funeral and burial expenses and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, DEVIN WOODS as Personal Representative of the Estate of Jenice Monique Woods, seeks compensatory and exemplary damages, attorneys' fees, and any other relief the Court deems just and proper against PIERRE ETIENNE. Plaintiff further demands a jury trial.

## COUNT XXXV (35)

### CONSPIRACY TO VIOLATE CIVIL RIGHTS AGAINST CHRISTOPHER REKDAHL FOR THE WRONGFUL DEATH OF JENICE MONIQUE WOODS COGNIZABLE UNDER 42 U.S.C. § 1983

496. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-63 of this Complaint as if fully set forth herein.

497. CHRISTOPHER REKDAHL and the other subject DEFENDANT OFFICERS reached an understanding and agreement, either explicitly or implicitly, to initiate an unauthorized pursuit, disengage required body-worn cameras, avoid radio communication, and refrain from reporting the fatal incident involving Marcia May Pochette and Jenice Monique Woods. In

133

furtherance of their unlawful conspiracy to violate Plaintiffs' clearly established constitutional rights, Defendants intentionally initiated and continued an unauthorized high-risk vehicular pursuit using low profile and unmarked vehicles, deliberately disengaged or failed to activate body-worn cameras, knowingly avoided radio and supervisory communications to prevent monitoring and termination of the pursuit, failed to report and affirmatively concealed the pursuit and resulting fatal crash, abandoned injured civilians without rendering or summoning emergency medical aid, and coordinated false and misleading omissions and non-reporting to conceal their unconstitutional conduct and evade accountability.

498. This agreement and coordinated inaction violated and was deliberately indifferent to Plaintiffs' constitutional rights.

499. As a result of Defendants' actions, the decedents endured immense physical suffering from their injuries, which contributed to and caused their death that otherwise may have been preventable.

500. The Estate of Jenice Monique Woods seeks damages as a direct and proximate result of the DEFENDANT OFFICERS' actions including but not limited to: the decedent's conscious pain and suffering until death, mental pain and suffering of the survivor, loss of the decedent's companionship, guidance, and protection, and the loss of support and services previously provided by Jenice Monique Woods, funeral and burial expenses and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, DEVIN WOODS as Personal Representative of the Estate of Jenice Monique Woods, seeks compensatory and exemplary damages, attorneys' fees, and any other relief the Court deems just and proper against CHRISTOPHER REKDAHL. Plaintiff further demands a jury trial.

134

## COUNT XXXVI (36)

## CONSPIRACY TO VIOLATE CIVIL RIGHTS AGAINST MICHAEL BORGEN FOR THE WRONGFUL DEATH OF JENICE MONIQUE WOODS COGNIZABLE UNDER 42 U.S.C. § 1983

501. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-63 of this Complaint as if fully set forth herein.

502. MICHAEL BORGEN and the other subject DEFENDANT OFFICERS reached an understanding and agreement, either explicitly or implicitly, to initiate an unauthorized pursuit, disengage required body-worn cameras, avoid radio communication, and refrain from reporting the fatal incident involving Marcia May Pochette and Jenice Monique Woods. In furtherance of their unlawful conspiracy to violate Plaintiffs' clearly established constitutional rights, Defendants intentionally initiated and continued an unauthorized high-risk vehicular pursuit using low profile and unmarked vehicles, deliberately disengaged or failed to activate body-worn cameras, knowingly avoided radio and supervisory communications to prevent monitoring and termination of the pursuit, failed to report and affirmatively concealed the pursuit and resulting fatal crash, abandoned injured civilians without rendering or summoning emergency medical aid, and coordinated false and misleading omissions and non-reporting to conceal their unconstitutional conduct and evade accountability.

503. This agreement and coordinated inaction violated and was deliberately indifferent to Plaintiffs' constitutional rights.

504. As a result of Defendants' actions, the decedents endured immense physical suffering from their injuries, which contributed to and caused their death that otherwise may have been preventable.

505. The Estate of Jenice Monique Woods seeks damages as a direct and proximate

135

result of the DEFENDANT OFFICERS' actions including but not limited to: the decedent's conscious pain and suffering until death, mental pain and suffering of the survivor, loss of the decedent's companionship, guidance, and protection, and the loss of support and services previously provided by Jenice Monique Woods, funeral and burial expenses and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, DEVIN WOODS as Personal Representative of the Estate of Jenice Monique Woods, seeks compensatory and exemplary damages, attorneys' fees, and any other relief the Court deems just and proper against MICHAEL BORGEN. Plaintiff further demands a jury trial.

<u>**COUNT XXXVII (37)**</u>

<u>**CONSPIRACY TO VIOLATE CIVIL RIGHTS AGAINST WILLIAM LOAYZA FOR THE WRONGFUL DEATH OF JENICE MONIQUE WOODS COGNIZABLE UNDER 42 U.S.C. § 1983**</u>

506. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-63 of this Complaint as if fully set forth herein.

507. WILLIAM LOAYZA and the other subject DEFENDANT OFFICERS reached an understanding and agreement, either explicitly or implicitly, to initiate an unauthorized pursuit, disengage required body-worn cameras, avoid radio communication, and refrain from reporting the fatal incident involving Marcia May Pochette and Jenice Monique Woods. In furtherance of their unlawful conspiracy to violate Plaintiffs' clearly established constitutional rights, Defendants intentionally initiated and continued an unauthorized high-risk vehicular pursuit using low profile and unmarked vehicles, deliberately disengaged or failed to activate body-worn cameras, knowingly avoided radio and supervisory communications to prevent monitoring and termination of the pursuit, failed to report and affirmatively concealed the pursuit and resulting fatal crash,

136

abandoned injured civilians without rendering or summoning emergency medical aid, and coordinated false and misleading omissions and non-reporting to conceal their unconstitutional conduct and evade accountability.

508.    This agreement and coordinated inaction violated and was deliberately indifferent to Plaintiffs' constitutional rights.

509.    As a result of Defendants' actions, the decedents endured immense physical suffering from their injuries, which contributed to and caused their death that otherwise may have been preventable.

510.    The Estate of Jenice Monique Woods seeks damages as a direct and proximate result of the DEFENDANT OFFICERS' actions including but not limited to: the decedent's conscious pain and suffering until death, mental pain and suffering of the survivor, loss of the decedent's companionship, guidance, and protection, and the loss of support and services previously provided by Jenice Monique Woods, funeral and burial expenses and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, DEVIN WOODS as Personal Representative of the Estate of Jenice Monique Woods, seeks compensatory and exemplary damages, attorneys' fees, and any other relief the Court deems just and proper against WILLIAM LOAYZA. Plaintiff further demands a jury trial.

## COUNT XXXVIII (38)

### CONSPIRACY TO VIOLATE CIVIL RIGHTS AGAINST BRANDAN STEDFELT FOR THE WRONGFUL DEATH OF JENICE MONIQUE WOODS COGNIZABLE UNDER 42 U.S.C. § 1983

511.    Plaintiff realleges and incorporates by reference the allegations set forth in

137

paragraphs 1-63 of this Complaint as if fully set forth herein.

512. BRANDAN STEDFELT and the other subject DEFENDANT OFFICERS reached an understanding and agreement, either explicitly or implicitly, to initiate an unauthorized pursuit, disengage required body-worn cameras, avoid radio communication, and refrain from reporting the fatal incident involving Marcia May Pochette and Jenice Monique Woods. In furtherance of their unlawful conspiracy to violate Plaintiffs' clearly established constitutional rights, Defendants intentionally initiated and continued an unauthorized high-risk vehicular pursuit using low profile and unmarked vehicles, deliberately disengaged or failed to activate body-worn cameras, knowingly avoided radio and supervisory communications to prevent monitoring and termination of the pursuit, failed to report and affirmatively concealed the pursuit and resulting fatal crash, abandoned injured civilians without rendering or summoning emergency medical aid, and coordinated false and misleading omissions and non-reporting to conceal their unconstitutional conduct and evade accountability.

513. This agreement and coordinated inaction violated and was deliberately indifferent to Plaintiffs' constitutional rights.

514. As a result of Defendants' actions, the decedents endured immense physical suffering from their injuries, which contributed to and caused their death that otherwise may have been preventable.

515. The Estate of Jenice Monique Woods seeks damages as a direct and proximate result of the DEFENDANT OFFICERS' actions including but not limited to: the decedent's conscious pain and suffering until death, mental pain and suffering of the survivor, loss of the decedent's companionship, guidance, and protection, and the loss of support and services previously provided by Jenice Monique Woods, funeral and burial expenses and the loss of

138

prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, DEVIN WOODS as Personal Representative of the Estate of Jenice Monique Woods, seeks compensatory and exemplary damages, attorneys' fees, and any other relief the Court deems just and proper against BRANDAN STEDFELT. Plaintiff further demands a jury trial.

## COUNT XXXIX (39)

### CONSPIRACY TO VIOLATE CIVIL RIGHTS AGAINST DARIAN THOMAS FOR THE WRONGFUL DEATH OF JENICE MONIQUE WOODS COGNIZABLE UNDER 42 U.S.C. § 1983

516. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-63 of this Complaint as if fully set forth herein.

517. DARIAN THOMAS and the other subject DEFENDANT OFFICERS reached an understanding and agreement, either explicitly or implicitly, to initiate an unauthorized pursuit, disengage required body-worn cameras, avoid radio communication, and refrain from reporting the fatal incident involving Marcia May Pochette and Jenice Monique Woods. In furtherance of their unlawful conspiracy to violate Plaintiffs' clearly established constitutional rights, Defendants intentionally initiated and continued an unauthorized high-risk vehicular pursuit using low profile and unmarked vehicles, deliberately disengaged or failed to activate body-worn cameras, knowingly avoided radio and supervisory communications to prevent monitoring and termination of the pursuit, failed to report and affirmatively concealed the pursuit and resulting fatal crash, abandoned injured civilians without rendering or summoning emergency medical aid, and coordinated false and misleading omissions and non-reporting to conceal their unconstitutional conduct and evade accountability.

518. This agreement and coordinated inaction violated and was deliberately indifferent

139

to Plaintiffs' constitutional rights.

519.    As a result of Defendants' actions, the decedents endured immense physical suffering from their injuries, which contributed to and caused their death that otherwise may have been preventable.

520.    The Estate of Jenice Monique Woods seeks damages as a direct and proximate result of the DEFENDANT OFFICERS' actions including but not limited to: the decedent's conscious pain and suffering until death, mental pain and suffering of the survivor, loss of the decedent's companionship, guidance, and protection, and the loss of support and services previously provided by Jenice Monique Woods, funeral and burial expenses and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, DEVIN WOODS as Personal Representative of the Estate of Jenice Monique Woods, seeks compensatory and exemplary damages, attorneys' fees, and any other relief the Court deems just and proper against DARIAN THOMAS. Plaintiff further demands a jury trial.

## COUNT XL (40)

## FAILURE TO TRAIN AGAINST THE CITY OF WEST PALM BEACH COGNIZABLE UNDER 42 U.S.C. § 1983 FOR THE WRONGFUL DEATH OF JENICE MONIQUE WOODS

521.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-109 of this Complaint as if fully set forth herein.

522.    At all material times, the individually named DEFENDANT OFFICERS were employees of Defendant CITY OF WEST PALM BEACH, acting under color of state law and within the course and scope of their employment.

140

523. Defendant CITY OF WEST PALM BEACH had a duty to adequately train its police officers, including Defendants AUSTIN DANIELOVICH, PIERRE ETIENNE, CHRISTOPHER REKDAHL, MICHAEL BORGEN, WILLIAM LOAYZA, BRANDAN STEDFELT, and DARIAN THOMAS, to prevent the violation of constitutional rights including the right to life and liberty protected by the substantive component of the Due Process Clause of the Fourteenth Amendment.

524. Defendant CITY OF WEST PALM BEACH failed to properly train its officers in the implementation of (a) the Department's vehicular pursuit policy, including the limitations on pursuits conducted in unmarked vehicles and the prohibition against high speed pursuits for nonviolent offenses; (b) the required use and activation of body worn cameras and radio communication during pursuits; (c) the duty to render or summon emergency medical assistance at the scene of a crash; and (d) the supervisory responsibilities of first line and mid level supervisors, who, as the City's own April 2025 Organizational Assessment found, received no formal training from the agency before or immediately following their promotions.

525. The City's failure to train persisted after the City had actual notice, through the pattern of pursuit related crashes, injuries, and deaths described above, through the 2021 Special Investigations Audit, through the Police Internal Affairs Audit issued March 29, 2022, and through the wrongful death litigation and settlement arising from the July 30, 2021 GHOST unit pursuit, that its existing training was inadequate to prevent its officers from conducting unauthorized and dangerous pursuits. The City's decision to continue its training program unchanged in the face of that notice constituted deliberate indifference to the known and obvious consequence that its officers would violate the constitutional rights of the public.

526. The City's failure to train extended to the supervisory ranks responsible for enforcing the Department's vehicular pursuit policy. First line and mid level supervisors holding the ranks of sergeant and lieutenant received no formal training from the agency before or immediately following their promotions. Every mechanism by which Policy III-25 was to be enforced, including the supervisor's duty to monitor and control an active pursuit, the supervisor's authority and obligation to order termination of a pursuit, and the command review of pursuit documentation, depended upon supervisors whom the City had never trained to perform those functions. The GHOST unit itself was structured around this untrained supervisory layer, with each of its teams overseen by a sergeant and the unit as a whole overseen by a lieutenant and a captain.

527. The City had notice of this supervisory training deficiency years before the subject incident. The 2021 Stratified Policing Assessment, delivered to Chief Adderley, identified a lack of accountability among the Department's patrol sergeants, lieutenants, and captains. The April 2025 Organizational Assessment confirmed that this deficiency had never been corrected, finding that sergeants and lieutenants received no formal training before or immediately following promotion and warning that operational failures, injuries, casualties, and substantial liability are the typical consequences when personnel performing critical roles are not properly trained. The City thus maintained, through the date of the fatal crash, a supervisory structure it had been warned lacked accountability, staffed by supervisors it had never trained.

528. The manner in which the City implemented or failed to implement its pursuit policies resulted in a custom and practice of authorizing, tolerating, and acquiescing in unauthorized, low profile and high risk vehicular pursuits, including the use of unmarked vehicles, ghost chases, non-radio pursuits, failure to activate body-worn cameras, and failure to render or summon emergency medical aid after crashes.

142

529.    The City had actual and constructive notice of this pattern of unconstitutional conduct by its officers involving unauthorized vehicular pursuits, concealment of pursuit activity, and post-crash abandonment of injured civilians, as demonstrated by the prior incidents alleged above spanning 2002 through 2023, the July 30, 2021 GHOST unit pursuit and the resulting wrongful death litigation resolved by a City Council approved settlement, the 2021 Special Investigations Audit, the Police Internal Affairs Audit issued March 29, 2022, and the documented disciplinary histories of the officers the City assigned to and retained within the GHOST unit.

530.    Despite this notice, the City failed to implement adequate training to enforce its policies in each of the respects identified above, including the limitations on vehicular pursuits, radio communication and supervisory notification, body worn camera activation, the duty to render emergency medical aid, and the termination of pursuits when the danger to the public outweighs the need for immediate apprehension.

531.    On July 30, 2024, the OFFICER DEFENDANTS violated each of the very requirements as to which the City had failed to train, conducting an unauthorized high speed pursuit for a nonviolent offense, in unmarked and marked vehicles, without radio communication or supervisory notification, with their body worn cameras deactivated, and abandoning the scene without rendering or summoning aid. The City's deliberately indifferent failure to train was the moving force behind and a legal cause of the constitutional violations that resulted in the deaths of Marcia May Pochette and Jenice Monique Woods.

532.    This deliberate indifference is evidenced by prior complaints, documented incidents, or patterns of misconduct involving the City's officers and their failure to take remedial or corrective action.

143

533.   In the alternative, and pursuant to Federal Rule of Civil Procedure 8(d)(2), the need to train officers on the constitutional limits of high speed vehicular pursuit and on the duty to aid persons injured by police conduct is so obvious, and the consequence of failing to do so is so predictably a deprivation of life, that the City's failure to train constituted deliberate indifference even in the absence of a pattern of prior similar violations.

534.   As a direct and proximate result of Defendant CITY OF WEST PALM BEACH's failure to train, the wrongful death of Jenice Monique Woods is compensable under 42 U.S.C. § 1983.

535.   The Personal Representative of the Estate of Jenice Monique Woods seeks damages for the Estate and the surviving spouse as a direct and proximate result of the constitutional deprivation alleged herein, including but not limited to: the decedent's conscious pain and suffering until death, including the physical and mental pain and suffering associated with the traumatic termination of her pregnancy, survivor's mental pain and suffering, mental anguish, extreme grief and sorrow, loss of the decedent's companionship, guidance, consortium and protection, and the loss of support and services previously provided by Jenice Monique Woods, funeral and burial expenses and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, DEVIN WOODS as Personal Representative of the Estate of Jenice Monique Woods, demands judgment against the CITY OF WEST PALM BEACH for compensatory damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs, and any other relief this Court deems just and proper and demands a trial by jury on all issues so triable.

## COUNT XLI (41)

144

## FAILURE TO SUPERVISE AGAINST THE CITY OF WEST PALM BEACH COGNIZABLE UNDER 42 U.S.C. § 1983 FOR THE WRONGFUL DEATH OF JENICE MONIQUE WOODS

536.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-109 of this Complaint as if fully set forth herein.

537.    At all material times, the individually named DEFENDANT OFFICERS were employees of Defendant CITY OF WEST PALM BEACH, acting under color of state law and within the course and scope of their employment, and by conducting the unauthorized high speed pursuit described above they deprived Jenice Monique Woods of her right to life and liberty protected by the substantive component of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

538.    Defendant CITY OF WEST PALM BEACH had a duty to adequately supervise, discipline, and control its police officers, including the DEFENDANT OFFICERS, to prevent the violation of constitutional rights regarding vehicular pursuit.

539.    Defendant CITY OF WEST PALM BEACH failed to properly supervise its officers to ensure (a) compliance with the Department's vehicular pursuit policy, including the limitations on pursuits conducted in unmarked vehicles and the prohibition against low profile and high speed pursuits for nonviolent offenses; (b) the use and activation of body worn cameras and radio communication during pursuits; and (c) the duty to render or summon emergency medical assistance at the scene of a crash.

540.    The City maintained a custom and practice of failing to supervise and discipline officers who engaged in unauthorized vehicular pursuits, ghost chases, concealment of pursuits, and abandonment of injured civilians following police caused crashes. This custom was longstanding and widespread, predated the creation of the GHOST unit, and is reflected in the

145

recurring pattern of pursuit related crashes, serious injuries, and deaths described in the Historical and Prior Incidents section above. Within the GHOST unit, which operated in unmarked vehicles, on a separate and unmonitored radio channel, and without proactive supervisory review, this custom of non supervision reached its most acute expression and enabled the OFFICER DEFENDANTS to conduct and conceal the pursuit that killed the decedents.

541.    The City had actual and constructive notice of this custom and of the supervisory deficiencies that sustained it. The 2021 Special Investigations Audit expressly advised the City that no clear policy required random or periodic supervisory review of its officers' body worn camera footage and warned that this deficiency created a risk that officers would deactivate their cameras to conceal improper conduct. The City possessed further notice through the 2022 Police Internal Affairs Audit; through the 2021 Stratified Policing Assessment, which identified a lack of accountability among the Department's patrol sergeants, lieutenants, and captains; through the documented disciplinary histories of the officers it assigned to the GHOST unit; and through the recurring pursuit related crashes, injuries, and deaths described above. The April 2025 Organizational Assessment confirmed that these supervisory and accountability deficiencies were longstanding and had never been remedied. The disciplinary histories are alleged as notice of the need for supervision and not as prior adjudicated constitutional violations.

542.    Despite this notice, the City failed to take corrective or remedial action, failed to impose discipline, and failed to implement supervisory safeguards to prevent recurrence. When the 2021 Special Investigations Audit recommended that the City institute supervisory review of body worn camera footage, the City declined to adopt the recommendation and represented that no change was necessary, leaving the deficiency in place through the date of the subject incident.

146

543. The City's failure of supervision consisted not merely of a failure to review body worn camera footage after the fact, but of its providing no means of supervisory oversight that did not depend on the officers reporting their own conduct. Camera activation, radio updates, notification of a supervisor, and the filing of pursuit reports each depended entirely on the voluntary compliance of the officers being supervised, and the unit operated on a separate radio channel unmonitored by anyone outside the GHOST unit, as alleged above. The City employed no independent means by which a supervisor could detect or intervene in a pursuit the officers attempted to conceal.

544. The absence of the officers' camera footage of the July 30, 2024 pursuit is not a defense to the City's failure of supervision but a demonstration of it, because oversight entrusted solely to the discretion of the officers being overseen fails precisely when it is most needed. Having been advised in the 2021 Special Investigations Audit that its review of footage occurred only reactively and that proactive review would deter misconduct, the City declined to adopt such review and continued to rely on officer self reporting, thereby tolerating the conditions that allowed the OFFICER DEFENDANTS to conduct an unauthorized high speed pursuit, kill Marcia May Pochette and Jenice Monique Woods, and return to their jurisdiction undetected.

545. The City's failure to supervise and discipline its officers, in the face of its knowledge of the custom and the deficiencies described above, constituted deliberate indifference to the known and obvious risk that its officers would conduct unauthorized and unsupervised pursuits endangering the public, including Jenice Monique Woods. That deliberately indifferent failure to supervise was the moving force behind and the legal cause of the constitutional violations that resulted in the death of Jenice Monique Woods.

546.    The Personal Representative of the Estate of Jenice Monique Woods seeks damages for the Estate and the surviving spouse as a direct and proximate result of the constitutional deprivation alleged herein, including but not limited to: the decedent's conscious pain and suffering until death, including the physical and mental pain and suffering associated with the traumatic termination of her pregnancy, survivor's mental pain and suffering, mental anguish, extreme grief and sorrow, loss of the decedent's companionship, guidance, consortium and protection, and the loss of support and services previously provided by Jenice Monique Woods, funeral and burial expenses and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, DEVIN WOODS as Personal Representative of the Estate of Jenice Monique Woods, demands judgment against the CITY OF WEST PALM BEACH for compensatory damages, attorney's fees pursuant to 42 U.S.C. § 1988, costs, and any other relief this Court deems just and proper and demands a trial by jury on all issues so triable.

## COUNT XLII (42)

### NEGLIGENT RETENTION AGAINST THE CITY OF WEST PALM BEACH COGNIZABLE UNDER FLORIDA LAW FOR THE WRONGFUL DEATH OF JENICE MONIQUE WOODS

547.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-109 of this Complaint as if fully set forth herein.

548.    This Count is pleaded in the alternative to Count XXIII pursuant to Federal Rule of Civil Procedure 8(d)(2). To the extent the conduct of any Officer Defendant is found to have been committed outside the course and scope of his employment, or in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property within

148

the meaning of section 768.28(9)(a), Florida Statutes, the CITY OF WEST PALM BEACH remains directly liable under this Count for its own negligence in retaining and assigning the OFFICER DEFENDANTS.

549. Defendant CITY OF WEST PALM BEACH owed a duty to exercise reasonable care in the retention and assignment of its police officers, including a duty to act upon knowledge acquired during an officer's employment that the officer was unfit for his assignment or posed a foreseeable risk of harm to the public, by means of reassignment, corrective supervision, retraining, discipline, or termination. The retention and assignment of individual officers, and the decision to place particular officers in particular assignments, were operational functions.

550. During the employment of the OFFICER DEFENDANTS, the City acquired actual knowledge, through its own personnel and disciplinary records, that specific officers had documented histories of dangerous driving, pursuit related misconduct, and body worn camera and accountability violations, as alleged above. That knowledge included, among other things, that Defendant ETIENNE had received a written reprimand for his role in a pursuit during which officers drove against the flow of traffic on Interstate 95, and that he was one of three GHOST unit detectives involved in the July 30, 2021 pursuit that ended in a crash killing four people and that resulted in wrongful death litigation resolved by a City Council approved settlement; that Defendant REKDAHL had received written reprimands for at fault, on duty crashes and a suspension in connection with a crash identified in his disciplinary notice as his third preventable crash within a single year; that Defendant DANIELOVICH had received a written reprimand for a body worn camera violation, had activated his body worn camera late on multiple occasions, and had been placed under a lieutenant level review requirement for his use of force events; and that

149

Defendant THOMAS had received a written reprimand for an at fault crash in which he failed to yield the right of way.

551. Despite this knowledge, the City retained each of these officers and assigned or continued to assign them to duties involving the operation of police vehicles and to the GHOST unit, a plainclothes unit that operated in unmarked vehicles, on a separate and unmonitored radio channel, and without proactive supervisory review, an assignment in which the risks reflected in their documented histories were most likely to result in harm to the public and least likely to be detected. The City imposed no heightened supervision, corrective training, reassignment, or meaningful discipline sufficient to prevent the foreseeable recurrence of the conduct reflected in their records.

552. The City knew or should have known that retaining these officers in these assignments without corrective action posed an unreasonable risk of death or serious bodily injury to members of the public, including persons using the public roadways.

553. The City's failure to exercise reasonable care in the retention and assignment of the OFFICER DEFENDANTS constituted negligence under Florida law.

554. The City's negligent retention and assignment of the OFFICER DEFENDANTS was a direct and proximate cause of the unauthorized pursuit of July 30, 2024, the abandonment of the crash scene, and the wrongful death of JENICE MONIQUE WOODS.

555. The Personal Representative of the Estate of Jenice Monique Woods seeks damages for the Estate and surviving spouse as a direct and proximate result of the CITY OF WEST PALM BEACH's negligent retention and assignment of the OFFICER DEFENDANTS, to include, but not limited to: severe mental pain and suffering, severe mental anguish, extreme grief and sorrow, the loss of the decedent's companionship, guidance, consortium and protection, and the loss of

150

support and services previously provided by Jenice Monique Woods, lost wages, medical, funeral, burial and travel expenses and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, DEVIN WOODS, as personal representative of the Estate of Jenice Monique Woods, demands judgment against the CITY OF WEST PALM BEACH for compensatory damages for the Estate and survivor, together with fees and costs and any such further relief as the Court deems just. Plaintiff further demands a jury trial.

## COUNT XLIII (43)

### NEGLIGENT TRAINING AGAINST THE CITY OF WEST PALM BEACH COGNIZABLE UNDER FLORIDA LAW FOR THE WRONGFUL DEATH OF JENICE MONIQUE WOODS

556. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-109 of this Complaint as if fully set forth herein.

557. This Count is pleaded in the alternative to Count XXIII pursuant to Federal Rule of Civil Procedure 8(d)(2). To the extent the conduct of any Officer Defendant is found to have been committed outside the course and scope of his employment, or in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property within the meaning of section 768.28(9)(a), Florida Statutes, the CITY OF WEST PALM BEACH remains directly liable under this Count for its own negligence, through its supervisory and training personnel, in implementing the training required by its own policies.

558. To the extent any incorporated allegation describes a discretionary, judgmental, planning level, or policymaking decision of the CITY OF WEST PALM BEACH, that allegation is incorporated solely as background and as notice to the City, and not as the basis of the negligence

151

alleged in this Count. The negligence alleged in this Count is the City's failure to carry out, at the operational level, the training and supervisory functions its own established policies required.

559. Defendant CITY OF WEST PALM BEACH, having adopted written policies and training protocols governing vehicular pursuits, the operation of unmarked vehicles, the activation of body worn cameras, radio communications, and the rendering and summoning of emergency medical assistance, owed a duty to implement and carry out the training its own policies and protocols required, and to do so with reasonable care. The implementation of the City's established training requirements was an operational function.

560. The City knew or should have known that its failure to implement its established training requirements posed an unreasonable risk of death or serious bodily injury to the public. The City had actual or constructive notice of that risk through the prior incidents alleged above spanning 2002 through 2023, the July 30, 2021 GHOST unit pursuit and the resulting wrongful death litigation resolved by a City Council approved settlement, the 2021 Special Investigations Audit, the Police Internal Affairs Audit issued March 29, 2022, and the 2021 Stratified Policing Assessment, which identified a lack of accountability among the Department's patrol sergeants, lieutenants, and captains.

561. Despite this knowledge, the City failed to implement and carry out the training required by its own policies and protocols regarding the initiation and termination of vehicular pursuits, the limitations on pursuits conducted in unmarked vehicles, the required radio communication and supervisory notification during pursuits, the mandatory activation of body worn cameras, and the duty to render and summon emergency medical aid. The City likewise failed to provide its first line and mid level supervisors the training its own supervisory structure required, as reflected in the assessments alleged above.

152

562.    The City's failure to implement and carry out its established training requirements constituted negligence under Florida law.

563.    The negligent training of DEFENDANT OFFICERS DANIELOVICH, ETIENNE, REKDAHL, BORGEN, LOAYZA, STEDFELT, and THOMAS directly and proximately caused the unauthorized pursuit, the abandonment of the crash scene, and the wrongful death of JENICE MONIQUE WOODS.

564.    The Personal Representative of the Estate of JENICE MONIQUE WOODS seeks damages for the Estate and surviving spouse as a direct and proximate result of the CITY OF WEST PALM BEACH's negligent failure to implement and carry out its established training requirements, to include, but not limited to: severe mental pain and suffering, severe mental anguish, extreme grief and sorrow, the loss of the decedent's companionship, guidance, consortium and protection, and the loss of support and services previously provided by Jenice Monique Woods, lost wages, medical, funeral, burial and travel expenses and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, DEVIN WOODS, as personal representative of the Estate of JENICE MONIQUE WOODS, demands judgment against the CITY OF WEST PALM BEACH for compensatory damages for the Estate and survivor, together with fees and costs and any such further relief as the Court deems just. Plaintiff further demands a jury trial.

## COUNT XLIV (44)

153

## NEGLIGENT SUPERVISION AGAINST THE CITY OF WEST PALM BEACH COGNIZABLE UNDER FLORIDA LAW FOR THE WRONGFUL DEATH OF JENICE MONIQUE WOODS

Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-109 of this Complaint as if fully set forth herein.

565.    This Count is pleaded in the alternative to Count XXIII pursuant to Federal Rule of Civil Procedure 8(d)(2). To the extent the conduct of any Officer Defendant is found to have been committed outside the course and scope of his employment, or in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property within the meaning of section 768.28(9)(a), Florida Statutes, the CITY OF WEST PALM BEACH remains directly liable under this Count for its own negligence in supervising, monitoring, and disciplining its officers pursuant to its own established policies and procedures.

566.    To the extent any incorporated allegation describes a discretionary, judgmental, planning level, or policymaking decision of the CITY OF WEST PALM BEACH, that allegation is incorporated solely as background and as notice to the City, and not as the basis of the negligence alleged in this Count. The negligence alleged in this Count is the City's failure to carry out, at the operational level, the training and supervisory functions its own established policies required.

567.    Defendant CITY OF WEST PALM BEACH, having adopted written policies establishing supervisory responsibilities over vehicular pursuits, including the requirements of Policy III-25 that pursuits be reported to and monitored by supervisors, reviewed through the chain of command and by the Pursuit Review Board, and documented through required reports, and having established internal accountability processes for the investigation and discipline of officer misconduct, owed a duty to implement and carry out those established supervisory and disciplinary

154

functions with reasonable care. The implementation of the City's established supervisory and disciplinary mechanisms was an operational function.

568.   The City knew or should have known that its officers were engaging in unauthorized ghost chases, concealment of pursuits, deactivation of body worn cameras, and abandonment of injured civilians following crashes caused by police pursuits. The City had actual or constructive notice through the prior incidents alleged above spanning 2002 through 2023, the July 30, 2021 GHOST unit pursuit and the resulting wrongful death litigation resolved by a City Council approved settlement, the 2021 Special Investigations Audit, which advised the City that no clear policy required periodic supervisory review of its officers' body worn camera footage and warned of the risk that officers would deactivate their cameras to conceal improper conduct, the Police Internal Affairs Audit issued March 29, 2022, which documented systemic deficiencies in the Department's mechanisms for investigating and disciplining officer misconduct, the 2021 Stratified Policing Assessment, which identified a lack of accountability among the Department's patrol sergeants, lieutenants, and captains, and the documented disciplinary histories of the officers the City assigned to and retained within the GHOST unit.

569.   Despite such knowledge, the City failed to carry out its established supervisory and disciplinary functions, failed to take corrective action, failed to impose discipline, and failed to implement the supervisory safeguards its own auditor had recommended, including by declining, in substance, to make any change in response to the 2021 Special Investigations Audit recommendation for proactive supervisory review of body worn camera footage. The City's supervision of its officers depended entirely on the officers reporting their own conduct, and the City employed no independent means by which a supervisor could detect or intervene in a pursuit the officers attempted to conceal.

155

570. The City's failure to carry out its established supervisory and disciplinary functions constituted negligence under Florida law.

571. The negligent supervision of DEFENDANT OFFICERS DANIELOVICH, ETIENNE, REKDAHL, BORGEN, LOAYZA, STEDFELT, and THOMAS was a direct and proximate cause of the fatal pursuit, the abandonment of the crash scene, and the wrongful death of JENICE MONIQUE WOODS.

572. The Personal Representative of the Estate of Jenice Monique Woods seeks damages for the Estate and surviving spouse as a direct and proximate result of the CITY OF WEST PALM BEACH's negligent failure to carry out its established supervisory and disciplinary functions, to include, but not limited to: severe mental pain and suffering, severe mental anguish, extreme grief and sorrow, the loss of the decedent's companionship, guidance, consortium and protection, and the loss of support and services previously provided by Jenice Monique Woods, lost wages, medical, funeral, burial and travel expenses and the loss of prospective net accumulations of the estate had she survived the fatal incident.

WHEREFORE the Plaintiff, DEVIN WOODS, as personal representative of the Estate of Jenice Monique Woods, demands judgment against the CITY OF WEST PALM BEACH for compensatory damages for the Estate and survivor, together with fees and costs and any such further relief as the Court deems just. Plaintiff further demands a jury trial.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 21, 2026, a true and correct copy of the foregoing was

156

filed via CM/ECF and served on all counsel of record.

Scott B. Smith, Esq.
Florida Bar No.: 158569
Smith, Ball, Báez & Prather Florida
 Injury Lawyers
4400 PGA Blvd., Suite 800
Palm Beach Gardens, FL 33410
Tel: 561-675-0840
Fax: 561-675-0841
Email: ssmith@smithball.com
*Attorney for Plaintiffs*

s/ Jerome A. Stone, Jr.
Jerome A. Stone, Esq.
Florida Bar No.: 57010
Law Offices of Stone & Capobianco, P.L.
219 SE Ocean Blvd
Stuart, FL 34994-2218
Tel: 772-781-4357
Fax: 772-781-4340
Email: jas@stonelawfl.com
*Attorney for Plaintiffs*

s/ Kevin R. Anderson
Kevin R. Anderson, Esq.
Florida Bar No.: 0044857
Anderson & Welch, LLC
500 S. Australian Ave., 6th Flr.
West Palm Beach, FL 33401-6237
Tel: 561-832-3386
Fax: 561-820-4867
Email: kan@andersonandwelch.com
andewelch@andersonandwelch.com
*Attorney for Plaintiffs*

s/ Linda E. Capobianco
Linda E. Capobianco, Esq.
Florida Bar No.: 121916
Law Offices of Stone & Capobianco, P.L.
219 SE Ocean Blvd
Stuart, FL 34994-2218
Tel: 772-781-4357
Fax: 772-781-4340
Email: lec@stonelawfl.com
*Attorney for Plaintiffs*